**2014-1244**

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

◆◆

TOMITA TECHNOLOGIES USA, LLC and TOMITA TECHNOLOGIES INTERNATIONAL, INC.,

*Plaintiffs-Appellees,*

— v. —

NINTENDO CO., LTD. and NINTENDO OF AMERICA, INC.,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
JUDGE JED S. RAKOFF
1:11-CIV-04256

## BRIEF FOR DEFENDANTS-APPELLANTS

JAMES S. BLANK
SCOTT G. LINDVALL
KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
(212) 836-8000

STEVEN S. ROSENTHAL
PAUL I. MARGULIES
KAYE SCHOLER LLP
901 15th Street, N.W.
Washington, DC 20005
(202) 682-3500

*Attorneys for Defendants-Appellants
Nintendo Co., Ltd. and Nintendo
of America, Inc.*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, undersigned counsel for Appellants

Nintendo Co., Ltd. and Nintendo of America Inc. certifies the following:

1.    The full name of every party represented by me in this appeal is: Nintendo Co., Ltd. and Nintendo of America Inc.

2.    The names of the real parties in interest, if different from the parties named above, are:  Not applicable.

3.    The names of all parent corporations and any publicly held companies that own 10% or more of the stock of the party represented by me are:  Nintendo Co., Ltd., whose stock is publicly traded in Japan, owns 100% of Nintendo of America Inc.

4.    The names of all law firms and the partners or associates that appeared for Appellants in the district court or are expected to appear in this court are:

> KAYE SCHOLER LLP:  James S. Blank, Scott G. Lindvall, Steven S. Rosenthal, Soumitra Deka, and Paul I. Margulies; and

> Formerly with KAYE SCHOLER LLP:  Stephen J. Elliott.

Dated:  March 17, 2014                    _____/s/ James S. Blank_____
                                          James S. Blank
                                          *Attorney for Appellants,*
                                          *Nintendo Co., Ltd. and*
                                          *Nintendo of America Inc.*

# TABLE OF CONTENTS

<u>Page</u>

CERTIFICATE OF INTEREST ................................................................... i

TABLE OF AUTHORITIES ..................................................................... iv

STATEMENT OF RELATED CASES .................................................... 1

STATEMENT OF JURISDICTION ........................................................ 2

INTRODUCTION ..................................................................................... 3

STATEMENT OF ISSUES ....................................................................... 8

STATEMENT OF THE CASE .................................................................. 9

    A.    The Parties ................................................................... 10

        1.    Nintendo ......................................................... 10

        2.    Tomita ............................................................ 11

    B.    Background Regarding the Nintendo 3DS ................... 12

        1.    The 3D Camera Application ........................... 13

        2.    The AR Games Application ............................ 17

    C.    Background on 3D Imaging .......................................... 18

    D.    The '664 Patent ........................................................... 19

    E.    District Court Proceedings .......................................... 25

        1.    Claim construction ......................................... 25

        2.    Trial ................................................................ 27

        3.    Post-Verdict Motions ..................................... 31

SUMMARY OF ARGUMENT ................................................................ 33

STANDARD OF REVIEW ...................................................................... 35

ARGUMENT ........................................................................................... 37

I.    THE JUDGMENT THAT THE NINTENDO 3DS INFRINGES THE '664
      PATENT SHOULD BE REVERSED ...................................................37

      A.    There Is No Substantial Evidence That the 3DS "Measur[es] CP
            Information on the Cross-Point (CP) of Optical Axes" of Its
            Cameras. ...............................................................................37

      B.    There Is No Substantial Evidence That the 3DS Uses Any of
            the Three Structures of the "Cross Point Measuring Means," or
            Equivalents Thereof. .............................................................44

      C.    There Is No Substantial Evidence That the 3DS Has Any
            Structure Corresponding to the "Offset Presetting Means," as
            Correctly Construed. .............................................................48

            1.    The court erred by construing the corresponding structure
                  of the "offset presetting means" to be a "circuit and a
                  manual entry unit." .......................................................48

            2.    Under the correct claim construction, the 3DS does not
                  have an "offset presetting means." .................................53

II.   THE JUDGMENT OF NO INVALIDITY SHOULD BE REVERSED ......................54

      A.    Claim 1 Is Not Enabled. .......................................................54

      B.    The '664 Patent Specification Does Not Contain an Adequate
            Written Description of Claim 1. .............................................57

III.  ALTERNATIVELY, A NEW TRIAL IS WARRANTED. ......................................59

      A.    A New Trial Is Warranted Because the District Court Erred by
            Failing to Instruct the Jury on Its Claim Construction. ......................59

      B.    A New Trial Is Warranted Because Tomita Confused the Jury
            by Conflating "Cross-Point" and "Cross-Point Information"
            with "Offset." ......................................................................62

CONCLUSION ...................................................................................66

ADDENDUM .....................................................................................67

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312 (Fed. Cir. 2012) .................................................................................63

*Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010) (en banc) ........................................................................................58

*Atl. Research Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345 (Fed. Cir. 2011) .................58

*Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274 (Fed. Cir. 2007) ............................................................................... 36, 55

*B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419 (Fed. Cir. 1997) ............. 36, 47

*Bennett Marine, Inc. v. Lenco Marine, Inc.*, 2012-1336, 2013 WL 5273116 (Fed. Cir. Sept. 19, 2013) .......................................................................50

*Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371 (Fed. Cir. 2009) ...............49

*Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341 (Fed. Cir. 2011) ............................................................................... 36, 57

*ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340 (Fed. Cir. 2012) .................................................................................35

*Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319 (Fed. Cir. 2009) ......................61

*Creative Internet Adver. Corp. v. Yahoo!, Inc.*, 476 F. App'x 724 (Fed. Cir. 2011) .................................................................................62

*Cytologix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168 (Fed. Cir. 2005) .........61

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291 (Fed. Cir. 2005) .......................................................................... 49, 52

*Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361 (Fed. Cir. 2012) .................................................................................51

*Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323 (Fed. Cir. 2008) ...................45

*Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010)..............64

*Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361 (Fed. Cir. 1997)..................56

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368 (Fed. Cir. 2009)..............58

*Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352 (Fed. Cir. 2000) ............61

*Kim v. Hurston*, 182 F.3d 113 (2d Cir. 1999)..........................................................35

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359 (Fed. Cir. 2010) ..................................................................................................................35

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371 (Fed. Cir. 2007) ................56

*Lighting Ballast Control LLC v. Philips Elecs. N.A. Corp.*, No. 2012-1014, 2014 WL 667499 (Fed. Cir. Feb. 21, 2014) (en banc) ......................................35

*Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311 (Fed. Cir. 2004) ........36

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308 (Fed. Cir. 2003) ..........................................................................................................45

*Markman v. Westview Instruments*, 517 U.S. 370 (1996) ......................................63

*Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d 1291 (Fed. Cir. 2012) ..........51

*Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351 (Fed. Cir. 2012) ......................44

*Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302 (Fed. Cir. 2012)................................52

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008) ............................................................................................... 62, 63

*Rohm & Haas Co. v. Brotech Corp.*, 127 F.3d 1089 (Fed. Cir. 1997)...................44

*Saffran v. Johnson & Johnson*, 712 F.3d 549 (Fed. Cir. 2013).............................47

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001)...........................................................................................39

*SEC v. DiBella,* 587 F.3d 553 (2d Cir. 2009) ........................................................35

*Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784 (Fed. Cir. 2010)..............63

*Sitrick v. Dreamworks, LLC*, 516 F.3d 993 (Fed. Cir. 2008) ..................................55

*Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356 (Fed. Cir. 2004) ............... 36, 60

*SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870 (Fed. Cir. 2004)...........37

*Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316 (Fed. Cir. 2001) ........................................................................................................37

*Tomita Techs. USA, LLC v. Nintendo Co., Ltd.*, 818 F. Supp. 2d 770 (S.D.N.Y. 2011) .......................................................................................9

*Tomita Techs. USA, LLC v. Nintendo Co., Ltd.*, 855 F. Supp. 2d 33 (S.D.N.Y. 2012) .......................................................................................25

*Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10 (Fed. Cir. 2012)...........35

## Statutes

28 U.S.C. § 1291 ........................................................................................2

28 U.S.C. § 1295 ........................................................................................2

28 U.S.C. § 1331 ........................................................................................2

28 U.S.C. § 1338 ........................................................................................2

35 U.S.C. § 112 ................................................................................. passim

## Rules

Federal Circuit Rule 28 ...............................................................................9

Federal Circuit Rule 32 .............................................................................69

Federal Circuit Rule 47.5 ............................................................................1

Federal Rule of Appellate Procedure 32 ...................................................69

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Appellants Nintendo Co., Ltd. and Nintendo of America Inc. provides as follows:

1.      There has been no previous appeal in this case.

2.      Counsel is unaware of any pending case that will directly affect or be directly affected by the Court's decision in this appeal.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

Following the verdict, judgment was entered on March 14, 2013.  A31.  On August 13, 2013, the district court denied all of Nintendo Co., Ltd. and Nintendo of America Inc.'s post-trial motions, except it granted Nintendo's motion for remittitur.  A7, A29.  After additional briefing, the district court entered judgment for an ongoing royalty on December 16, 2013 (A2), and amended the judgment to reflect the remitted amount, supplemental damages, pre-judgment interest and the ongoing royalty on December 30, 2013.  A1.  On January 9, 2014, Nintendo filed a timely Notice of Appeal.  A4895-4896.  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291 and 1295(a)(1).

**INTRODUCTION**

Nintendo Co., Ltd. and Nintendo of America Inc. (collectively, "Nintendo") appeal from a judgment awarding Tomita Technologies USA, LLC and Tomita Technologies International, Inc. (collectively, "Tomita") $15.3 million (plus ongoing royalties).  The judgment is based on the finding that the Nintendo 3DS handheld video game system (the "3DS") infringes U.S. Patent No. 7,417,664 (the "'664 patent").  This is erroneous.  The 3DS does not embody the claimed invention.

The 3DS is fundamentally different from the alleged invention.  The '664 patent is directed to solving a narrow problem in the century-old field of three dimensional (3D) capture and display.  The problem is how to display captured 3D images on a display screen of any size without altering the intended 3D effect for the viewer.  The perception of 3D is created by displaying two images captured by two cameras (*i.e.*, left and right cameras) wherein the images are offset from each other.  Displaying 3D images on different screen sizes, however, requires different "offsets" between left- and right-eye images in order to maintain the intended 3D effect for the viewer.  A different offset needs to be set for each screen size; otherwise, the wrong offset will result in a 3D effect that may be too strong or too weak.

The '664 patent is directed to one of the many ways to address this issue. It describes a device that records information about the configuration of the left and right cameras. That information is subsequently used to determine an appropriate "offset" for a given screen size. Specifically, the '664 patent claims a "cross-point measuring means for measuring CP information on the ***cross-point (CP) of optical axes*** of" the left and right cameras. An "optical axis" is a straight line extending through the center of a camera lens outward. The '664 patent thus requires that the cameras be positioned so their optical axes intersect at a "cross-point," as illustrated in Figure 14 of the patent (to the right).



The measurement and subsequent use of "information on the cross-point (CP) of optical axes" of the cameras is the crux of the claimed invention. In fact, the '664 patent specification recognizes that "there is no CP [cross-point] information" without a "cross-point" of the cameras' optical axes. In the absence of two cameras forming a "cross-point (CP) of optical axes," the claimed invention cannot function. This is key to understanding why the undisputed facts compel judgment as a matter of law in

Nintendo's favor.

In March 2011, Nintendo released the latest in its decades-long series of

handheld video game systems, known as the "Nintendo 3DS." The 3DS has an

upper screen for displaying 3D images without the user having to wear special

glasses, and a second, lower touch-controlled screen.    Like its predecessor

handheld video game systems such as the

Nintendo DS, the primary functionality of

the 3DS is playing games. Tomita's

infringement claim, however, is not

directed to gaming. Rather, their case is

focused solely on an ancillary feature of

the 3DS: taking 3D photos or videos

using the two cameras on the back of the

device and displaying them on the upper

screen.



A7002

The 3DS's upper screen has a fixed size of 3.53 inches. Thus, the 3DS does

not have the problem addressed by the '664 patent. It is undisputed that the 3DS's

two outward facing cameras are positioned *parallel* to each other, and have optical

axes that are also *parallel*, as illustrated in the trial demonstrative below.



Because the optical axes are parallel, they never cross. This means the optical axes of the 3DS's outer cameras never intersect to form a "cross-point," as required by the '664 patent. This fact mandates reversal.

Further, the district court construed the corresponding structure for performing the function of "measuring CP information on the cross-point (CP) of optical axes" of the two cameras to be a "cross-point data device" that uses any of three techniques. These techniques, as described in the '664 patent, are: (1) a "laser distance measuring technique;" (2) "based upon the inclination angle between the optical axes of the left-eye and right-eye cameras;" and (3) where "an operator inputs the distance." No algorithms are disclosed in the '664 patent to perform these techniques. There is simply no evidence in the record that the 3DS uses of any of these three techniques, or an equivalent thereof. For this additional reason, the judgment of infringement must be reversed.

Claim 1 of the '664 patent also requires an "offset presetting means for offsetting and displaying" different video images, which determines the appropriate offset between left- and right-eye images for a given screen size. It determines the offset using the previously captured cross-point information, the size of the screen, and video image information. The corresponding structure of this means-plus-function limitation is disclosed with reference to Figure 3 of the '664 patent, and involves a particular circuit that uses frame memories to create the offset. The district court erred in failing to identify the appropriate corresponding structure in its construction. Instead, the district court relied on citations to the '664 patent that either do not disclose sufficient structure or do not link the structure with the claimed function. When the term is properly construed, there is no evidence in the record that the 3DS uses identical or equivalent structure. For this additional reason, the judgment of infringement must be reversed.

Alternatively, if claim 1 is interpreted in a way that covers the 3DS, the claim is invalid because the '664 patent fails to enable one of ordinary skill in the art to measure "CP information on the cross-point (CP) of optical axes" using a device having two fixed, parallel cameras with parallel optical axes. It is axiomatic that inventor Tomita was not in possession of the full scope of his invention, therefore failing to meet the written description requirement. Accordingly, the judgment of no invalidity must be reversed.

Finally, a new trial is warranted for two separate reasons. First, the district court failed to instruct the jury on its claim construction, namely with respect to the three structures it construed as corresponding to the "cross-point measuring means." As such, the jury lacked sufficient guidance to decide the question of infringement. Second, the district court allowed Tomita to "define" and "explain" the claim term "cross-point" to the jury, despite ruling that no construction is necessary. Each of the district court's actions was erroneous and highly prejudicial, necessitating a new trial.

## STATEMENT OF ISSUES

1.      Whether the infringement judgment should be reversed and judgment entered for Nintendo, where it is undisputed that the 3DS uses parallel cameras with parallel optical axes and there is no substantial evidence that the 3DS "measur[es] CP information on the cross-point (CP) of optical axes of" of its cameras.

2.      Whether the infringement judgment should be reversed and judgment entered for Nintendo, where there is no substantial evidence that the 3DS has any of the three structures the district court construed as corresponding to the "cross-point measuring means," or equivalents thereof.

3.      Whether the infringement judgment should be reversed and judgment entered for Nintendo, where the district court erred in construing the structure

corresponding to the "offset presetting means" and there is no substantial evidence that the 3DS has identical or equivalent structure corresponding to the "offset presetting means," as correctly construed.

4.    Whether the judgment of no invalidity should be reversed and judgment entered for Nintendo, where a reasonable jury could only have found the asserted claim to be invalid for lack of enablement and failure to satisfy the written description requirement.

5.    Whether a new trial should be granted because the district court erred by failing to instruct the jury on its claim construction or because it allowed Tomita to present its own meaning of "cross-point" to the jury, despite ruling that no construction was necessary.

## STATEMENT OF THE CASE

On June 22, 2011, Tomita sued Nintendo alleging infringement of the '664 patent.[1]  A601.  Specifically, Tomita accused two features of the 3DS of infringing the '664 patent—the "3D Camera Application" and the "Augmented Reality (AR) Games Application."  A8-9; A5790:15-19; A5886:13-16; A5886:21-5887:4.  The 3D Camera Application allows users to take 2D and 3D photos and videos and

---

[1]  Pursuant to Fed. Cir. R. 28, Nintendo notes that the district court denied its transfer motion in *Tomita Techs. USA, LLC v. Nintendo Co., Ltd.*, 818 F. Supp. 2d 770 (S.D.N.Y. 2011).

display them on the 3DS's upper screen.  A7001, 7024.  The AR Games

Application allows users to superimpose computer graphics images over realtime

images of playing cards packaged with the 3DS.  A7032.  Each of these

applications uses the two outward facing cameras located on the back of the 3DS.

A7003, A7009, A7024; A5906:14-23; *see* A8600.  A jury found that Nintendo

infringed claim 1 of the '664 patent and that that claim was not invalid, and

awarded $30,200,000 in damages.  A4969.

Nintendo moved for judgment as a matter of law or a new trial with respect

to infringement, invalidity and damages, and for remittitur.  *See* A4247-4249. The

district court denied Nintendo's motions, except for remittitur.  A7, A29.

Following Tomita's acceptance of the reduced damages award of $15.1 million

(A4884), the court awarded $29,483.50 in prejudgment interest and $211,747.50 in

supplemental damages, for a total award of $15,341,231.  A3-6; A1.  The court

also awarded Tomita an ongoing royalty of 1.82% of 3DS sales.  A3-6; A1.

### A.    The Parties

#### 1.    Nintendo

Nintendo has been a world-wide leader in the design and development of

home and handheld video game hardware and software for more than 30 years.

A7058-7059.  Since 1983, Nintendo has distinguished itself in the industry by

developing a series of innovative gaming hardware platforms, including the

Nintendo Entertainment System, Super NES, Nintendo 64, Nintendo GameCube, Wii, Game Boy, Game Boy Advance, Nintendo DS, and Nintendo DSi. *Id.* At the same time, Nintendo has sold more than 3.8 billion games, creating iconic video game franchises such as Mario, Zelda, and Donkey Kong. *Id.* Nintendo's success is the result of innovation, a deep understanding of its customers and marketplace, and the talents of its engineers and software developers, numbering approximately 1000 in Japan alone. A6356:10-12.

### 2.    Tomita

Tomita has never manufactured any products. A5641:4-6; A5642:8-9. Plaintiff Tomita Technologies International, Inc. is a Japanese corporation owned entirely by Seijiro Tomita, the named inventor of the '664 patent. A5598:24-5599:3; A5641:1-3. Plaintiff Tomita Technologies USA, LLC is a New York limited liability company, formed two months prior to the start of this lawsuit. A7817; A602. At the time of its formation, Mr. Tomita owned 99% of the company. A5641:7-25. At the time of trial, Mr. Tomita still held a majority stake, with the remaining shares owned by a "licensing" company that also does not manufacture any products. A5642:1-7. A stated purpose of Tomita Technologies USA, LLC is "[t]o defend, litigate and pursue past, present and future infringement of intellectual property of the Company," including the '664 patent. A7813, A7818, A7865; A5642:18-5643:9.

### B.    Background Regarding the Nintendo 3DS

Nintendo released the 3DS in March

2011.  A6393:3-5.  Like its predecessor

handheld systems, the Nintendo DS and DSi,

the 3DS has two screens—an upper display

screen for game play and a lower touch-screen

for user input.  A5706:6-22; A7002.  On the

3DS, however, the upper screen, which has a

fixed size of 3.53 inches, is capable of both 2D

and 3D display.  A7002, A7013, A7057.



A7002

The 3DS also has two outer cameras, located on the rear of the upper screen,

with which a user can take 2D or

3D photos of the real world.

A7003, A7009, A7024;

A5906:14-23; A8600.  These

cameras are off-the-shelf image



A7003

components like those used in cell phones.  A6192:6-10; A5901:25-5902:3;

A7712.  The outer cameras of the 3DS are situated *parallel* to each other.

A5902:4-6; A6196:15-18.  The camera sensor is centered in a fixed position

directly behind the camera lens.  A5895:18-24; A6347:25-6348:4.  The cameras

have no moving parts (A6192:11-17; *see* A5901:12-19; A5902:7-10), and their

optical axes are parallel.  A6348:5-10; A5889:3-5890:14 (Tomita's expert, Mr.

Merritt, agrees that the optical axes of the 3DS's outer cameras are parallel).

The 3DS includes a slot where a user can insert game cartridges, allowing

for play of a variety of games.  A6363:10-17; A7017.  As of trial, more than 500

computer graphics video game titles had been released for the 3DS.  A6399:24-

6401:2.  For example, Mario Kart 7 is a 3DS car racing game that uses 3D

computer generated graphics of characters and vehicles, of the user's choosing,

competing at a virtual racetrack.  A6364:2-6366:1; A8601.

Although gaming is the 3DS's purpose (*see*, *e.g.*, A24-25), Tomita's

allegations are directed to the use of two applications that are pre-loaded on each

3DS:  the 3D Camera Application and the Augmented Reality ("AR") Games

Application.  A8-9; A5790:15-19; A5886:13-16; A5886:21-5887:4.  The 3D

Camera Application makes use of the 3D photo and video capabilities of the 3DS,

and the AR Games Application makes use of the 3D photo capability of the 3DS.

### 1.    The 3D Camera Application

The 3D Camera Application, using the so-called Mobiclip "auto focus"

technology, allows users to take, store, and view 3D photos and videos using the

outer cameras of the 3DS.  A7024-7026; A6134:7-18; *see* A5790:22-5791:2;

A5887:5-7; A5906:18-23.  In order to create a 3D effect, it uses a software

algorithm to analyze the images after they are captured and determine the appropriate offset between the images for display. *See* A6129:15-19. This software-based solution for calculating the offset is fundamentally different from the solution promoted by the '664 patent.

First, the "auto focus" software of the 3D Camera Application "receive[s] the image from the left camera and the right camera" of the 3DS and extracts only the bare brightness values from the color images. A6108:13-6109:6; A6214:5-10; A6215:10-6216:1; A8029-30. As illustrated at No. 1 in the figure below, an admitted trial exhibit that a Nintendo engineer drew while testifying, the software next "divides those pictures into nine equal zones." A6109:4-16; A8599; A5913:21-5914:2; A6216:2-10. Within each of the nine zones of the left image and right image, the software sums each column of brightness values to find the average (illustrated at No. 2 of the figure below), resulting in a single row of average brightness values representative of the zone (illustrated at No. 3 of the figure below). A6109:17-6111:1; A8599; A6216:11-19.

Second, the software compares the average brightness across a zone in the left image with the corresponding zone in the right image, "one pixel at a time from left to right to determine if they match or if they don't match"—a mathematical correlation. A6110:23-6112:17; A6117:7-6118:20; A7989, A8051, A8124; A8599; A6217:14-A6218:6. This is illustrated at No. 4 of the figure

below.  After finding the closest correlation between left and right images for each of the nine zones, the software "remove[s] irrelevant values" and "calculate[s] an average" of the remaining values, illustrated at No. 5 of the figure below. A6112:18- 6113:4; A6118:21-6119:15; A7989, A8124; A8599; A6217:25-6218:9; A6218:19-6219:12.  This average value is used for the offset, as shown at No. 6 of the figure below.  A6113:10-18; A6119:11-22; A6219:13-20; *see also* A5913:21-5915:6 (Tomita's expert does not dispute the description of the algorithm); A4444, A4451-52 ("there is, in fact, essentially no dispute over the operation of the 3DS source code").



**A8599 (annotated)**

Thus, the 3D Camera Application calculates the appropriate offset for display of the captured left and right images without the use of any information other than the captured images themselves; it does not use any information about a "cross-point of optical axes." *E.g.*, A6107:8-14; A6113:19-23; A6119:23-6120:5; A6121:25-6122:7; A6134:19-A6135:4; A6214:25-6215:5; A6220:6-21. This algorithm is the subject of a pending patent application and is efficient, a quality that is important for battery-powered handheld devices. A6221:1-14; A7900, A7914; A6124:9-12; A6124:22-6125:24.

### 2.    The AR Games Application

The accused AR Games application involves the use of physical "AR Cards."  The user points the cameras at an AR Card, such as the "Mario" card shown below.  The 3DS then superimposes computer-generated graphics over the real-time 3D image of the card, such as a graphic of Mario standing on the card. A5887:8-11; A5915:7-14; A6156:6-15; A7032; A8602.



**A8602**

The AR Games application software creates this 3D effect by performing image analysis on the images captured by one of the outer cameras.  A6159:12-16.  The algorithm again bears no resemblance to any approach disclosed by the '664 patent.

First, the software locates the "white border that surrounds the card" and the "black rectangular area that is enclosed within the white border" of the AR card seen in the image.  A6159:12-21; A6177:9-17; A8483, A8488; A7971, A7977-78; A6223:9-6224:3; A8362, A8364.   Next, the application uses "pattern matching" to compare the image on the card to a database of potential AR Cards.  A6159:21-6160:1; A6180:11-6181:5; A7945, A7951; A8498, A8501; A6224:4-6225:20; A6226:1-16.  The software next identifies the size of the AR Card and "the positional relationship between the AR card and the camera that took the

photograph." A6160:9-14; A7945, A7959-7961. The application then has enough information to correctly render the appropriately sized 3D image over the image of the AR Card. A6178:22-6180:10; A7945, A7951; A6226:17-6227:17.

This approach depends on pattern recognition and basic image processing. A6230:11-14. The AR Games application never uses a "cross-point of optical axes" or any information about a "cross-point of optical axes." A6222:16-21; A6228:7-6229:10.

### C.    Background on 3D Imaging

The basic technique for creating stereoscopic or 3D images has been known for "well over a hundred years." A5923:7-10; A6191:1-14. Mimicking human vision, two cameras are used to capture two slightly different images of the same scene, one corresponding to the left-eye and one to the right-eye. *See* A5745:1-9; A5759:12-5760:14. When these left- and right-eye images are subsequently displayed together but *offset* from each other, as illustrated in the demonstrative above, the viewer's brain creates the illusion of a 3D scene. This approach does not require



users to wear special eye glasses to see the 3D effect.[2]

Thus, the '664 patent does not claim the fundamental concept of an "offset" between left and right images (A5629:25-5630:2), or glasses-free 3D technology. A5620:18-5621:14. Rather, the patent-in-suit is directed to a very specific approach to the problem of recording 3D images that can be correctly displayed on various screen sizes. The 3DS does not face this problem, and thus does not use Tomita's solution to it.

### D.    The '664 Patent

The '664 patent purports to solve a specific problem related to the *quality* of the 3D effect when displaying captured 3D images using an offset in the usual way on different sized display screens. A4950-51 (2:65-3:2). If a camera operator intends to display 3D images on one screen size at the time of capture and they are subsequently displayed on a different sized screen, a viewer's perception of 3D will be altered from what the camera operator intended. A4950 (2:11-16). For example, "stereoscopic image contents for large amusement parks are produced assuming that the display devices have a large size screen on which the contents are displayed . . . ." A4950 (2:16-21). If the display screen is too large, it "provides two [sic] strong stereoscopic feeling, making viewers uncomfortable,

---

[2]  Glasses-free 3D displays have been known since at least 1997. A6191:1-14; A7162.

while small size screen provides less stereoscopic feeling, giving no satisfaction to the viewers." A4950 (2:21-24).

The reason a change in screen size impacts the quality of the 3D effect is that the offset between the left and right 3D images becomes magnified on larger-than-intended screens and minimized on smaller-than-intended screens. This hampers the viewer's ability to perceive the 3D effect. *See* A5765:25-5766:24; A6194:2-16; A4950 (2:21-24).

In an attempt to solve this problem, the '664 patent discloses measuring and recording information about the cameras' configuration at the time an image is recorded. This information is called "cross-point information." The cross-point information is saved with the 3D images. The system later uses the cross-point information to adjust the offset between the left and right images based on the size of the display. *See* A5758:21-5759:5; A6194:23-6195:3; A5594:12-18.

Claim 1 is the only asserted claim. It reads as follows, with important limitations emphasized:

1. A stereoscopic video image pick-up and display system comprising:

> a stereoscopic video image pick-up device including **two video image pick-up means** for outputting video information from said pick-up means;
>
> a **stereoscopic video image display device** for displaying different video images for the eyes of a viewer; and

a **medium** for transmitting video image information from said stereoscopic video image pick-up device to said stereoscopic video image display device,

in which said stereoscopic video image pick-up device includes

> **cross-point measuring means for measuring CP information on the cross-point (CP) of optical axes of said pick-up means** and
>
> **outputs information including the CP information** and video image information **to said medium**; and

in which said stereoscopic video image display device includes

> **offset presetting means for offsetting and displaying said different video images based upon said video image information, said cross-point information and information on the size of the image which is displayed** by said stereoscopic video image display device.

A4960 (21:44-65) (emphases added).  The "two video image pick-up means" are cameras.  A4953 (8:9-10); A4960 (21:46-48); A5636:5-10.  The "stereoscopic video image display device" contains a 3D display.  A4960 (21:49-50).  The "medium" transmits information between the two.  A4960 (21:51-53).

The heart of the claimed invention is the "cross-point measuring means for measuring CP information on the cross-point (CP) of optical axes of said pick-up means."  A4960 (21:54-59).  Figure 14 of the patent illustrates the concept of a "cross-point (CP) of optical axes" of two cameras.  It shows two cameras 602 and 603 pointed at "object surfaces," *i.e.*, the item to be photographed.  A4950 (1:22-

32).  Lines CL1 and CL2 represent the "optical

axes" of the cameras.  *Id.*  Camera 603 is angled

inward by θ so that the optical axes CL1 and CL2

intersect on the surface of the object being

photographed, at a "cross-point."  *See* A4954 (9:19-

22) ("The left-eye and right-eye cameras are

disposed in such a manner that their optical axes

intersect with each other.  The intersection of these

axes is the cross-point (CP) which is present on a

plane of the object.").  This description, among

others, confirms that a "cross-point" is the location

where the optical axes of two cameras intersect.



FIG. 14
PRIOR ART

A4948

Claim 1 requires measuring "CP information *on* the cross-point (CP)" of the

cameras' optical axes.  According to the specification, CP or cross-point

information includes "the distance between the pick-up device and CP," denoted

by "L" in Figure 14.  A4950 (2:1-6); A4954 (9:11-12); A4950 (1:32-36).  "The

distance between the left-eye camera and the right eye camera," denoted as "d" in

Figure 14, may also be part of the CP information.  A4954 (9:28-33).  As the

district court observed during claim construction, these "distances constitute the

sides of a triangle" (A73, A84) with its vertex at the cross-point.  Cross-point

information is thus encoded data regarding the optical axes of the cameras at the time an image is captured.

The specification contains significant statements confirming that CP information requires cameras having intersecting optical axes. Most importantly, the specification states that "there is no CP information" where "the distance to CP is infinite." A4954 (10:46-53) (explaining that, absent CP information, the embodiment of Figure 3 may still be used to adjust the "parallax" or offset between images for display). This is logical, as the optical axes never "cross" where the distance to intersection is infinity. Without crossing, the optical axes do not form a triangle from which geometric calculations may be performed. Therefore, according to the '664 patent, if the optical axes of the two cameras do not intersect (*e.g.*, are fixed and parallel like the 3DS's cameras), there is no cross-point to use in the geometric calculation recited by the claims.

The '664 patent acknowledges a "cross-point of optical axes" as "PRIOR ART." *See* A4948 (Figure 14); A4950 (1:22-32). In addition, while recording CP information was also known in the art according to the '664 patent, the use of CP information "as a signal . . . when the stereoscopic image is played back" was purportedly not. A4950 (2:1-10); *see* A5622:17-21. Therefore, the purportedly novel aspect of the '664 patent is using encoded cross-point information to adjust the offset between left and right images at the time an image is displayed.

In addition to the cross-point measuring means, claim 1 also requires that the "stereoscopic video image display device" include "offset presetting means for offsetting and displaying said different video images based upon" three distinct and different pieces of information:  (1) "video image information"; (2) "cross-point information"; and (3) "information on the size of the image which is displayed by said stereoscopic video image display device."  A4960 (21:60-65).  As described in the specification, the "offset presetting means" serves to "preset[] a offset value to display the left-eye and right-eye video images," so as to "provid[e] the viewers with the same stereoscopic feeling irrespective of . . . different conditions."  A4954 (9:3-10).  It thus calculates the offset to be used between the left and right images from the cross-point information, the size of the display screen, and the images themselves.  A4951 (3:25-29; 3:39-44; 4:14-19); A4958 (17:59-63; 18:6-11; 18:49-54).



**A4935 (annotated)**

In summary, the cameras 402L and 402R capture left and right images and CP Measuring Means 403 measures CP information on the "cross-point (CP) of optical axes" of the cameras. A4953 (8:7-16). This is shown in the highlighted version of Figure 1 from the patent (above). The image data and CP information are transferred over Medium 500 to the display control circuit. A4953 (8:18-24); *see* A4953-54 (8:56-9:10). The "Offset Presetting Means" (106) uses the CP information, screen size, and the video images to calculate the appropriate offset and display the images with the intended 3D effect. A4951 (3:25-29); A4953 (8:18-24); A4958 (59-63); *see* A4953 (8:56-9:10).

### E.    District Court Proceedings

#### 1.    Claim construction

The district court issued a "bottom-line" order with its claim construction (A95-98), followed by a memorandum providing its reasoning. A73-94.[3]

During claim construction, Nintendo asked the district court to construe the term "cross-point" in the '664 patent. A664, A678. The term is central to resolving the parties' dispute. However, the district court held that the term "requires no construction." A95.

Nintendo also asked the district court to include in its construction of "cross-

---

[3] The district court's claim construction memorandum was published at *Tomita Techs. USA, LLC v. Nintendo Co., Ltd.*, 855 F. Supp. 2d 33 (S.D.N.Y. 2012).

point information" the acknowledgement from the specification that "[i]f the distance to the cross-point (CP) is infinite, there is no CP information." A664, A679. The court declined, reasoning that even parallel "video image pick-up means [*i.e.*, cameras] can generate a cross-point that is a finite distance from the pick-up means by, for example, laterally shifting computer chips located inside the means." A84-85. In other words, parallel cameras may use movable camera sensors, which could potentially form a cross-point if adjusted to the right position. The 3DS, in contrast, has fixed camera sensors that do not shift.

For the term "cross point measuring means for measuring CP information on the cross-point (CP) of optical axes of said [cameras]," the parties agreed that it is a means-plus-function limitation under 35 U.S.C. § 112 with the function "to measure CP information on the cross-point (CP) of the optical axes of the two video image pick-up means." A664, A682. The court adopted this as its construction. A96. In its "bottom-line" order, the court found that the "corresponding structure is comprised of a cross-point data device that determines the cross point information as described and shown" in particular places in the '664 patent specification. *Id*. The court elaborated in its claim construction memorandum that a cross-point data device measures cross-point information "by any of *three* different techniques." A89 (citing 9:23-35 of the '664 patent) (emphasis added). These three techniques are: (1) a "laser distance measuring

technique;" (2) "based upon the inclination angle between the optical axes of the left-eye and right-eye cameras;" and (3) where "an operator inputs the distance." A4954 (9:23-28).

For the claim term "offset presetting means for offsetting and displaying said different video images," the parties also agreed that it is a means-plus-function element under 35 U.S.C. § 112. A664, A684. With respect to the structure of the "offset presetting means," Tomita asserted that the corresponding structure is "a circuit and manual entry unit that sets the offset between the right eye image and left eye image," which the district court adopted. A943, A963-964; A97. In doing so, the court rejected Nintendo's argument that Figure 3 depicts the structure of the "offset presetting means." *See* A664, A687-692.

### 2.     Trial

*__Infringement__*.  Tomita presented its infringement case through its expert, Mr. John Merritt. Mr. Merritt only holds degrees in psychology (A5858:6-10), and he conceded that he lacks the education and training to understand the 3DS source code. A5863:22-5864:6; A5921:25-5922:9; A5937:19-20. Yet, as Mr. Merritt acknowledged, it is the source code that dictates how the accused features of the 3DS function. A5757:7-13; A5790:15-19; A5886:13-16; A5886:21-5887:4; A5907:3-6; A5908:16-20; *see* A6222:22-6223:8. Thus, his opinions on infringement consisted largely of observations as an ordinary user of the 3DS. *See*,

*e.g.*, A5806:8-13 ("You can plainly see [measurement of CP information] when observing the behavior of the 3DS."); A5813:7-19; A5818:14-5819:7; A5822:3-14; A5836:1-21; A5845:10-5846:4; A5847:23-5848:6; A5965:13-5966:5.

During his testimony, Mr. Merritt conceded important facts that confirm the 3DS does not infringe.  He agreed that the outer cameras of the 3DS are arranged in parallel (A5902:4-6), that the image sensors (*i.e.*, chips) of these cameras are centered in a fixed position directly behind the cameras lenses without shifting chips (A5895:18-24), and that the optical axis of each camera remains fixed in parallel.  A5872:10-20; *see also* A5763:11-13.  In fact, in the course of testifying that the 3DS infringes claim 8, Mr. Merritt testified that the 3DS's outer cameras are parallel and have parallel optical axes.  A5889:3-5890:14.

While Mr. Merritt nevertheless asserted that the 3DS measures "CP information" despite having parallel optical axes, he failed to provide any explanation or evidence as to *how* this is possible.  *See* A5804:2-5; A5805:3-7; A5806:8-13; A5813:7-5815:6; A5818:14-5819:7; A5821:17-5882:2; A5823:24-5824:10.  He instead assumed the 3DS uses cross-point information based on its ability to display 3D images.  This is erroneous.

Nintendo's engineers presented detailed testimony on the operation of the accused features of the 3DS.  Alexandre Delattre, one of the developers of the software for the 3D Camera Application, explained in detail how the 3D Camera

Application calculates an offset between left and right images for display without the use of any information other than the captured camera images. *Supra* at pp. 13-16.

With respect to the AR Games Application, Dr. Yuichiro Ito, one of the developers of the software, explained how the AR Games software uses image processing to calculate the offset. *Supra* at pp. 17-18. Nintendo also presented the testimony of its expert, Dr. Jan-Michael Frahm, a computer scientist and professor at the University of North Carolina at Chapel Hill whose research, funded by government and private grants, focuses on 3D technology. A6186:15-6187:16; A6188:4-16. Dr. Frahm presented the jury with the results of his independent analysis of the 3DS operation and software. *See infra* at p. 40; *see also* A6190:8-23.

During trial, the parties disagreed on the construction of the corresponding structure of the "cross-point measuring means." This occurred because Tomita contended that the correct construction included a fourth, alternative corresponding structure, which "calculates the cross-point based upon the position of picking up of an object." *See* A5959:15-5960:6; A5964:25-5965:11. After several objections at trial (*see* A5806:14-5807:5; A6162:25-A6169:5), the court ruled, "I don't think that [the alleged fourth structure is] not embraced by those three" other structures, but did not prevent Tomita from using this purported structure independently of the

other three.  A6169:1-5.  The parties' claim construction dispute was never resolved by the district court, and Tomita was allowed to argue for infringement based on this alternative, incorrect corresponding structure.

*__Invalidity__*.  Nintendo's expert, Dr. Frahm, presented evidence that claim 1 of the '664 patent is invalid because the claimed function of measuring CP information on the "cross-point (CP) of optical axes of said pick-up means" is not enabled by the '664 patent when those optical axes are parallel, *i.e.*, to the full scope of Tomita's infringement positions.  Relying on the patent's statement that "there is no CP information" where the distance to the cross-point is "infinite" A4954 (10:51-52), Dr. Frahm testified that the patent does not enable measuring a cross-point in the case of parallel optical axes.  A6280:17-6281:22.  In rebuttal, Tomita only offered the conclusory testimony of Mr. Merritt:

> In reading the Tomita patent, it was clear to me that I would be able to make and operate what is described in the patent. I found that I would not require undue experimentation in making and using an example of it, an embodiment of it. And I am sure my colleagues would not either, colleagues in my field.

A6472:21-6473:5.  This conclusory testimony is non-responsive.  Tomita failed to explain how the '664 patent enables an embodiment with two fixed, parallel cameras with parallel optical axes.

Dr. Frahm also testified that claim 1 of the '664 patent is invalid for failure to satisfy the written description requirement.  Relying again on the patent's

statement that where the distance to the cross-point is infinite there is no cross-point information, Dr. Frahm opined that "the '664 patent does not describe . . . how to practice the invention when there is parallel optical axes . . . ." A6283:6-22; *see* A6281:6-22. The specification contains no description showing the inventor possessed an embodiment for measuring CP information where the distance to CP is infinite, *i.e.*, fixed, parallel cameras with parallel optical axes. Mr. Merritt offered no opinions regarding written description. *See* A6473:12-21. At the close of evidence, the court nevertheless granted JMOL that Nintendo had not proved invalidity for failure to satisfy the written description requirement. A6488:1-6489:25 (decision of court).

*__Jury Instructions__*. Nintendo requested that the district court instruct the jury on its claim construction, including the three techniques for the cross-point data device that the court construed as corresponding structure to the cross-point measuring means. A6441:7-6442:15; A3557, A3628-3631. The court declined, reasoning that the jury could request further instructions during their deliberation for "a particular term that they are hung up on." A6441:21-24.

### 3.    Post-Verdict Motions

The jury found Nintendo liable and awarded damages of $30.2 million. A4969. Nintendo moved for JMOL and, alternatively, for a new trial or remittitur.

The district court rejected Nintendo's non-infringement arguments.  The court noted that "the actual operation of the 3DS source code was relatively undisputed," and that "the central issue at trial was whether those methods were in fact merely methods of employing the '664 patent's technology."  A7, A12.  The court viewed the "heart" of Nintendo's motion to be that the optical axes of the 3DS's cameras are parallel.  But the court concluded that "the optical axes may be set by selecting outer or inner subsets of the left and right images as captured by the cameras' chips, which moves the cross-point closer or farther away, respectively."  A13-14.  The court erroneously concluded the 3DS measures cross-point information in this manner.

The court also noted that "[a]lthough individual moments of Mr. Merritt's testimony may have been less than illuminating," he brought his "extensive experience" to bear and Tomita thus presented substantial evidence to support the jury's finding.  A11; A16.  The court's opinion did not address several of Nintendo's other non-infringement arguments, such as Tomita's failure to present evidence that the 3DS uses one of the three structures of the "cross-point measuring means."  *See* A4247, A4257-4258.

Similarly, the court rejected as "irrelevant" Nintendo's argument that the patent was not enabled because "it is clear that the jury rejected Nintendo's claim that the optical axes of the 3DS's cameras are parallel."  A16-17.  The court also

rejected Nintendo's request for a new trial because the jury was not instructed on claim construction.  A19.  In doing so, the court stated that there was "no dispute over the claim terms that the jury had to resolve," noting that both sides had presented their definitions to the jury.  A20-21.

Finally, the district court denied Nintendo's motion that Tomita's damages expert erroneously relied on the entire market value of the 3DS, but granted remittitur, finding the jury's award "'intrinsically excessive' and unsupported by the evidence presented at trial."  A23.  The court offered Tomita the choice between a halving of the damages award to $15.1 million or a new trial on damages.  A25.  Following Tomita's acceptance of the reduced damages award (A4884), the court awarded $29,483.50 in prejudgment interest and $211,747.50 in supplemental damages, for a total award of $15,341,231.  A3-6 at A6; A1.  The court also awarded Tomita an ongoing royalty of 1.82% of 3DS sales.  *Id.*

## SUMMARY OF ARGUMENT

1.     The infringement judgment should be reversed because the 3DS does not measure "CP information on the *cross-point (CP) of optical axes of*" its cameras.  The 3DS has fixed, parallel cameras with parallel optical axes that do not intersect.  The device therefore cannot measure CP information as required by claim 1.

2.     The infringement judgment should be reversed because the 3DS does not have the claimed "*cross-point measuring means*."  The district court construed this means-plus-function limitation to include corresponding structure of a cross-point data device that uses one of three techniques.  The 3DS contains no such structure, or any equivalent thereof.

3.     The infringement judgment should be reversed because the 3DS has no "*offset presetting means*," as correctly construed.  The district court erred in construing the structure corresponding to this means-plus-function limitation as a "circuit and manual entry unit."  When properly construed, the corresponding structure includes a "video signal generating circuit," A/D converters, left and right frame memories, synthesis frame memory, timing signals, a read-out timing control unit, and a D/A converter.  The 3DS does not satisfy this limitation.

4.     The judgment of no invalidity should be reversed.  Clear and convincing evidence demonstrated that the '664 patent fails to enable the full scope of claim 1 to the extent that that claim covers a system with parallel cameras having parallel optical axes.  Clear and convincing evidence also demonstrated that inventor Tomita was not in possession of such an invention, thus failing to satisfy the written description requirement.

5.    Alternatively, a new trial should be granted because the district court: (a) failed to instruct the jury on its claim construction of the corresponding structure for the "cross-point measuring means," and (b) allowed Tomita to present its own definition of the claim term "cross-point" to the jury, despite ruling that no construction was necessary.  Each was erroneous and highly prejudicial.

## STANDARD OF REVIEW

This Court reviews JMOL and new trial rulings under regional circuit law. *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1343 (Fed. Cir. 2012).  The Second Circuit reviews the grant or denial of JMOL *de novo*.  *Kim v. Hurston*, 182 F.3d 113, 117 (2d Cir. 1999).  This Court has interpreted the Second Circuit standard to be "[s]imilar to the frequently applied substantial evidence standard."  *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 18 (Fed. Cir. 2012).  "The Second Circuit reviews for abuse of discretion the denial of a motion for new trial."  *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1366 (Fed. Cir. 2010) (citing  *SEC v. DiBella,* 587 F.3d 553, 563 (2d Cir. 2009)).

This Court reviews *de novo* the district court's claim construction.  *Lighting Ballast Control LLC v. Philips Elecs. N.A. Corp.*, No. 2012-1014, 2014 WL 667499, at *1 (Fed. Cir. Feb. 21, 2014) (en banc).  The determination of corresponding structure under 35 U.S.C. § 112 is similarly a question of law.

*Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1318 (Fed. Cir. 2004).

"The question of whether a jury instruction on an issue of patent law is erroneous is a matter of Federal Circuit law and is reviewed de novo." *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004). Infringement is a question of fact reviewed for substantial evidence. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1423 (Fed. Cir. 1997).

Finally, "[w]hether the subject matter of a patent claim satisfies the enablement requirement under 35 U.S.C. § 112[(a)] is a question of law, reviewed *de novo*, based on underlying facts, reviewed for clear error." *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1281 (Fed. Cir. 2007). Written description under 35 U.S.C. § 112 "is a question of fact" reviewed for substantial evidence, although "[a] patent also can be held invalid for failure to meet the written description requirement based solely on the face of the patent specification." *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1347 (Fed. Cir. 2011).

# ARGUMENT

## I.    THE JUDGMENT THAT THE NINTENDO 3DS INFRINGES THE '664 PATENT SHOULD BE REVERSED.

### A.    There Is No Substantial Evidence That the 3DS "Measur[es] CP Information on the Cross-Point (CP) of Optical Axes" of Its Cameras.

Claim 1 of the '664 patent recites a "***cross-point*** measuring means for measuring ***CP information*** on the ***cross-point (CP)*** of ***optical axes*** of said pick-up means." A4690 (21:55-57) (emphasis added).

The term "cross-point" did not have an ordinary meaning to one of skill in the art at the time of the filing of the '664 patent in 2003, nor does it now. A706, 712 ¶ 25. In contrast, the term "optical axis" was well known in the art; it is the "straight line that coincides with the axis of rotational symmetry of the lens," *i.e.*, a line extending outward through the center of the lens. A709-710 ¶¶ 15-16 (citing exhibits at A767-786).   Consistent with the express claim language, the specification makes clear that a "cross-point" is the point where the optical axes of the cameras intersect. *See SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 893-94 (Fed. Cir. 2004) ("The phrase 'directly controlling' does not have an accepted meaning in the art and we therefore look to the specification for the necessary guidance in interpreting this phrase."); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1326 (Fed. Cir. 2001). This is illustrated by Figure

14 of the patent.  *See supra* at pp. 21-23; *see also* A4954 (9:19-22; 10:59-61);

A4958 (17:53-56).

Figure 14 of the patent further illustrates that the optical axes of two cameras

intersect to form a "cross-point" when they are "toed-in" or angled "inward with

respect to each other."  A1010, A1017 ¶ 25; *supra* at pp. 21-23.  However, the

converse is also true: when two cameras are not "toed-in" or not otherwise

positioned to have intersecting optical axes, they cannot form a cross-point.  *See*,

*e.g.*, A5873:23-5874:2; *cf.* A4954 (9:19-22) (cameras must be "disposed in such a

manner that their optical axes intersect").

The '664 patent recognizes that there are circumstances where a cross-point

cannot be measured.  It explains:  "Although appropriate stereoscopic feeling is

provided by" displaying the images using "CP information" as recited in claim 1,

"there is no CP information" where "the distance to CP is infinite."  A4954 (10:46-

53).  The distance to the cross-point is infinite and cannot be measured in the form

of "CP information" where the two cameras have ***parallel*** optical axes.  A712 ¶ 28;

A1072, A1077-1078 ¶ 13 (citing article by Mr. Merritt at A1093-1097); *see also*

A5892:5-9 ("Theoretically, if [the optical axes are] parallel, the lines would meet

only at infinity.")

Indeed, it is a basic mathematical axiom that parallel lines never cross.  *See*

A5892:14-16; A6195:18-6196:1; A6344:1-10.  Thus, there cannot be a "cross-

point (CP) of optical axes" in the case of parallel optical axes.  A712 ¶ 28; *see also*

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341

(Fed. Cir. 2001) ("Where the specification makes clear that the invention does not

include a particular feature, that feature is deemed to be outside the reach of the

claims of the patent, even though the language of the claims, read without

reference to the specification, might be considered broad enough to encompass the

feature in question.")

This results in non-infringement based on undisputed facts.  It is undisputed

that the 3DS has neither toed-in cameras nor cameras with moving parts.  Tomita's

expert, Mr. Merritt, conceded that the 3DS's outer cameras are arranged in parallel

(A5902:4-6) and that the image sensors (*i.e.*, chips) of these cameras are centered

in a fixed position (A5895:18-5896:8).

Moreover, the parties do not dispute the location of the "optical axis" of

each of the 3DS's outer cameras.  Mr. Merritt testified that the optical axis of a

camera extends from "the center pixel of each of the chips . . . through the center

of the lens," and thus, like those components in the 3DS, is fixed in place.

A5872:10-20; *see also* A5763:11-13.  These facts were confirmed by Nintendo's

expert.  A6196:15-18; A6347:25-A6348:10.  Indeed, Mr. Merritt testified that the

3DS has parallel optical axes in accordance with his opinion that the 3DS infringes

dependent claim 8 (a claim that Tomita later dropped).  *See supra* at p. 28.  Thus,

there is no dispute that the cameras of the 3DS have parallel optical axes.

Nintendo presented overwhelming testimony of how the accused 3D Camera

Application and AR Games Application operate *without* measuring cross-point

information.  For the 3D Camera Application, Mr. Delattre, a developer of the

software, explained to the jury in detail how it functions without using CP

information.  Dr. Frahm confirmed these facts.  *Supra* at pp. 13-16; A6214:5-10;

A6214:25-6215:5; A6220:6-21.  With respect to the AR Games Application, Dr.

Ito, one of the developers, explained how the software operates using image

processing—a method which does not involve measuring a cross-point.  *Supra* at

pp. 17-18; *see also* A6223:9-6229:6 (confirmation by Dr. Frahm).

Tomita and its expert agreed with these central facts regarding how the 3D

Camera and AR Games applications work.  A12 ("the actual operation of the 3DS

source code was relatively undisputed"); A5913:21-5914:6; A5919:18-20.  Thus,

the facts regarding how the accused applications use image processing to offset

right and left images, without creating or using cross-point information, are

undisputed.  Indeed, the specification of the '664 patent states that cross-point

information is distinct and different from the camera images themselves (*i.e.*,

"video image information").  *See*, *e.g.*, A4951 (3:9-29); A4952 (6:47-51); A4953

(8:14-15).  Moreover, claim 1 separately requires both "cross-point information"

and "video image information." A4960 (21:54-65). The use of image processing

thus cannot amount to cross-point information.

Despite this evidence, the court denied Nintendo's motion for JMOL of no

infringement. The district court relied on its interpretation of Tomita's

infringement theory. The district court summarized that theory as follows:

> "cross-point information" is measured at the time an
> image is captured in the form of the offset. The offset is
> determined by selecting a subset of the image captured
> by the software [sic] chips, and this information is used
> to determine the angle of intersection of the cameras'
> optical axes, or the location of the cross-point. Explained
> another way, the optical axes may be set by selecting
> outer or inner subsets of the left and right images as
> captured by the cameras' chips, which moves the cross-
> point closer or farther away, respectively.

A14. That is, Tomita argued that "cross-point information" includes an "offset"

between the left and right images that is calculated using image processing. *See*

A5902:19-5903:4 (clarifying that the subset is selected in software). This is

contrary to the express requirements of claim 1.

First, Tomita's interpretation of claim 1 conflates "cross-point" and "offset,"

contrary to the express language. *See*, *e.g.*, A5804:23-24; *see also* A6314:10-11

(Tomita's counsel describing Mr. Merritt's position as "offset information is cross-

point information"). "Offset" and "cross-point" information are not the same. To

the contrary, claim 1 states "offsetting" is performed "***based upon*** . . . cross-point

information." A4960 (21:60-65) (emphasis added); *supra* at pp. 21-24. This

means that cross-point information is one variable in the particular method of offsetting that is claimed by the patent. The district court erred by conflating these concepts.

Mr. Merritt's testimony on this issue was inconsistent and erroneous. While Mr. Merritt agreed with the basic premise that offset and "cross-point" are not synonymous (A5915:17-5916:4), he nevertheless testified that using the offset to calculate the cross-point satisfies the claim. He explained that the 3DS is "detecting the cross-point. It's detecting how far away the object is by how far apart you have to *offset* the left or right images to get them to appear." A5814:10-13 (emphasis added).[4] This is the *opposite* of what claim 1 states, *i.e.*, calculating the appropriate offset using cross-point information.

Second, Tomita's interpretation relies on the intersection of the two images, not the optical axes of the cameras as required by the claim. This theory of

---

[4] *See also* A5820:3-10 ("I was led to believe it was determining *cross-point* because the objects it would draw . . . appear in approximately the right place relative to the table . . . . And to do that it would have to set the *offset* of the things that it's drawing to match exactly what is on the table") (emphasis added); A5836:1-12 (explaining the basis of his opinion that the 3DS stores *cross-point* information as "the *offset* that was in effect when you took [the video], the offset between left and right, that was in effect when you pressed the start video button, also is present when you play it back") (emphasis added); A5850:10-15 ("if you know what the *offset* is and the spacing between the lenses, you can calculate the angle of the intersection of the two optical axes and thereby you can calculate eventually the distance from there to the cross-point") (emphasis added).

infringement erroneously depends on cropping captured camera images to alter the

purported "cross-point":

> If you select from areas that are toward the outside [of
> the images], . . . then the cross-point will move closer.  If
> you select from areas that are moved toward each other,
> then you can see the cross-point moves further away.
> And this is the method that is used in the 3DS.

A5764:4-15; *see also* A5803:2-5804:1; A5851:19-23 ("you can calculate what the

cross-point is, in effect, in the displayed images"); A5968:19-24 ("because of the

way . . . the selected areas on the chips shifted, they were able to shift the *images*

that were displayed inward or outward with respect to each other.  Giving a

different cross-point, being able to change the cross-point") (emphasis added).  A

"cross-point" in claim 1 is the "cross-point (CP) of optical axes" of the *cameras*,

not merely the convergence of two recorded images.  A "cross-point" of the

cameras' optical axes cannot be generated or reconfigured using image processing

alone.  Tomita's infringement theory thus broadens the meaning of "CP

information" beyond recognition.

Third, Tomita failed to support its conclusion that the 3DS allegedly

measures CP information with actual evidence.  Although Mr. Merritt asserted the

3DS measures "CP information on the cross-point of optical axes of the cameras,"

he failed to provide any explanation or evidence as to *how* this is allegedly

measured.  *See supra* at p. 28.  His opinion is based on conclusory inferences

drawn from observing the software applications in use. *See*, *e.g.*, A5804:2-5 (noting that the 3D camera application measures cross-point information "by knowing what it's doing and sending that information along with the images"); A5813:9-19 ("I could see that it was *somehow* measuring the distance to things out there in front of it") (emphasis added). This is insufficient to support Mr. Merritt's ultimate conclusion. *See Mirror Worlds, LLC v. Apple Inc*., 692 F.3d 1351, 1358 (Fed. Cir. 2012) (affirming judgment as a matter of law of non-infringement where expert's "conclusory statement is... insufficient to allow a reasonable juror to find that Mirror Worlds has met its burden of proof"); *Rohm & Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997) (affirming verdict of non-infringement where patentee "offered nothing more than its expert's general opinion that the accused product or process infringed the patents").

Because the 3DS does not measure "CP information on the cross-point (CP) of optical axes of" cameras, the judgment should be reversed.

### B.   There Is No Substantial Evidence That the 3DS Uses Any of the Three Structures of the "Cross Point Measuring Means," or Equivalents Thereof.

The district court construed the means-plus-function claim limitation "cross-point measuring means for measuring CP information on the cross-point (CP) of optical axes of said pick-up means" to require the corresponding structure of "a cross-point data device" that uses one "of *three* different techniques":   (1) a "laser

distance measuring technique;" (2) "based upon the inclination angle between the optical axes of the left-eye and right-eye cameras;" and (3) where "an operator inputs the distance." *Supra* at pp. 26-27.  Accordingly, to prove infringement Tomita was required to show that "the relevant structure in the accused device perform[s] the identical function recited in the claim and [is] identical or equivalent to" one of these three corresponding structures.  *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1320 (Fed. Cir. 2003).  Tomita failed to make the necessary showing.

Tomita did not identify a structure in the 3DS that is "identical or equivalent" to one of the three techniques.  Instead, Mr. Merritt offered numerous, inconsistent contentions regarding the structure that satisfied this claim requirement.  For example, he indiscriminately stated the cross-point measuring means included "two camera pick-up devices," "the system on chip," "all that mess of integrated circuits," "other circuits around," "the bus that transfers information around," "a display," "the touch pad," "the circle pad," and the "3-D slider." A5824:11-5827:7; A5903:25-5904:8.  Mr. Merritt also referenced "software routines" (A5824:11-18), but the patent does not discuss any algorithms for performing these three techniques such that software might serve as part of the structure.  *See Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) ("the patent must disclose . . . enough of an algorithm to provide the

necessary structure"). Thus, what is missing from Tomita's evidence is a description of a structure that uses one of the "three techniques" identified by the court's claim construction. This failure of proof is dispositive.

Tomita's erroneous attempt to prove infringement at trial based on a new claim construction also fails. Unable to present evidence based on any of the three techniques from the court's claim construction, Tomita based its entire infringement case on an alleged *fourth* technique—calculating the "cross-point based upon the position of picking up of an object" in the camera images. *See* A5959:15-5960:6; A5964:25-5965:11. During trial, Nintendo objected to Tomita's use of the fourth structure (A5806:14-5807:5) and arguments occurred outside the presence of the jury when Tomita objected to a Nintendo slide omitting the alleged fourth structure (*see* A6162:18-6169:5). After hearing from both parties, the court ruled: "I don't think that [the alleged fourth structure is] not embraced by" the three techniques it included in its claim construction, "[h]owever, I will allow [Tomita] to cross-examine." A6169:1-5.

However, "calculat[ing] the cross-point based upon the position of picking up of an object" is not disclosed by the patent as a means for "measuring CP information on the cross-point (CP) of optical axes." In contrast to this claimed function, the patent describes this purported technique as one for "calculat[ing] the position of the *cross point*" based on CP information, not for measuring the CP

information *itself*.  A4953 (8:16-18).  It never is described as capable of

"measuring CP information *on* the cross-point," as with the other three structures.

*See* A4954 (9:23-31).  Indeed, each mention of this fourth purported technique in

the patent makes clear that it is dependent on first measuring CP information as in

claim 1.  *See* A4951 (3:64-67); A4958 (18:31-30); A4960 (22:30-34).  Moreover,

this alleged fourth technique cannot serve as corresponding structure because the

patent specification does not "clearly link[] or associate[] that structure to the

function recited in the claim," namely the function of "measuring CP information."

*Saffran v. Johnson & Johnson*, 712 F.3d 549, 562 (Fed. Cir. 2013) (citing *B. Braun

Med.*, 124 F.3d at 1424).

Even if this alleged fourth technique were found to be independent

corresponding structure, there is no evidence that the 3DS uses it.  Contrary to

Mr. Merritt's vague testimony, both Mr. Delattre and Dr. Frahm testified that the

3DS does not recognize objects in images.  Mr. Delattre explained that the 3D

Camera Application does not even "care" about or "look at" objects.  A6119:23-

6120:8; *see also* A6109:13-16; A6122:8-19; A6146:8-17.  Dr. Frahm's testimony

confirmed that the 3DS "has nothing to do with objects . . . ."  *E.g.*, A6215:6-9;

A6216:7-10; A6301:25-6302:3; A6346:4-6347:15; A6351:16-21.  Even Mr.

Merritt conceded that the comparison between left and right images performed by

the 3D Camera Application is based on matching a "pattern" rather than the "the

position of picking up of an object" as required by the purported fourth structure.

A5914:18-5915:3.  Thus, the 3DS does not infringe, even if the so-called "fourth

technique" is erroneously included in the construction of "cross-point measuring

means."

### C.    There Is No Substantial Evidence That the 3DS Has Any Structure Corresponding to the "Offset Presetting Means," as Correctly Construed.

#### 1.    The court erred by construing the corresponding structure of the "offset presetting means" to be a "circuit and a manual entry unit."

The district court erroneously construed "offset presetting means" based on

structures that the specification does not indicate correspond to this limitation.

This error further broadened the scope of claim 1 in a manner inconsistent with the

claim language and written description.

During claim construction and in its proposed jury instructions, Nintendo

explained that the "offset presetting means" corresponds to the circuit elements

disclosed in Figure 3 of the '664 patent as follows:

> The structures required to perform the "offsetting"
> function are electrical circuits (which, other than signal
> switch 40, are not disclosed in the patent specification)
> able to perform the function of read-out timing control
> unit 32, right-eye frame memory 31, left-eye frame
> memory 30, clock 22, switch control unit 41, signal
> switch 40, frame memory 50, syc. signal generator 70, as
> well as the inputs to each of those functional boxes
> including the inputs 71-74 and 82-84 in Figure 3, and as
> further discussed at 9:23-10:52.

> The structures required to perform the "displaying" function are electrical circuits (not disclosed in the patent specification) able to perform the function of frame memory 50 and D/A converter 60 in Figure 3, and as further discussed at 9:23-10:52, as well as other circuits (not disclosed in the patent) able to perform the function of expanding the right- and left-eye images for purposes of display, as discussed at 11:60-12:15.

A3557, 3629-3630; *see* A664, A687-692. The district court rejected Nintendo's proposal in favor of Tomita's interpretation that the corresponding "structure is comprised of a circuit and a manual entry unit that sets the offset between the right and left eye images." A97. That was error.

The corresponding structure of a means-plus-function limitation must be clearly linked or associated with the specific "function recited in the claim." *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005) (citations omitted). The offset presetting means is shown in Figures 1 and 2 of the patent as a plain box. While this alone is insufficient corresponding structure (*see Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1383 (Fed. Cir. 2009)), both appearances of the offset presetting means are situated within a larger box labeled "Display Control Circuit," which is shown in detail in Figure 3. *See* A4953 (7:60-63). The Display Control Circuit "comprises a stereoscopic video image signal generating circuit 101," which in turn comprises "offset presetting means." A4953-54 (8:56-9:10); *see also* A4957 (15:50-56)

("The stereoscopic video image signal generating circuit 101 offsets and displays the right-eye and left-eye video images . . . ."); A4957 (16:3-9) ("The offset . . . is preset . . . by the stereoscopic video image generating circuit 101").  The specification explains how this circuit in Figure 3 performs the claimed functions of offsetting and displaying, by adjusting the timing of the readout of images from frame memories.

First, the left and right captured images are "input to the stereoscopic video signal generating circuit" and stored in left and right frame memories 30 and 31, respectively.  A4954 (9:35-42); A706, A716-720 ¶ 39.  The left and right images are alternately transferred to synthesis frame memory 50 as directed by read-out timing control unit 32.  A4954 (9:38-50; 10:3-20).  This timing signal is calculated using CP information 12 and screen size information.  A4954 (10:3-20).  By advancing or delaying the timing of the read out from the right frame memory, the desired offset is set for display.  A4954 (10:9-16); A718 ¶ 41.

Thus, the structure which performs the claimed functions—offsetting and displaying—of the offset presetting means is found among the functional boxes of the "stereoscopic video image signal generating circuit" shown in Figure 3.  *See Bennett Marine, Inc. v. Lenco Marine, Inc.*, 2012-1336, 2013 WL 5273116, at *5 (Fed. Cir. Sept. 19, 2013) (declining to expand corresponding structure to include "any circuit fulfilling the required function," and instead limiting the structure to

the specific circuit disclosed); *Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d 1291, 1295-96 (Fed. Cir. 2012).

In contrast, the district court's construction of the corresponding structure states:

> The '664 patent describes various embodiments of this structure in Figures One and Two, which identify it as number 106, Figures Two and Three, which refer to manual entry of information, Figures Four through Eight, and at 3:24-29, 3:39-44, 4:14-19, 4:63-67, 5:21-24; 5:35-37, 5:63-67, 9:3-10, 11:12-12:52, 15:50-67, 16:9-10, 16:15-16, 17:58-63, 18:6-11, 18:49-54, 19:31-35, 19:56-59, and 20:3-5.

A97.   However, these portions of the specification either do not disclose sufficient structure or do not link the structure with the claimed functions.

Figures 1 and 2 merely show plain boxes with the words "offset presetting means" and 5:21-24 and 19:56-59 mention a "simple circuit."  These "black box" disclosures are insufficient.  *Blackboard*, 574 F.3d at 1383; *see Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1363-64 (Fed. Cir. 2012) ("The recitation of 'control device' provides no more structure than the [claim] term 'control means' itself, rather it merely replaces the word 'means' with the generic term 'device.'").  Many of the citations in the court's construction disclose only functional language (*see* A4951 (4:63-67) ("offset presetting means presets the offset"); A4954 (9:3-10); A4957 (16:9-10, 16:15-16); A4959 (19:31-35)), or merely parrot the functional language of claim 1: "offset presetting means for

offsetting and displaying said different video images . . . ."  A4951 (3:24-29, 3:39-44, 4:14-19); A4958 (17:58-63, 18:6-11, 18:49-54).  "This type of purely functional language, which simply restates the function associated with the means-plus-function limitation, is insufficient to provide the required corresponding structure."  *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1317 (Fed. Cir. 2012).

Other citations are not linked to the claimed functions of "offsetting" and "displaying."   A4952 (5:35-37) (image "can be *synthesized* and *stored* in the frame memory") (emphasis added); A4959 (20:3-5) (same); A4952 (5:63-67) ("controlling LED lighting").  *See Default Proof Credit Card*, 412 F.3d at 1298 (corresponding structure must be clearly linked or associated with the specific "function recited in the claim").

Another citation explains that while "[t]he stereoscopic video image signal generating circuit 101 offsets and displays the right-eye and left-eye video images," it does so based on "the stereoscopic degree which is instructed to the [manual] entry unit 105 by a viewer."  A4957 (15:50-67).  Thus, the "manual entry unit" may be a portion of the structure of the offset presetting means of claim 1, but is not the structure that performs "offsetting and displaying . . . based upon said video image information, said cross-point information and information on the size of the image which is displayed."  *See* A4960 (21:60-65).

Finally, Figures 4-6, together with their description in the specification, "explain[] the adjustment of the stereoscopic degree by a change in relative positions of the right and left eye images." A4955 (11:12-14). They seek to demonstrate how the offsetting of left and right images upon display impacts a viewer.[5] Figures 7 and 8, with their accompanying description, illustrate the mathematical formulae used to calculate the offset.

In sum, the '664 patent does not support Tomita's construction, which was erroneously adopted by the district court. The corresponding structure of the "offset presetting means" is the disclosure of Figure 3 of the '664 patent, as Nintendo correctly contended.

### 2.  Under the correct claim construction, the 3DS does not have an "offset presetting means."

Tomita has not and cannot establish that the 3DS includes an "offset presetting means," applying the correct interpretation of that phrase. Tomita's expert testimony on the topic is off-point, irrelevant and conclusory. For example, Mr. Merritt's opinion on the structure of the "offset presetting means" is that it includes "the circle pad, or the touch panel, or the depth slider," which are three different controls accessible to users of the 3DS. *See* A5845:10-20; A5848:15-17.

---

[5]  The reference to "cross-point" in Figures 4-6 is not the claimed "cross-point of optical axes," but rather the "cross-point" of the viewer's eyes. *See* A4953 (7:23-28).

He also testified that the structure includes "electrical circuits . . . that were shown in that big blocked diagram" (A5845:21-5846:4) and "a system on a chip, which has a lot of circuits integrated into one chip, and it has auxiliary processing units." A5848:7-11.  However, Mr. Merritt admitted that he had not analyzed the functionality of the 3DS at the necessary level of detail:  "I'm not absolutely sure which one does which, but I know that it does perform that function because—I know there is structure in there that performs the function because you will see that the function is performed."  A5848:7-14; *see also* A5848:22-5849:1.  Thus, there was no evidence presented that the 3DS has or uses A/D or D/A converters, clock or timing signals, left and right and synthesis frame memories, synchronization signals, or a read-out timing control unit, among the other elements of Figure 3, to perform the claimed functions.

Tomita's failure of proof regarding the "offset preset means" is another reason to reverse the judgment of infringement.

## II.   THE JUDGMENT OF NO INVALIDITY SHOULD BE REVERSED.

### A.   Claim 1 Is Not Enabled.

If claim 1 is interpreted in a way that covers the 3DS, it is invalid under section 112 of the Patent Act.  To the extent claim 1 includes a device with cameras having parallel optical axes, the specification must enable a person of ordinary skill to make a device with fixed, parallel cameras that are nonetheless

capable of "measuring CP information on the cross-point (CP) of optical axes of said pick-up means." *See Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1000 (Fed. Cir. 2008) ("Because the asserted claims are broad enough to cover both movies and video games, the patents must enable both embodiments."). The specification lacks any such disclosure.

Following the jury's verdict, Nintendo moved for JMOL that the claims of the patent are invalid due to lack of enablement because the patent fails to teach how to implement the claimed cross-point measuring means in the case of parallel optical axes. *See* A4247, A4269-4271. The district court denied the motion as "irrelevant," finding that "it is clear the jury rejected Nintendo's claim that the optical axes of the 3DS's cameras are parallel." A16-17. That was error.

Pursuant to 35 U.S.C. § 112, a patent "specification shall describe 'the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the [invention.].'" *Auto. Techs. Int'l*, 501 F.3d at 1282 (citing 35 U.S.C. § 112) (alterations in original). This enablement requirement is met "when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation." *Id.* (citation omitted). However, "[i]t is the specification, not the knowledge of one skilled in the art that must supply the novel aspects of an invention in order to constitute

adequate enablement." *Id.* at 1283 (citation omitted); *see also Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997) ("Patent protection is granted in return for an enabling disclosure of an invention, not for vague intimations of general ideas that may or may not be workable.").

Measuring CP information on the "cross-point (CP) of optical axes of said pick-up means" is not enabled by the '664 patent when those optical axes are parallel. As discussed above, the patent specification acknowledges that "there is no CP information" where the distance to the cross-point is "infinite." A4954 (10:51-52); *supra* at p. 23. It is undisputed that the distance to the cross-point is infinite where the optical axes of the two cameras are parallel. *See* A5892:5-16 (Merritt); A6281:6-13 (Frahm); *supra* at pp. 38-39. Where, as here, "the specification teaches against a purported aspect of an invention, such a teaching 'is itself evidence that at least a significant amount of experimentation would have been necessary to practice the claimed invention.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1379 (Fed. Cir. 2007) (citation omitted). Moreover, it is mathematically impossible for fixed parallel optical axes to intersect. *See* A6344:1-10. Thus, no amount of experimentation would be enough. Indeed, Mr. Merritt recognized that "divergent" optical axes pointing away from one another would also not form a cross-point. A5873:23-5874:2. The patent therefore does

not describe how to implement the claimed cross-point measuring means in these circumstances.

At trial, Nintendo's expert Dr. Frahm explained that the '664 patent mentions parallel cameras in only three places, using the language "two pick-up means which are disposed in a parallel relationship."  A6282:17-6283:1; A4951 (3:62-67); A4958 (18:31-35); A4960 (22:30-34).  He accordingly testified that the claims of the '664 patent do not enable measuring cross-point information in the case of parallel optical axes of those cameras.  A6280:17-6281:22.  However, the district court concluded the claims cover this very configuration.  If the district court is correct about the scope of the claim, it is invalid for non-enablement.

### B.    The '664 Patent Specification Does Not Contain an Adequate Written Description of Claim 1.

To the extent claim 1 of the '664 patent is construed to cover pick-up means having parallel optical axes as in the 3DS, the specification must reasonably convey to one skilled in the art that the inventor had possession of such a configuration.  *See Centocor*, 636 F.3d at 1348.  The specification fails to satisfy this requirement.  The district court's interpretation of claim 1 renders the claim invalid for lack of written description.

Pursuant to 35 U.S.C. § 112, a patent "specification shall contain a written description of the invention . . . ."  *Centocor*, 636 F.3d at 1347-48 (citing 35 U.S.C. § 112, ¶ 1).  The test for the written description requirement "is whether the

disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). The "specification must describe an invention understandable" to one of ordinary skilled in the art "and show that the inventor actually invented the invention claimed." *Id.*

The specification of the '664 patent does not show that Mr. Tomita had possession of the invention of claim 1 in the case of parallel optical axes. As discussed above, the patent explains that the measurement of "CP information" is impossible where the distance to the cross-point is "infinite." This means the specification teaches away from measuring CP information when a device uses two fixed and parallel cameras. *Cf. Atl. Research Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1354-55 (Fed. Cir. 2011) (affirming finding of invalidity for lack of written description where the "specification discloses an invention with two support points" while the claim requires only a single support); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1378 (Fed. Cir. 2009) (affirming invalidity where "the specification describes only medical valves with spikes" and asserted claims "do not include a spike limitation").

Nintendo offered unrebutted expert testimony at trial regarding written description. Dr. Frahm explained that the written description requirement is not

satisfied if claim 1 is interpreted in a way that covers the 3DS, because fixed, parallel optical axes cannot form a cross-point.  A6283:6-22.  Mr. Merritt did not respond.

Tomita points to descriptions of a "parallel *camera* arrangement" in an attempt to satisfy the written description requirement.  A6487:1-16 (emphasis added).  These portions of the patent are off-point.  The problem is the specification does not disclose measuring cross-point information where the optical axes, not just the cameras, are parallel.  The patent's discussion of parallel cameras does nothing to show the inventor possessed a way to measure cross-point information as recited by claim 1 where the distance to the cross-point is infinite.  The district court's implied claim construction invalidates claim 1 for this second reason.

## III.   ALTERNATIVELY, A NEW TRIAL IS WARRANTED.

### A.    A New Trial Is Warranted Because the District Court Erred by Failing to Instruct the Jury on Its Claim Construction.

Nintendo requested that the district court instruct the jury on its claim construction.  A6441:7-6442:15.  The district court declined, reasoning that the jury could request further instructions during their deliberation for "a particular term that they are hung up on."  A6440:21-24.  In denying Nintendo's motion for a new trial on these grounds, the district court explained that "the parties presented the Court's claim construction in their closing statements, and there was no dispute

presented to the jury regarding the terms of the Court's ruling." A20. The court's ruling was factually and legally erroneous, resulting in prejudice to Nintendo.

A "district court must instruct the jury on the meanings attributed to all disputed terms used in the claims in suit so that the jury will be able to 'intelligently determine the questions presented.'" *Sulzer*, 358 F.3d at 1366 (citation omitted). Even where the court has determined the "disputed meaning of the claim term," "that does not change the fact that the meaning of the claim terms was not apparent, was disputed by the parties, and was resolved only by the court's claim construction rulings." *Id.* at 1367. Failure to instruct the jury on such claim terms is error because it leaves "the jury free to make its own determination of the meaning of the claims." *Id.*

Here, the district court was incorrect that "there was no dispute" regarding the meaning of the term "cross-point measuring means for measuring CP information on the cross-point (CP) of optical axes of said pick-up means." Not only was the meaning of the term "cross-point measuring means" disputed during claim construction, but it was disputed *during* trial. *See supra* at pp. 44-47 (discussing dispute of three versus four techniques for the structure of the cross-point measuring means).

While Nintendo adhered to the court's construction, Tomita was allowed to present its own view of the corresponding structure to the jury. *See supra* at p. 46.

The district court at different points overruled and sustained Nintendo's objections to Tomita's use of demonstrative slides with this alleged fourth structure.  *See* A5791:9-25; A5806:14-5807:5.  The jury was thus presented with conflicting views about what constitutes corresponding structure for the "cross-point measuring means."  *Compare* A5959:15-5960:6 and A5964:25-5965:11 (Merritt), *with* A6345:21-6346:3 (Frahm).  As this Court has recognized, the "risk of confusing the jury is high when experts opine on claim construction."  *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1337 (Fed. Cir. 2009) (citation omitted) (holding that "it is improper to argue claim construction to the jury"); *Cytologix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005) (allowing experts to testify as to claim meaning and counsel to argue conflicting claim constructions was improper).  The district court's approach was contrary to this principle.

Moreover, as a means-plus-function limitation, the jury was required to determine that the 3DS contains structure that is identical or equivalent to the corresponding structure identified by the court and that the structure performs an identical function as the claimed function for the "cross-point measuring means" element.  *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000).

Without instruction from the court about the three techniques identified in its claim construction memorandum (A89), the jury was left to deliberate without any understanding as to which structures correspond to the claim terms. The jury was therefore erroneously left to identify the corresponding structure. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute."). The district court's decision not to instruct the jury on its constructions, "had the effect of leaving a critical question of claim construction to the jury" and was error. *Creative Internet Adver. Corp. v. Yahoo!, Inc.*, 476 F. App'x 724, 728 (Fed. Cir. 2011).

Thus, the failure of the district court to instruct the jury on its claim construction was prejudicial to Nintendo and warrants a new trial.

**B.    A New Trial Is Warranted Because Tomita Confused the Jury by Conflating "Cross-Point" and "Cross-Point Information" with "Offset."**

Before trial, Nintendo moved *in limine* to preclude Tomita from "arguing and/or introducing evidence regarding the meaning" of the term "cross-point." A2794, A2797. Although the district court had ruled that no construction was required for this claim term (A95), Mr. Merritt's expert reports purported to set forth at least two definitions of "cross-point," prompting Nintendo's motion. The district court denied the motion, ruling that although Mr. Merritt should refrain

from "using the term 'definition'" in his testimony," Tomita otherwise was

allowed to present evidence as to the meaning of the claim term "as explanation."

A5503:16-25.  In the court's view, it was merely "a question of terminology" as to

whether such testimony is permissible.  *Id.*   This was error, resulting in prejudice

to Nintendo.

Claim construction is a matter of law for the Court, not the jury.  *See*

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996) ("[T]he

construction of a patent, including terms of art within its claim, is exclusively

within the province of the court.").  Where parties disagree about the meaning of a

claim term, it is the court's duty to resolve it; it is improper to submit "parties'

arguments regarding the meaning and legal significance of [a claim term] . . . to the

jury."  *O2 Micro*, 521 F.3d at 1362.  A party, therefore, cannot further "define" or

"explain" claim terms to the jury, once the court has decided that they require no

further construction.  *See*, *e.g.*, *id.*; *ActiveVideo Networks, Inc. v. Verizon*

*Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) (affirming district court's

ruling that two claim terms have plain meanings that do not require additional

construction, and noting that "[i]t was up to the jury to determine whether the

[accused product] satisfied the *plain and ordinary meaning* of [those] limitations")

(emphasis added); *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 798

(Fed. Cir. 2010) (affirming denial of JMOL of anticipation where expert witness's

opinion on the claim term "operating directly on" contradicted the ordinary meaning of the term); *cf. Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) (noting with favor that district court stopped expert witness "from repeating to the jury" a rejected claim construction).

Claim 1 of the '664 patent requires first "measuring CP information on the cross-point (CP) of optical axes of said pick-up means" and then "offsetting and displaying" the two images "based upon . . . said cross-point information." A4960 (21:54-65). Mr. Merritt agreed with this basic premise. A5915:17-5916:4. Nevertheless, Mr. Merritt presented Tomita's interpretation that the *reverse* process could find "cross-point information" and also provided Tomita's definition that a "cross-point" is equivalent to the offset between left and right images upon display:

- "In this case, the storage ***cross-point or offset*** information in this structure is called sysmaker notes." A5804:23-24 (emphasis added).

- The 3DS is "detecting the ***cross-point***. It's detecting how far away the object is by how far apart you have to ***offset*** the left or right images to get them to appear." A5814:10-13 (emphasis added).

- "I was led to believe it was determining ***cross-point*** because the objects it would draw . . . appear in approximately the right place relative to the table . . . . And to do that it would have to set the ***offset***

of the things that it's drawing to match exactly what is on the table."
A5820:3-10 (emphasis added).

- The basis of Mr. Merritt's opinion that the 3DS "store[s] *cross-point information*" is that "the *offset* that was in effect when you took [the video], the offset between left and right, that was in effect when you pressed the start video button, also is present when you play it back." A5836:1-12 (emphasis added).

- "[I]f you know what the *offset* is and the spacing between the lenses, you can calculate the angle of the intersection of the two optical axes and thereby you can calculate eventually the distance from there to the *cross-point*." A5850:10-15 (emphasis added).

*See also* A6314:10-11 (Tomita counsel describing Mr. Merritt's position as "offset information is cross-point information").

Moreover, in summation, Tomita's counsel took the same approach, further compounding the confusion:

- It is "the *offset* of the sections of the images . . . that focuses at the *cross-point*." A6506:20-24 (emphasis added).

- The "*offset* value . . . tells you where the *cross-point* is." A6507:2-3 (emphasis added)

- "That *offset* value, that's *cross-point* information. That's

  infringement." A6508:23-24 (emphasis added).

The unchecked explanations and definitions of "cross-point" by Tomita

made it nearly impossible for the jury to focus on the meaning of the claim

language, which governed under the court's construction. Because Nintendo

suffered severe prejudice as a result, a new trial should be granted.

## CONCLUSION

For the reasons set forth above, the district court's judgment with respect to

infringement and validity should be reversed and judgment entered for Nintendo.

Alternatively, the case should be remanded for a new trial.


Dated: March 17, 2014                    Respectfully submitted,

                                         KAYE SCHOLER LLP
                                         JAMES S. BLANK
                                         SCOTT G. LINDVALL
                                         STEVEN S. ROSENTHAL
                                         PAUL I. MARGULIES

                                         _____*/s/ James S. Blank*_____
                                         James S. Blank
                                         *Attorney for Appellants Nintendo Co.,*
                                         *Ltd. and Nintendo of America Inc.*

## ADDENDUM

| Tab | Document | Page Nos. |
|---|---|---|
| 1 | Claim Construction Order, Dkt. No. 52 (January 3, 2012) | A95-98 |
| 2 | Claim Construction Memorandum, Dkt. No. 64 (February 22, 2013) | A73-94 |
| 3 | Decision on record (Tr. 984:14-990:25) granting plaintiffs' motion for JMOL on written description (March 12, 2013) | A38-A39 |
| 4 | Judgment, Dkt. No. 127 (March 14, 2013) | A31 |
| 5 | Memorandum Order denying defendants' motions for JMOL and a new trial and granting remittitur, Dkt. No. 166 (August 14, 2013) | A7-30 |
| 6 | Memorandum Order setting prejudgment interest, supplemental damages, and ongoing royalty, Dkt. No. 171 (December 11, 2013) | A3-6 |
| 7 | Judgment, Dkt. No. 172 ( December 16, 2013) | A2 |
| 8 | Amended Judgment, Dkt. No. 173 (December 30, 2013) | A1 |
| 9 | U.S. Patent No. 7,417,664 | A4933-4961 |

**TAB 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
TOMITA TECHNOLOGIES USA, LLC; TOMITA    :
TECHNOLOGIES INTERNATIONAL, INC.        :
                                        :       11 Civ. 4256(JSR)
              Plaintiffs,               :
                                        :            ORDER
              -v-                       :
                                        :
NINTENDO CO., LTD.; NINTENDO OF         :
AMERICA INC.,                           :
                                        :
              Defendants.               :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

        On November 22, 2011, the Court heard oral argument regarding
how to construe certain terms in the claims of U.S. Patent No.
7,417,664 (the "'664 patent").  Having now fully considered the
parties' written submissions and oral presentations, the Court makes
the following findings:

   •    The term "video image pick-up means" requires no
        construction.

   •    The term "stereoscopic video image pick-up device . . .
        for outputting video information from said pick up
        means" requires no construction.

   •    The term "cross-point (CP)" requires no construction.

   •    The term "cross-point information" means "information
        relating to the cross point, including information that
        can be used to determine the distance from the image
        pick-up means to the cross point."

- The term "optical axes" requires no construction.

- The term "cross-point measuring means for measuring CP information on the cross-point of optical axes of said pick-up means" is a means-plus-function limitation under 35 U.S.C. § 112(6).  The function is "to measure CP information on the cross-point (CP) of the optical axes of the two video pick-up means."  The corresponding structure is comprised of a cross-point data device that determines the cross-point information as described and shown, for example, in Figure One (where it is identified as number 403) and Figure Three (where it is identified at number 12), and in the '664 patent at 3:50-67, 4:1-6, 8:11-18, 9:23-35, and 18:17-42.  The structure also includes equivalents of the structures described above.

- The term "offset presetting means for offsetting and displaying said different video images based upon said video image information, said cross-point information and information on the size of the image which is displayed by said stereoscopic video image display device" is a means-plus-function limitation under 35 U.S.C. § 112(6).  The function is "offsetting and displaying said different video images based upon said

2

**A96**

video image information, said cross-point information and information on the size of the image which is displayed by said stereoscopic video image display device." The structure is comprised of a circuit and a manual entry unit that sets the offset between the right and left eye images. The '664 patent describes various embodiments of this structure in Figures One and Two, which identify it as number 106, Figures Two and Three, which refer to manual entry of information, Figures Four through Eight, and at 3:24-29, 3:39-44, 4:14-19, 4:63-67, 5:21-24; 5:35-37, 5:63-67, 9:3-10, 11:12-12:52, 15:50-67, 16:9-10, 16:15-16, 17:58-63, 18:6-11, 18:49-54, 19:31-35, 19:56-59, and 20:3-5. The structure also includes equivalents of the structures described above.

- The term "calculates the cross-point based upon the position of picking-up of an object in said two pick-up means" means "calculates the cross-point based upon the position of an object in the images picked up by the two pick-up means."
- The term "disposed in a parallel relationship" requires no construction.
- The term "stereoscopic feeling" requires no construction.

3

**A97**

A written opinion stating the reasons for this ruling will issue in due course.  In the meantime, the parties should proceed in accordance with the dates set forth in the Case Management Plan.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        December 31, 2011

4

**A98**

**TAB 2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
TOMITA TECHNOLOGIES USA, LLC; TOMITA  :
TECHNOLOGIES INTERNATIONAL, INC.      :
                                      :
                                      :        11 Civ. 4256(JSR)
           Plaintiffs,                :
                                      :        MEMORANDUM
           -v-                        :
                                      :
NINTENDO CO., LTD.; NINTENDO OF       :
AMERICA INC.,                         :
                                      :
           Defendants.                :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.



     Tomita Technologies USA, LLC ("Tomita"), the owner of the

intellectual property rights of inventor Seijiro Tomita, sues Nintendo

Co., Ltd. ("Nintendo") for patent infringement, claiming that the

Nintendo 3DS infringes U.S. Patent No. 7,417,664 (the "'664 patent").

On November 22, 2011, the Court heard oral argument regarding how to

construe certain terms in the claims of the '664 patent. On December

31, 2011, the Court issued a "bottom-line" order construing the

relevant terms. This Memorandum explains the reasons for the Court's

bottom-line order.

     By way of background, the '664 patent seeks to solve a problem in

the technology of three-dimensional or "stereoscopic" imaging.

Technicians have long used the same basic approach to project three-

dimensional images. See generally Declaration of John Merritt dated

October 27, 2011 ("Merritt Decl.") ¶¶ 16–28. In the old days, viewers

often wore glasses that had blue lenses (over their right eyes) and

1

**A73**

red lenses (over their left eyes). Id. ¶ 21 fig. 3. If the screen
displayed one image to those viewers, their eyes would have focused on
that image, which would have appeared to be flat and to lie on the
surface of the screen. In contrast, if the screen displayed two
images, a blue one on the right and a red one on the left, the
viewers' right eyes would have focused on the blue image, which they
would have seen through the blue lenses, and their left eyes would
have similarly focused on the red image. Id. Since the viewers' two
eyes would have focused on different parts of the screen, the focal
point — i.e., the point at which the eyes' lines of sight would have
intersected — would have been beyond the surface of the screen,
making the image appear to be inside the screen, i.e., to have "three-
dimensional" depth. Id. To make this system work, however, the blue
and the red images would have to be captured by two different cameras
or other instruments positioned to replicate the different locations
of each viewer's two eyes. Id. ¶ 22.

This system created certain problems, since viewers' distances
from the screen varied, as did the sizes of the screens on which
presentation occurred. Id. This variance changed the viewers' focal
points. Id. For example, if a viewer was closer to the screen than the
presenter anticipated, her eyes' lines of sight would have intersected
at a point that was not as far inside the screen as the presenter
desired. As a result, the image would have seemed flatter to the
viewer than the presenter intended. Id. ¶ 30.

2

**A74**

In an attempt to address this kind of problem in situations where the viewer has some control over the display, the '664 patent describes an apparatus that records not just two images (e.g., a red and a blue image), but also a variety of other information about the focal point so that a single viewer can adjust the display to attain the desired degree of stereoscopic effect. Id. ¶¶ 31-35. For example, if a viewer wants to sit farther from the screen than the presenter anticipated — or even if her eyes are closer together than the average viewer's — she can move the images on the screen closer together so that her focal point does not appear to be too far inside the screen. In other words, whereas three-dimensional presentations once included only one configuration of images, which people in different situations perceived differently, the '664 patent attempts to describe a method for presenting a number of different configurations in the hope of allowing different people to perceive essentially the same thing. Id.

Against this general background, the Court turns to the terms of the '664 patent. Construction of a patent's claims — "the portion[s] of the patent document that define[] the scope of the patentee's rights" — "is exclusively within the province of the court." Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996). Courts should interpret a word in a claim according to its "ordinary and customary meaning," i.e., "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005)

3

**A75**

(quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582
(Fed.Cir. 1996)). "[T]he person of ordinary skill in the art is deemed
to read the claim term not only in the context of the particular claim
in which the disputed term appears, but in the context of the entire
patent, including the specification." Id. at 1313. "In some cases, the
ordinary meaning of claim language as understood by a person of skill
in the art may be readily apparent even to lay judges, and claim
construction in such cases involves little more than the application
of the widely accepted meaning of commonly understood words." Id. at
1314.

   The context provided by the entire patent read as a whole,
combined with the record of the patent's proceedings in the Patent and
Trademark Office (the so-called "prosecution history"), constitutes
"intrinsic evidence" of a term's meaning. Id. at 1317. Courts may also
consider "extrinsic evidence," e.g., dictionaries and treatises, "as
long as those sources are not used to contradict claim meaning that is
unambiguous in light of the intrinsic evidence." Id. at 1324. Courts
are admonished, moreover, not to construe claims in a fashion that
"contribute[s] nothing but meaningless verbiage to the definition of
the claimed invention." Harris Corp. v. IXYS Corp., 114 F.3d 1149,
1152 (Fed Cir. 1997). Moreover, the Court should not construe a claim
to protect only examples recited in the specification, which may
merely be illustrative. Phillips, 415 F.3d at 1323 ("[W]e have
expressly rejected the contention that if a patent describes only a

4

**A76**

single embodiment, the claims of the patent must be construed as being limited to that embodiment.").

Under 35 U.S.C. § 112(6), where a claim expresses a means "for performing a specified function," but does not specify a structure, "such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." The construction of a "means-plus-function limitation" under § 112(6) has two steps: (1) "determine the claimed function"; and (2) "identify the corresponding structure in the written description that performs that function." JVW Enterprises, Inc. v. Interact Accessories, Inc., 424 F.3d 1324, 1330 (Fed. Cir. 2005). Use of the words "means" creates a presumption that the means-plus-function limitation applies. Sage Products, Inc. v. Devon Industries, Inc., 126 F.3d 1420, 1427 (Fed. Cir. 1997). Nonetheless, "where a claim uses the word 'means,' but specifies no corresponding function for the 'means,' it does not implicate section 112." Id. at 1427-28.

The parties have requested that the Court construe ten different claim terms. Before turning to the individual terms, however, the Court notes that one dispute between the parties pertains to several of the terms in question. Specifically, Nintendo argues that the '664 patent does not cover systems in which the "video image pick-up means" — most commonly, cameras — point in parallel directions. According to Nintendo, since parallel lines never cross, if the video image pick-up means point in parallel directions, they will never focus on the same image, as a viewer's two eyes would. In such a scenario,

5

**A77**

Nintendo argues, the "distance to [the cross-point] is infinite," and the system envisioned by the '664 patent cannot record any information about the cross-point. Cf. U.S. Patent No. 7,417,664 filed (Aug. 26, 2008) ("'664 patent") at 10:51-52.

In further support of this argument, Nintendo notes that a European patent examiner refused to find that Tomita's European patent application — which was identical to the application for the '664 patent — covered systems in which the video pick-up means pointed in parallel directions. Declaration of Stephen J. Elliott dated October 27, 2011 ("Elliott Decl.") Ex. 2. Apparently in response to the European examiner's decision, Tomita amended its American patent application by deleting at least one instance in which it used the phrase "in a parallel relationship" to describe the video image pick-up means. Elliot Decl. Ex. 3 at 86. Thus, Nintendo concludes that the '664 patent disclaims any system in which the video image pick-up means point in parallel directions.

The Court disagrees. The '664 patent specifically claims that it covers systems in which the "two pick-up means . . . are disposed in a parallel relationship." '664 patent at 22:30-34; see also id. at 3:62-67, 18:29-34. Thus, when the U.S. Patent and Trademark Office approved the '664 patent, its examiner necessarily disagreed with the European examiner on whom Nintendo relies. Cf. TI Group Automotive Systems (North America), Inc. v. VDO North America, L.L.C., 375 F.3d 1126, 1136 (Fed. Cir. 2004). The American examiner had good reasons for disagreeing. Stereoscopic systems in which the video image pick-up

6

**A78**

means point in parallel directions were "well-known at the time of the filing of the '664 patent," Merritt Decl. ¶ 26 & fig. 4, and were known as long ago as 1993, Andrew Woods et al., Image Distortions in Stereoscopic Video Systems, Proceedings of the SPIE, Feb. 1993, at 3 & fig. 2. Such systems function by laterally shifting computer chips located behind the cameras' lenses in order to change the cameras' foci without moving the cameras. Merritt Decl. ¶ 26 & fig. 4.

Nor does the Court agree with Nintendo that either the specification or the prosecution history of the '664 patent "clearly disclaim[s]" systems in which the video image pick-up means point in parallel directions. See Oatey Co. v. IPS Corp., 514 F.3d 1271, 1277 (Fed. Cir. 2008). Whatever reason Tomita may have had for removing one instance of the phrase "in a parallel relationship" from the specification, that reason apparently did not lead Tomita to remove two similar phrases in the specification. Moreover, given that stereoscopic systems with parallel video image pick-up means were well known at the time of filing, a person of ordinary skill in the art would have understood how to apply Tomita's insights about collecting important information to such stereoscopic systems. See '664 patent at 18:29-34. Accordingly, the Court interprets the '664 patent to include systems with parallel video image pick-up means and disfavors interpretations of claim terms that exclude such systems. Oatey, 514 F.3d at 1276.

Turning to another threshold issue, the parties should note that, where the Court concludes below that a term requires no construction,

7

**A79**

it does not invite the parties to present their arguments about that
term's meaning to the jury. See O2 Micro Int'l Ltd. v. Beyond
Innovation Tech. Co., 521 F.3d 1351, 1362 (Fed. Cir. 2008). Rather, in
light of the fact that courts must resolve disputes about claim
construction, the determination that a claim requires no construction
constitutes a rejection of the narrow construction proposed by
Nintendo and a finding that using other words would either restate the
claim, albeit slightly differently, or add only meaningless verbiage.
See U.S. Surgical Corp. v. Ethicon, 103 F.3d 1554, 1568 (Fed. Cir.
1997) ("The Markman decisions do not hold that the trial judge must
repeat or restate every claim term in order to comply with the ruling
that claim construction is for the court. Claim construction is a
matter of resolution of disputed meanings and technical scope, to
clarify and when necessary to explain what the patentee covered by the
claims, for use in the determination of infringement. It is not an
obligatory exercise in redundancy.").

Turning now to the terms in question, the Court first finds that
the term "video image pick-up means" requires no construction, any
more than typical such means, cameras, would. Nintendo argues that,
because this term includes the word "means," the Court should imply a
means-plus-function limitation under § 112(6). Sage Products, 126 F.3d
at 1427. Nonetheless, the patent consistently uses the term "video
image pick-up means" to refer to a structural element. See Baran v.
Med. Device Techs., Inc., 616 F.3d 1309, 1317 (Fed. Cir. 2010) ("The
relevant inquiry is whether the term at issue is purely functional.").

8

**A80**

Video image pick-up means comprise a necessary part of all
stereoscopic systems. The purported insight of the '664 patent does
not involve picking up images, but instead recording information in
order to allow viewers to adjust the display of such images. See Apple
Computer, Inc. v. Articulate Sys., Inc., 234 F.3d 14, 25 (Fed. Cir.
2000) ("[T]he claim must be interpreted in light of the . . . purpose
of the invention described therein."). Accordingly, the phrase "video
image pick-up" is "idle description" of a structural element rather
than a part of the patented system's "contemplated function." Baran,
616 F.3d at 1317.[1] Because the Court finds the term "video image pick-
up means" sufficiently clear, it declines to burden it with additional
construction.

For substantially the same reasons, the Court finds that the term
"stereoscopic video image pick-up device . . . for outputting video
information from said pick up means" requires no construction. Just as
all stereoscopic systems must have video image pick-up means, so they
must have structural components that receive data from the pick-up
means and transform that data into stereoscopic projection. Cf.
Merritt Decl. ¶¶ 42–43. Accordingly, this term describes only a
structural element and not a part of the patented system's
contemplated function.

_____

[1] Moreover, even if the term "video image pick-up means" did describe a
function, for which the '664 patent discloses only a camera as a
structure, § 112(6) provides that the '664 patent would cover cameras
and "equivalents thereof." The Court does not see how, and Nintendo
has not provided any examples in which, a video image pick-up means in
a stereoscopic system would not qualify as an equivalent of a camera.

9

**A81**

Moreover, while Nintendo urges the Court to regard the term as a means-plus-function limitation, "the presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome." Inventio AG v. ThyssenKrupp Elevator Americas Corp., 649 F.3d 1350, 1356 (Fed. Cir. 2011). Although parties sometimes rebut this presumption by showing that "there is no structure recited in the limitation that would save it from application of section 112, ¶ 6," Mas-Hamilton Group v. LaGard, Inc., 156 F.3d 1206, 1214 (Fed. Cir. 1998), here, the '664 patent recites a structure that those skilled in the art would comprehend, e.g., '664 patent at 8:18-24. Thus, the Court declines to construe the term as a means-plus-function limitation. Because the Court finds that that the term "stereoscopic video image pick-up device . . . for outputting video information from said pick up means" is sufficiently clear, it undertakes no construction of it.

Next, the Court finds that the term "cross-point (CP)" requires no construction. As the term clearly indicates, cross-point means the point on which the images captured by the two video image pick-up means converge, mimicking the focal point of the viewer's right and left eyes. See '664 patent at figs. 4-6. Nintendo does not dispute that the term indicates this, but instead invites the Court to incorporate language from the specification that indicates that the cross point will lie "on the surface," id. at 1:28, or "plane of the

**A82**

object" captured, id. at 9:22.[2] Nonetheless, Nintendo does not explain

what such language adds to the definition of cross point. Because

courts should avoid constructions that "contribute nothing but

meaningless verbiage to the definition of the claimed invention,"

Harris Corp., 114 F.3d at 1152, the Court declines to give a

construction of cross-point that refers to the "surface" or "plane" of

the object captured. Moreover, because stereoscopic presentation has

long relied on the convergence of two separate images, the Court finds

that those of ordinary skill in the art would readily understand the

term cross-point, see Merritt Decl. ¶ 44, and declines to burden the

term with additional construction.

Building on the Court's understanding of cross-point, the Court

construes the term "cross-point information" to mean "information

relating to the cross-point, including information that can be used to

determine the distance from the image pick-up means to the cross-

point." See, e.g., '664 patent at 9:28-34. Nintendo raises two

objections to this construction. First, it argues that the '664 patent

defines cross-point information to include only "information on the

---

[2] Nintendo also invites the Court to include the term "optical axes" in
its construction of cross-point. Nonetheless, because, as described
below, the Court rejects Nintendo's narrow construction of "optical
axes," it declines to incorporate that construction into the
construction of cross-point. Moreover, use of claim terms to define
one another creates its own serious problems. For example, if the
Court concluded that cross-point meant the "point of intersection of
the optical axes," then the claim would read: "the [point of
intersection of the optical axes] of optical axes." '664 patent at
21:56. Put somewhat differently, because the terms appear alongside
one another in the claim, context renders their relation to one
another clear.

11

**A83**

distance between the cameras and [the cross-point]," id. at 9:28-29,
and "[t]he distance between the left-eye camera and the right-eye
camera (intereye distance)," id. at 31-32. Based on these references,
Nintendo concludes that cross-point information includes only these
three distances. This argument overlooks the fact that these three
distances constitute the sides of a triangle. By recording other
information about the relevant triangle, such as the angles formed
between the optical axes and the line between the two video image
pick-up means, one can determine the distances that, according to
Nintendo, constitute cross-point information. Moreover, because the
'664 patent refers to "information on" the distances described by
Nintendo, id. at 9:28, the Court construes cross-point information to
include not only those specific distances, but also any other
"information that can be used to determine" those distances.

Second, Nintendo argues that the Court's construction of cross-
point information should specify that, "if the distance to [the cross-
point] is infinite," then "there is no [cross-point] information." Id.
at 10:51-52. According to Nintendo, by making this acknowledgement
about cross-point information, the '664 patent disclaims stereoscopic
systems in which the video image pick-up means point in parallel
directions. As discussed above, however, stereoscopic systems with
parallel video image pick-up means can generate a cross-point that is
a finite distance from the pick-up means by, for example, laterally
shifting computer chips located inside the means. See Merritt Decl.
¶ 26 & fig. 4; see also Andrew Woods et al., Image Distortions in

12

**A84**

Stereoscopic Video Systems, Proceedings of the SPIE, Feb. 1993, at 3 &
fig. 2. Thus, the language quoted by Nintendo does not constitute a
disclaimer.

Moreover, Nintendo takes the quoted language from the '664 patent
out of context. According to the '664 patent, "by controlling the
timing of read-out of the right-eye video data," the patented system
can generate stereoscopic effect "even if" there is no cross-point
information. '664 patent at 10:46–52. Because the language Nintendo
emphasizes does not indicate that parallel pick-up means will not
generate a cross-point — instead noting that the patented system can
appropriately deal with the absence of cross-point information,
however that absence might occur — the Court sees no reason to refer
in its construction of cross-point information to an absence that, by
virtue of its apparent insignificance to the patented system,
threatens to confuse interpreters.

Next, the Court finds that the term "optical axes" requires no
construction. At the time of filing, one of ordinary skill in the art
would have understood the meaning of the term optical axis. Merritt
Decl. ¶ 48; see also Declaration of Jan-Michael Frahm dated October
27, 2011 ¶¶ 15–16. Notwithstanding the accessibility of this term,
Nintendo argues by reference to extrinsic evidence that an optical
axis must "coincide[] with the axis of rotational symmetry of the lens
of a pick-up means." Nintendo further claims that figure 14,
containing prior art, supports its construction because the optical
axes in that figure appear to bisect the cameras. Cf. Kumar v. Ovonic

13

**A85**

Battery Co., 351 F.3d 1364, 1368 (Fed. Cir. 2003) ("[P]rior art cited
in a patent or cited in the prosecution history of the patent
constitutes intrinsic evidence."). Nonetheless, the portion of the
patent describing figure 14 makes no reference to axes of rotational
symmetry. '664 patent at 1:27-32. The Court sees no reasons to
attribute so complicated a concept as "the axis of rotational
symmetry" to figure 14 when the '664 patent's description of that
figure fails to do so. Moreover, the patent uses the term optical axes
interchangeably with "lines of sight." See '664 patent at 11:4-7
(describing the "optical cross point of the right and left video
images" as "a point at which the right and left lines of sight
intersect[] with each other").

Most problematically, however, by focusing on "the axis of
rotational symmetry," Nintendo apparently asks the Court to construe
"optical axes" such that the '664 patent cannot apply to systems with
parallel pick-up means, one of the '664 patent's preferred
embodiments. See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576,
1583 (Fed. Cir. 1996) ("Indeed, if 'solder reflow temperature' were
defined to mean liquidus temperature, a preferred . . . embodiment in
the specification would not fall within the scope of the patent claim.
Such an interpretation is rarely, if ever, correct and would require
highly persuasive evidentiary support, which is wholly absent in this
case."). If cameras point in parallel directions, Nintendo argues,
lines that bisect their lenses (as in figure 14) will also be
parallel, forming no cross-point. But, to repeat once more, systems

14

**A86**

with parallel cameras can in fact produce cross-points. See Merritt
Decl. ¶ 26 & fig. 4; see also Andrew Woods et al., Image Distortions
in Stereoscopic Video Systems, Proceedings of the SPIE, Feb. 1993, at
3 & fig. 2.[3] Moreover, Nintendo employs an analytical approach that
the Federal Circuit has forbidden, using extrinsic evidence about the
definitions of "optical axes" in order to foreclose the most plausible
interpretation of the intrinsic evidence. See Vitronics, 90 F.3d at
1584 ("[E]xtrinsic evidence in general, and expert testimony in
particular, may be used only to help the court come to the proper
understanding of the claims; it may not be used to vary or contradict
the claim language. . . . Nor may it contradict the import of other
parts of the specification."). Accordingly, the Court rejects
Nintendo's unduly narrow construction of the term "optical axes."
Moreover, because the Court finds that the alternative construction
offered by Tomita does not clarify the term, and that the term is
already sufficiently clear, the Court declines to adopt any additional
construction.

The Court next finds that the term "cross-point measuring means
for measuring CP information on the cross-point of optical axes of
said pick-up means" is a means-plus-function limitation under 35

---

[3] In fact, the article by Woods et al., published in 1993,
distinguishes in the "parallel camera configuration" between the
lenses' optical axes, which never cross, and the cameras' optical
axes, which do not point straight out of the camera and which do
cross. Image Distortions in Stereoscopic Video Systems, Proceedings of
the SPIE, Feb. 1993, at fig. 2. This distinction indicates that the
extrinsic evidence cited by Nintendo does not exhaust the
understanding of optical axes shared by those of ordinary skill in the

15

U.S.C. § 112(6). The function is "to measure CP information on the cross-point (CP) of the optical axes of the two video pick-up means." The corresponding structure is comprised of a cross-point data device that determines the cross-point information as described and shown, for example, in figure 1 (where it is identified as number 403) and figure 3 (where it is identified at number 12), and in the '664 patent at 3:50-67, 4:1-6, 8:11-18, 9:23-35, and 18:17-42.  Under § 112(6), the structure also includes equivalents of the structures described above.

Nintendo objects to this construction, arguing that the figures mentioned above contain only black-box diagrams and that the passages in the specification mentioned above refer only to techniques by which the cross-point measuring means can perform its function. See Telecordia Techs., Inc. v. Cisco Sys., Inc., 612 F.3d 1365, 1376 (Fed. Cir. 2010) ("The question is not whether one of skill in the art would be capable of implementing a structure to perform the function, but whether that person would understand the written description itself to disclose such a structure." (quoting Tech. Licensing Corp. v. Videotek, Inc., 545 F.3d 1316, 1338 (Fed. Cir. 2008))). But in Telecordia, the Federal Circuit concluded that, although figures in the relevant patent depicted a "controller" only as a "black box" and "nothing in the figures describe[d] the details of its inner circuity," the patent "disclose[d] adequate defining structure to render the bounds of the claim understandable to an ordinary artisan"

---

art at the relevant time.

**A88**

because "an ordinary artisan would have recognized the controller as
an electronic device with a known structure." 612 F.3d at 1377. The
'664 patent contains similar information, referring to "a cross-point
data input device . . . which measures" cross-point information by any
of three different techniques. '664 patent at 9:23–35. Moreover, the
black-box diagrams indicate that these devices have a specific place
in the patented system, namely, inside the stereoscopic image pick-up
device. Id. figs. 1 & 3. Because devices for measuring cross-point
information like those described in the '664 patent were well known to
ordinary artisans at the relevant time, the Court concludes that an
ordinary artisan would have understood the references to these devices
to disclose known structures. See Merritt Decl. ¶¶ 50–51. Accordingly,
the Court rejects Nintendo's argument that the '664 patent fails to
disclose adequate structure.

The Court further determines that the term "offset presetting
means for offsetting and displaying said different video images based
upon said video image information, said cross-point information and
information on the size of the image which is displayed by said
stereoscopic video image display device" is a means-plus-function
limitation under 35 U.S.C. § 112(6). The Court addresses the function
and the corresponding structure in turn. First, the function is
"offsetting and displaying said different video images based upon said
video image information, said cross-point information and information
on the size of the image which is displayed by said stereoscopic video
image display device." Nintendo argues that the function should also

17

**A89**

include the '664 patent's reference to "presetting a[n] offset." '664

patent at 9:3; cf. Apple Computer, 234 F.3d at 25 ("The claim

interpretation Articulate asserts focuses on the words following 'help

access window' and ignores the limitation imposed by the word

'help.'"). But the '664 patent more consistently refers to the

function at "offsetting and displaying said different video images."

'664 patent at 3:25-26; 4:14-15; 21:61-62. Moreover, Nintendo does not

describe what the "presetting a[n] offset" would mean in the context

of the patent. The '664 patent purportedly describes a method for

offsetting images in order to preserve a constant ratio between

different distances, thus producing consistent stereoscopic effect.

See id. at 12:15-52, figs. 7 & 8. While the "offset presetting means"

requires a default or preset value for the ratio in order to perform

the function of offsetting the two images, that value would not

constitute a part of the function the means performed, but instead

data that the means used to perform that function. Thus, in the

absence of any explanation for how "presetting a[n] offset"

constitutes a function, the Court refuses to include that language

within the description of the functions performed by the "offset

presetting means."

Second, the structure corresponding to the "offset presetting

means" is comprised of a circuit and a manual entry unit that sets the

offset between the right and left eye images.  The '664 patent

describes various embodiments of this structure in figures 1 and 2,

which identify it as number 106, figures 2 and 3, which refer to

18

**A90**

manual entry of information, figures 4 through 8, and at 3:24-29,
3:39-44, 4:14-19, 4:63-67, 5:21-24; 5:35-37, 5:63-67, 9:3-10, 11:12-
12:52, 15:50-67, 16:9-10, 16:15-16, 17:58-63, 18:6-11, 18:49-54,
19:31-35, 19:56-59, and 20:3-5. Under § 112(6), the structure also
includes equivalents of the structure described above.

While Nintendo argues that the '664 patent fails to disclose
adequate structure, the patent specifically discloses, for example,
that a "stereoscopic video image signal generating circuit 101 offsets
and displays the right-eye and left-eye video images." '664 patent at
15:52-54; see also Apex Inc. v. Raritan Computer, Inc., 325 F.3d 1364,
1373 (Fed. Cir. 2003) ("While we do not find it necessary to hold that
the term 'circuit' by itself always connotes sufficient structure, the
term 'circuit' with an appropriate identifier such as 'interface,'
'programming' and 'logic,' certainly identifies some structural
meaning to one of ordinary skill in the art."). Moreover, in its
alternative argument, Nintendo fails to provide a plausible
explanation for why the Court should refer only to the structures
Nintendo emphasizes rather than the other structures disclosed by the
'664 patent. See Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d
1250, 1258 (Fed. Cir. 1999) ("A means-plus-function claim encompasses
all structure in the specification corresponding to that element and
equivalent structures."). Instead, Nintendo argues, somewhat
curiously, that the Court should limit the term to the structure
disclosed in figure 3 because figures 2 and 3 disclose the essentially
the same structure. Even if Nintendo's claim were true, it would

19

**A91**

justify finding that both figures disclose (the same) structure, not
limiting the term to the structure disclosed in one. Accordingly, the
Court finds that that the term encompasses all of the structure
referenced in the passages of the '664 patent cited above.

Next, the Court finds that the term "calculates the cross-point
based upon the position of picking-up of an object in said two pick-up
means" means "calculates the cross-point based upon the position of an
object in the images picked up by the two pick-up means." Nintendo
first argues that this term is indefinite because, where cameras point
in parallel directions, their optical axes will not generate a cross-
point, preventing the calculation of any cross-point. The Court has
already addressed and rejected this argument above. In the
alternative, Nintendo argues that the Court should substitute the
phrase "computes mathematically" for the word calculates. Nonetheless,
Nintendo does not indentify any place in the specification where
"computes mathematically" appears, instead relying on extrinsic
evidence. Because the Court finds that the term "calculates" has a
readily apparent, ordinary meaning, it finds that additional
construction will not clarify this term and declines to impose any.

Similarly, the Court finds that the term "disposed in a parallel
relationship" requires no construction. Nintendo argues in favor of a
construction that clarifies that the system's pick-up means are
disposed in this relationship. However, the '664 patent already makes
this fact abundantly clear by referring to "two pick-ups means which
are disposed in a parallel relationship." '664 patent at 22:34-35.

20

**A92**

Accordingly, the Court finds Nintendo's construction unhelpful and
declines to adopt it.

Finally, the Court finds that the term "stereoscopic feeling"
requires no construction. Nintendo argues that this term is
indefinite. Nonetheless, "[i]f the meaning of the claim is
discernible, even though the task may be formidable and the conclusion
may be one over which reasonable persons will disagree, we have held
the claim sufficiently clear to avoid invalidity on indefiniteness
grounds." Exxon Research and Eng'g Co. v. United States, 265 F.3d
1371, 1375 (Fed. Cir. 2001). The meaning of "stereoscopic feeling" is
not only discernible, but is obvious from the context of the '664
patent. Specifically, the '664 patent attempts to recreate a
stereoscopic viewing experience by preserving the ratio between
certain, important distances. Reference to this ratio provides an
"objective standard" that renders the term "stereoscopic feeling"
definite. Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342,
1350 (Fed. Cir. 2005). "Stereoscopic feeling" increases and decreases
as the ratio changes, alternately augmenting and reducing the
perceived depth of the displayed image. The fact that the viewer can
manipulate the ratio according to her preferences changes nothing.
Therefore, because the Court finds that the parties' proposed
construction does not clarify the term and does not resolve any
dispute between them, the Court declines to construe the term.

21

**A93**

In sum, for the foregoing reasons, the Court reaffirms the claim constructions contained in its bottom-line order dated December 31, 2011.

_____
JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        February 21 2012

22

**A94**

**TAB 3**

TOMITA TECHNOLOGIES USA v
NINTENDO CO., LTD.,                                                    **March 12, 2013**

| D3C8TOM2 | Page 984 |
|---|---|

1  between the two experts.
2    THE COURT: Let me hear from plaintiffs' counsel.
3    MR. STEIN: Dr. Frahm did not identify where the
4  manual entry unit is disclosed in Matsugu '408 that offsets the
5  left and right images. The portions of the patent that he
6  cited to makes no mention of it, and he admitted that on cross.
7    MR. LINDVALL: I disagree. He specifically showed two
8  portions of the patent that he understood, as one skilled in
9  the art would understand, what would disclose a manual entry
10  unit.
11    THE COURT: I agree with that. The motion is denied
12  on that prong.
13    Let's go to the second prong.
14    MR. STEIN: Second, Tomita moves for judgment as a
15  matter of law regarding Nintendo's lack of enablement and lack
16  of written description defenses.
17    Tomita does not believe there is sufficient evidence
18  under the clear and convincing evidence standard to show that
19  the '664 patent is invalid on those bases. These invalidity
20  defenses are presumably directed to the parallel camera
21  configuration described in claims of the '664 patent.
22    Nintendo's sole basis for these defenses was column
23  10, lines 46 to 53. In particular, the passage that states,
24  "The parallax can be adjusted by controlling the timing of
25  readout from the right-eye video data depending on the screen

| D3C8TOM2 | Page 985 |
|---|---|

1  size even if distance to CP is infinite (there is no CP
2  information 12)."
3    Based on that passage, Dr. Frahm asserts that the '664
4  patent says using cameras with parallel optical axes cannot be
5  done. And Dr. Frahm also asserts based on that passage that
6  the '664 patent claims offsetting between left and right images
7  based on the cross-point at infinite distance, but does not
8  explain how it can be done.
9    The Court, however, previously explained that Nintendo
10  takes that quoted language from the '664 patent out of context,
11  and the language Nintendo emphasizes, and Dr. Frahm emphasizes,
12  does not indicate that parallel pick-up means will not generate
13  ray cross-point.
14    Nintendo similarly relies on the same incorrect
15  reading of that passage in its lack of enablement and lack of
16  written description defenses. As a result, there is not
17  sufficient evidence under the clear and convincing standard for
18  the jury to find invalidity on those grounds.
19    THE COURT: All right. Let me hear on that prong from
20  defense.
21    MR. LINDVALL: Your Honor, Dr. Frahm didn't rely -- he
22  did mention that specification. That's not what he relied on.
23  He relied on his experience of one skilled in the art.
24    Let me read you a passage from Mr. Merritt that would
25  support our non-enablement argument. I asked Mr. Merritt in

| D3C8TOM2 | Page 986 |
|---|---|

1  this trial, "If they are close to parallel, does that mean they
2  are going to intersect in space?" Mr. Merritt responded, "It
3  means they could intersect seven light years away, but they
4  still intersect. The only time they don't intersect is when
5  they are actually parallel, which is almost impossible."
6    Well, I think what we can see here is Mr. Merritt is
7  agreeing with Dr. Frahm that if you have parallel or close to
8  parallel optical axes, the chance of creating a cross-point is
9  very, very remote. And if Tomita claims that their claim scope
10  is of such breadth that it will cover parallel camera
11  arrangement which has optical axes which are parallel, then
12  that means those claims are invalid under enablement. If they
13  don't claim that, if you can create a cross-point, if you have
14  a situation where the optical axes are parallel, which would
15  not create a cross-point, the patent itself doesn't teach that
16  type of embodiment because no cross-point is being created and
17  one skilled in the art wouldn't know how to create a
18  cross-point of parallel optical axes, as Mr. Merritt testified.
19    THE COURT: What do you say about the argument that
20  they just made that you haven't come forth with sufficient
21  evidence on the written description requirement? Put aside the
22  fact that I found even your latest proposed charge, the last
23  one you submitted last night on that subject, incomprehensible,
24  but it may be partly because the federal circuit has found it
25  difficult to use the English language in describing how a

| D3C8TOM2 | Page 987 |
|---|---|

1  patent must meet a written description requirement. Putting
2  aside that, we will get to that on the charge if we have to,
3  but on the merits, what is your evidence that it doesn't meet
4  the written description requirements?
5    MR. LINDVALL: With written description, I agree. We
6  are just looking at the four corners of the patent there,
7  unlike enablement. With written description what one does, and
8  I will do my best to try to explain this, is you look at the
9  patent claim, and then you look at the court's construction and
10  the breadth of it. And what Tomita has been arguing is that
11  the patent claim will be broad enough to cover a situation
12  where you have a camera arrangement with parallel axes.
13    If that's true, then you look into the written
14  description, the specification, and you see if there is support
15  in words for that type of arrangement. And the only discussion
16  about a parallel camera arrangement, where you have truly
17  optical axes that are parallel, is that one section that
18  Mr. Stein just referred to where the quote says you wouldn't
19  have cross-point information in that situation.
20    So what the position we would be taking in that case
21  is that the specification itself says that you would have
22  cross-point information. So, therefore, there is no support to
23  claim such an invention in claim 1. And that's our written
24  description argument.
25    THE COURT: Let me hear from plaintiffs.

TOMITA TECHNOLOGIES USA v
NINTENDO CO., LTD.,                                                      March 12, 2013

D3C8TOM2                                                    Page 988

1          MR. STEIN: I think Nintendo's counsel is
2  misconstruing Tomita's position in the case.  Tomita's position
3  and what Mr. Merritt said is that there can be a cross-point of
4  optical axes in the cameras even in a parallel camera
5  arrangement.  So when he talks about there not being a
6  cross-point, it's not what we have been arguing.  We have
7  consistently put up pictures and the Court has construed the
8  patent very clearly to cover a situation that would include a
9  parallel camera arrangement, you can create a cross-point in a
10 parallel camera arrangement.  It was known at the time.  It was
11 well-known at the time.  The Court not only heard the testimony
12 from Mr. Merritt that that type of configuration was known to
13 create a cross-point, but we brought in a paper from Mr. Woods,
14 which was dated I think eight years earlier, which clearly
15 showed how in a parallel camera arrangement you could create a
16 cross-point.
17         Also, with respect to written description, which is a
18 doctrine that is rarely applied to invalidate a patent, the
19 issue was whether or not Mr. Tomita was in possession of the
20 invention at the time he filed the application.  One test of
21 that is, was it described?  And, also, did he claim it?  And
22 the parallel camera arrangement was claimed in his originally
23 filed claims.  So for Nintendo to say he wasn't in possession
24 of that invention at the time he filed his application seems to
25 be completely without support.

D3C8TOM2                                                    Page 989

1          THE COURT: All right.  I am going to grant in part
2  and deny in part this prong of the motion.
3          I deny the part related to enablement.  I grant the
4  part related to written description.
5          Most of what I had to say on the subject of enablement
6  was actually said last night in connection with the charging
7  conference, and I will limit defense counsel's argument on
8  enablement to the kinds of arguments he indicated last night
9  and today so that it doesn't infringe on the Court's claim
10 construction.
11         With respect to the written description requirement, I
12 will start with the Federal Circuit in one of its most recent
13 formulations.  This is from Centocor Ortho Biotech, Inc. v.
14 Abbott Laboratories, 636 F.3d 1341, at page 1348 (Fed.Cir.
15 2011).  "To satisfy the written description requirement, the
16 applicant must convey with reasonable clarity to those skilled
17 in the art that, as of the filing date sought, he or she was in
18 possession of the invention and demonstrate that by disclosure
19 in the specification of the patent.  Assessing such possession
20 as shown in the disclosure requires an objective inquiry into
21 the four corners of the specification.  Ultimately the
22 specification must describe an invention understandable to a
23 person of ordinary skill in the art and show that the inventor
24 actually invented the invention claimed.  A mere wish or plan
25 for obtaining the claimed invention is not adequate written

D3C8TOM2                                                    Page 990

1  description."
2          Now, I know that I am a poor dumb district judge, not
3  skilled in all the learning that my betters on the Federal
4  Circuit possess, and, therefore, it would certainly be
5  inappropriate for me to suggest that what I have just read is
6  virtually meaningless.  It's a combination of terminology, such
7  as the use of the word "possession," in a way unknown to the
8  English language, and a bunch of other terms that are used in a
9  way that makes their application almost impossible.  I am not
10 surprised that this ground of invalidity is rarely invoked
11 because no one really understands it, except, of course, my
12 superiors on the Federal Circuit.
13         However, one gets, I think, a better idea of what the
14 Federal Circuit had in mind in the opinion of Judge Lourie, in
15 an en banc opinion of the Federal Circuit a year earlier,
16 entitled Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co., 598
17 F.3d 1146 (Fed.Cir. 2010)(en banc), where he says that the
18 purpose of this requirement is directed against "claims that
19 merely recite a description of the problem to be solved while
20 claiming all solutions to it."
21         That I can understand.  And that is not present here.
22 There is no evidence that would justify a reasoned argument,
23 let alone clear and convincing evidence, that that is the
24 problem with this patent, and, therefore, the motion to strike
25 the written description defense is granted.

D3C8TOM2                                                    Page 991

1          You had one other problem?
2          MR. STEIN: Two more.
3          THE COURT: We are on a roll.
4          MR. STEIN: Tomita moves for judgment as a matter of
5  law of infringement.  The undisputed evidence before the jury
6  establishes infringement.  In particular, the evidence
7  establishes that the 3DS determines cross-point information in
8  the form of a focus value at the time an image is captured.
9  The 3DS then outputs the image information and the cross-point
10 information to a medium, such as an SD card, RAM, flash memory
11 or a bus.
12         The undisputed evidence also shows that on display
13 images, the 3DS sets the offset between the left and right
14 images based on the image information and the cross-point
15 information.
16         In addition, the undisputed evidence shows that the
17 offset is multiplied by a scaling factor that is based on the
18 size of the displayed image.
19         Accordingly, the undisputed evidence shows that the
20 3DS meets each limitation of claim 1, and we respectfully
21 submit that Tomita is entitled to a judgment as a matter of law
22 on that issue.
23         THE COURT: Let me hear from defense counsel.
24         MR. LINDVALL: Your Honor, Nintendo presented three
25 witnesses which go to this fact which all rebut what Mr.

**TAB 4**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

TOMITA TECHNOLOGIES,

                         Plaintiff,

          -against-

NINTENDO CO. LTD.,

                        Defendant.

----------------------------------------------------------X

DATE FILED: 3/14/13

11 **CIVIL** 4256 (JSR)

**JUDGMENT**

A Jury Trial before the Honorable Jed S. Rakoff, United States District Judge, having begun on February 25, 2013, and at the conclusion of the trial, on March 13, 2013, the jury having rendered a verdict in favor of the plaintiff in the amount of $30,200,000.00 in compensatory damages, it is,

**ORDERED, ADJUDGED AND DECREED:** That the plaintiff have judgment in the sum of $ 30,200,000.00 in compensatory damages as against the defendant.

**DATED:**  New York, New York
        March 14, 2013

**RUBY J. KRAJICK**

**So Ordered:**

_____
         **USDJ**

         **Clerk of Court**

**BY:**
      _____
         **Deputy Clerk**

**THIS DOCUMENT** WAS ENTERED
**ON THE DOCKET ON** _____

**A31**

**TAB 5**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
TOMITA TECHNOLOGIES USA, LLC; TOMITA    :
TECHNOLOGIES INTERNATIONAL, INC.        :
                                        :        11 Civ. 4256 (JSR)
              Plaintiffs,               :
                                        :        MEMORANDUM ORDER
         -v-                            :
                                        :
NINTENDO CO., LTD.; NINTENDO OF         :
AMERICA INC.,                           :
                                        :
              Defendants.               :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

     Beginning on February 25, 2013, the Court conducted a jury

trial on claims by Tomita Technologies USA, LLC and Tomita

Technologies International (collectively, "Tomita") that the

Nintendo 3DS, a handheld gaming console created and sold by Nintendo

Co., Ltd., and Nintendo of America, Inc. (collectively, "Nintendo"),

infringed U.S. Patent No. 7,417,664 (the "'664 patent"), owned by

Tomita. On March 13, 2013, the jury returned a verdict for Tomita in

the amount of $30,200,000.00, finding that the 3DS infringed the

'664 patent and that the '664 patent was not invalid. The same day,

the Court ruled that, as a matter of law, Tomita had failed to prove

that Nintendo had willfully infringed the '664 patent by clear and

convincing evidence, which it confirmed in a written Memorandum and

Order. See Memorandum and Order, No. 11 Civ. 4256, ECF No. 128

(S.D.N.Y. Mar. 13, 2013). On March 14, 2013, the Court entered

judgment in favor of Tomita. Judgment, No. 11 Civ. 4256, ECF No. 127

(S.D.N.Y. Mar. 14, 2013).

1

**A7**

On April 11, 2013, Nintendo filed motions seeking judgment as a matter of law or a new trial as to liability, or, alternatively, remittitur or a new trial as to damages. Tomita, for its part, filed a motion to alter or amend the judgment under Rule 59 with respect to a number of issues related to its damages award and ongoing royalty payments. For the following reasons, the Court grants Nintendo's motion for remittitur or a new trial on damages; grants Tomita's motions in part; but otherwise denies the motions.

At the outset, a brief summary of the relevant technologies is in order. The '664 patent is a patent relating to stereoscopic (or 3D) imaging technology and includes four major elements: (1) "a stereoscopic video image pick-up device" (i.e., two cameras), (2) a " stereoscopic video image display," (3) a "cross-point measuring means for measuring [cross-point] information on the cross-point (CP) of optical axes," and (4) an "offset presetting means for offsetting and displaying said different video images." U.S. Patent No. 7,417,664 col. 2, 1.44-65. Tomita claims that Nintendo uses the '664 patent's technology in the 3DS's two outer cameras. Thus, only the 3DS's camera application (which allows the user to take and view 3D photos and videos) and the augmented reality ("AR") game card application (which allows some games to be superimposed over real-world images captured by the 3DS's cameras) are at issue. The 3DS's

other applications, including its 3D display, do not rely on the
'664 patent.[1]

In its motion for judgment as a matter of law, Nintendo –
reiterating many of the arguments it unsuccessfully advanced prior
to and/or during trial - argues that it is entitled to judgment as a
matter of law for the following reasons: (1) the testimony of John
Merritt, Tomita's infringement and validity expert, was conclusory
and unreliable and therefore was insufficient to support the jury's
verdict; (2) Tomita failed to prove that the 3DS infringes claim 1
of the '664 patent; (3) Tomita failed to show that Nintendo induced
infringement; and (4) clear and convincing evidence established that
the '664 patent was invalid.

"Judgment as a matter of law is appropriate when 'a party has
been fully heard on an issue' and 'a reasonable jury would not have
a legally sufficient evidentiary basis to find for the party on that
issue.'" Caceres v. Port Auth. of New York & New Jersey, 631 F.3d
620, 622 (2d Cir. 2011) (quoting Fed. R. Civ. P. 50(a)(1)). In
deciding such a motion, a court must "consider the evidence in the
light most favorable to the party against whom the motion was made"
and "give that party the benefit of all reasonable inferences that

---

[1] Although prior to trial, Tomita had taken the position that the 3DS
infringed upon claim 1 of the '664 patent (the patent's only
independent claim) and also upon various dependent claims that were,
in effect, variations on claim 1, nonetheless, since a finding of
infringement as to any dependent claim would require a finding that
claim 1 was also infringed, Tomita consented to a jury instruction
to make findings regarding infringement only as to claim 1.

3

A9

the jury might have drawn in his favor from the evidence." Id.
(quoting Tolbert v. Queens Coll., 242 F.3d 58, 70 (2d Cir. 2001)).
Thus, "[u]nder Rule 50(b), a jury verdict should be set aside only
where there is such a complete absence of evidence supporting the
verdict that the jury's findings could only have been the result of
sheer surmise and conjecture, or . . . such an overwhelming amount
of evidence in favor of the movant that reasonable and fair minded
men could not arrive at a verdict against him." Rafter v. Bank of
Am., No. 04 Civ. 3341, 2011 WL 5579029, at *1 (S.D.N.Y. Nov. 15,
2011), aff'd, 2013 WL 1595116 (2d Cir. Apr. 16, 2013). Against this
demanding standard, the Court turns to each of Nintendo's four
arguments.

        Nintendo first argues that Tomita's evidence at trial regarding
whether the 3DS infringes on the '664 patent consisted entirely of
the conclusory and unreliable testimony of Tomita's infringement
expert, Mr. John Merritt, such that judgment as a matter of law
should be granted in Nintendo's favor, or, alternatively, a new
trial should be granted. As Nintendo asserted in its motion in
limine – which the Court denied prior to trial – Mr. Merritt cannot
read the C++ programming language in which the 3DS's source code is
written, see Trial Transcript ("Tr.") 364:22-365:8, understanding of
which, Nintendo claims, is critical to the issue of infringement
because the 3DS's software dictates how the 3DS's 3D camera and AR
games features function. Because he could not read the source code,

4

**A10**

Mr. Merritt relied on the analysis of Ken Amron, a forensic software consultant hired by Tomita who did not testify at trial. Tr. 362:4-7, 436:22-24. In this way, Nintendo argues that Merritt merely parroted Mr. Amron's conclusions, rendering Merritt's opinions unreliable. Additionally, because Mr. Merritt could not read the source code, Nintendo claims that Mr. Merritt's opinion consisted merely of cursory observations as an ordinary user of the 3DS, which Nintendo claims cannot provide a sufficient basis for expert analysis as to how the 3D camera and AR games features actually function. Nintendo claims that such conclusory testimony is insufficient to sustain a finding of infringement.

However, Mr. Merritt's observations of the 3DS extended far beyond merely "cursory observations as an ordinary user." Mr. Merritt reviewed documentation for the 3DS, internal Nintendo documents, and deposition testimony of Nintendo engineers – in addition to his own testing of the 3DS and Mr. Amron's translation of the source code, see Tr. 257:3-285:14 – and applied to that information his extensive experience in stereoscopic imaging so as to arrive at his expert opinion with respect to the operation of the 3DS. See Medisim Ltd. v. BestMed LLC, 861 F. Supp. 2d 158, 169 (S.D.N.Y. 2012) ("Where a testifying expert has expertise in the field covered by a consulting expert and independently verifies the latter's conclusions, there is no danger that the former is acting as a mere 'mouthpiece or conduit' of the latter."). Moreover,

**A11**

Nintendo devoted a substantial portion of its closing arguments to
Mr. Amron's absence, so the jury was free to consider that alleged
insufficiency in addressing the credibility of Mr. Merritt's
testimony. See Arista Records LLC v. Lime Group LLC, No. 06 Civ.
5936, 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011) ("[C]laims that
the assumptions relied on by an expert are unfounded is generally an
argument that goes to the weight rather than the admissibility of
the evidence.").

What is more, the actual operation of the 3DS source code was
relatively undisputed, as Mr. Merritt conceded that the 3DS's 3D
camera and AR games applications operated largely as Nintendo
claimed. See Tr. 414:25-415:2, 420:18-22. Rather, the central issue
at trial was whether those methods were in fact merely methods of
employing the '664 patent's technology or were in some meaningful
way a different technology. Whether Mr. Merritt could read the
source code had little bearing on that issue. Based on the totality
of the evidence presented at trial, including testimony from
Nintendo's own expert witness, Dr. Jan-Michael Frahm, the jury
resolved this central question in favor of Tomita, and the Court
sees no reason to overturn that determination at this juncture.
Thus, the Court denies Nintendo's motion for judgment as a matter of
law and motion for a new trial to the extent it is based on a
challenge to the reliability of Mr. Merritt's expert testimony.

**A12**

Nintendo's second argument for judgment as a matter of law –
that Tomita failed to prove that the 3DS infringed the '664 patent
either literally or under the doctrine of equivalents – encompasses
various issues related to each of the '664 patent's key features:
whether Tomita identified at trial any structure in the 3DS that is
identical or equivalent to the corresponding "cross-point measuring
means" in the '664 patent and that performs the identical function;
whether Tomita proved by sufficient evidence that the 3DS performs
the function of "measuring [cross-point] information on the cross-
point (CP) of optical axes" of its outer cameras; whether Tomita
demonstrated that the 3DS performs offsetting based upon "cross-
point information" and "information on the size of the image," as
required to perform the function of the '664 patent's "offset
presetting means"; and whether Tomita showed that the 3DS uses a
preset value that serves as the baseline for calculating the claimed
offset to perform the function of the "offset presetting means."

At the heart of Nintendo's motion is its claim that the
evidence at trial unequivocally showed that the 3DS's two outer
cameras are configured such that their optical axes remain parallel.
From this follows the notion that, because the axes are parallel,
they never intersect, and so the 3DS never determines a cross-point.
Rather, Nintendo claims, the evidence at trial showed that the 3DS's
3D camera feature determines an "offset" based on the brightness of
the individual pixels that make up the two camera's images, not

based on distance information, and therefore does not rely on cross-point information. Similarly, Nintendo claims that, with respect to the AR games feature, the evidence showed that the distance to the AR card is estimated using only a single camera, which cannot create a cross-point on its own, and that the AR games application relies upon the shape and size of the AR card to determine if it is the proper distance away, and does not use any cross-point information.

However, the evidence at trial, viewed as it must be on Nintendo's motion most favorably to Tomita, established that the 3DS camera application operates through a combination of the operations of the 3DS's "System on a Chip," other circuits in the 3DS, and the 3DS's circle pad and touch screen. See Tr. 326:7-327:12, 330:19-331:2. In this system, "cross-point information" is measured at the time an image is captured in the form of the offset. The offset is determined by selecting a subset of the image captured by the software chips, and this information is used to determine the angle of intersection of the cameras' optical axes, or the location of the cross-point. Explained another way, the optical axes may be set by selecting outer or inner subsets of the left and right images as captured by the cameras' chips, which moves the cross-point closer or farther away, respectively. See, e.g., Tr. 304:2-305:1. This focus value can be determined based on user input from the circle pad or touch screen, or automatically based on the position of objects picked up by the 3DS's cameras, satisfying the alternative

8

**A14**

methodologies outlined in the patent.  Thus, the evidence supported

the jury's finding that, whereas the cameras themselves may be

parallel, the optical axes are not.

Turning to the two uses of the '664 patent in the 3DS, the

evidence, again taken in the light most favorable to Tomita,

supported Tomita's claim that the 3D camera application uses two

different offsets: the first is the offset or focus value, described

above, which constitutes cross-point information that is stored with

the left and right images, see Tr. 293:2-5; the second is the offset

that the 3DS's software determines (by its offset presetting means)

when displaying images, based on the focus value (cross-point

information) and information on the size of the image that is

displayed, see, Tr. 293:2-15.  Although the 3DS's screen is measured

only in pixel information, which does not inherently relate to

physical size, documentation for the 3DS demonstrates that there was

a known correlation in the context of the 3DS between the 3DS's

pixel information and the physical size of the screen. In the AR

games application, the 3DS determines the "focus value" using the

location of the AR game card, which is then used to determine the

cross-point based on that location. See, e.g., Tr. 319:14-321:10.

Thus, even if the distance to the game card is measured only by one

camera, the distance information, under Tomita's theory, is not the

cross-point itself, but is merely used to determine the cross-point.

9

**A15**

Although individual moments of Mr. Merritt's testimony may have
been less than illuminating, as a whole Mr. Merritt presented a
coherent vision of how the 3DS's operations meet each requirement of
claim 1 of the '664 patent. While Nintendo's motion papers refer to
comments by Mr. Merritt that were, out of context, conclusory, the
papers ignore other testimony by Mr. Merritt that provided more
factual detail. Overall, the Court finds, there was substantial
evidence to support the jury's finding as to each of the claim
limitations of claim 1 of the '664 patent.

Nintendo's third argument for judgment as a matter of law,
respecting Tomita's claim for induced infringement, is curious,
since, at trial, Tomita abandoned this claim, both by not pressing
it and by not objecting to the omission of any jury instruction on
this claim. Since, therefore, the claim was not presented to the
jury, this prong of Nintendo's motion is moot.

Nintendo's final argument for judgment as a matter of law is
that no reasonable jury could find that claim 1 of the '664 patent
is valid, because, Nintendo claims, clear and convincing evidence
showed both that the patent is not enabled and that it was
anticipated by the prior art. Nintendo argues that claim 1 is not
enabled where the two cameras are configured to have parallel
optical axes, as Nintendo claims is present in the 3DS, because no
reasonable jury could find that the patent teaches how to practice
such an embodiment without undue experimentation. However, as

10

**A16**

discussed above, it is clear that the jury rejected Nintendo's claim
that the optical axes of the 3DS's cameras are parallel; thus,
whether claim 1 is enabled in such a configuration is completely
irrelevant, and Nintendo's motion with respect to enablement is
denied.

As to whether claim 1 of the '664 patent was anticipated by the
prior art, Nintendo claims that the "Matsugu '408" patent is a
preexisting patent that disclosed each and every element of claim 1.
See Atlas Powder Co. v. Ireco, Inc., 190 F.3d 1342, 1346 (Fed. Cir.
1999) ("To anticipate a claim, a prior art reference must disclose
every limitation of the claimed invention, either explicitly or
inherently." (internal quotation marks omitted)). At trial, the
parties' experts disputed whether the Matsugu '408 patent
anticipated the '664 patent with respect to three elements: whether
the "per pixel parallel adjustment" of the Matsugu '408 patent is
meaningfully different from the offsetting of the '664 patent, see
Tr. 971:5-972:12, 837:7-17; whether "the size of the displayed
image" was "an input to the process" in the Matsugu '408 patent;
and, finally, whether the Matsugu '408 patent lacks a manual entry
unit corresponding to the offset-presetting means, as required by
the '664 patent, see Tr. 768:17-769:18, 840:3-842:20, 971:9-973:9.
The burden was on Nintendo to prove by clear and convincing evidence
that claim 1 of the '664 patent was anticipated by the Masugu '408

11

**A17**

patent, and the jury concluded that Nintendo had not met this
burden.

On this motion, therefore, Nintendo bears the burden of proving
that the jury's resolution of this dispute between experts was
unreasonable as a matter of law. Yet the jury was fully entitled to
credit Mr. Merritt's testimony rather than Dr. Frahm's, as Mr.
Merritt's testimony revealed a thorough understanding of the Matsugu
patent and clearly explained the elements missing from the Matsugu
'408 patent. See 976:14-977:1. In short, there was substantial
evidence in the record to support the jury's finding that the '664
patent was not anticipated by the Matsugu '408 patent.

For the foregoing reasons, the Court hereby denies Nintendo's
motion for judgment as a matter of law.  Nintendo next moves for a
new trial as to liability. "Unlike a motion for judgment as a matter
of law, a motion for a new trial may be granted even if there is
substantial evidence to support the jury's verdict." Caruolo v. John
Crane, Inc., 226 F.3d 46, 54 (2d Cir. 2000) (internal quotation
marks omitted). However, even though the standard is less stringent
than a motion for judgment as a matter of law, "[a] motion for a new
trial ordinarily should not be granted unless the trial court is
convinced that the jury has reached a seriously erroneous result or
that the verdict is a miscarriage of justice." Id. (internal
quotation marks omitted). And, once again, the Court is obligated to

12

**A18**

"view the evidence in the light most favorable to the nonmoving party." Id.

Nintendo argues that a new trial is required because the parties' claim-construction disputes were not resolved prior to submission of the case to the jury, and because the jury was not instructed on the Court's claim construction. As to the first issue, the Court, in its Markman decision, held that the terms "cross-point" and "optical axes" needed no construction and explicitly rejected Nintendo's proposed narrowing constructions in favor of the ordinary meaning of those terms. See Memorandum, No. 11 Civ. 4256, ECF No. 64 (S.D.N.Y. Feb. 22, 2012) at 10-11. Despite this, Nintendo argued at trial and continues to contend here that the Court failed to resolve the parties' dispute as to these terms. Nintendo claims that this purported failure allowed Tomita and Mr. Merritt to conflate the terms "offset" and "cross-point" in ways that misled the jury and to discuss the "optical axes" of the cameras in ways that were inconsistent and confusing.

The Court disagrees with Nintendo's characterization. As an initial matter, the Court once again reaffirms its claim-construction decision, as it did at trial when Nintendo raised this issue. Additionally, the Court rejects Nintendo's claim to have been prejudiced by this purported error, as Tomita's (and Mr. Merritt's) use of the terms "offset" and "cross-point" were proper. These terms were appropriately employed to explain the functioning of the 3DS

13

**A19**

and the '664 patent to the jury, and their usage reflected the notion that, as discussed above, the 3DS used the focus value or offset to determine the cross-point and then used that information in determining the offset for displaying the image on the 3DS's screen. Similarly, to the extent that Mr. Merritt testified that he did not know every detail of how the 3DS functions, it is perfectly logical that Mr. Merritt would testify to alternative ways in which the 3DS might "tilt" the optical axes of its cameras to form a cross-point. Thus, the Court finds no justification for Nintendo's request for a new trial with respect to its resolution of claim-construction disputes.

As to the second issue, Nintendo argues that where the district court makes "specific claim construction rulings," it is "required to inform the jury that it . . . must apply the district court's construction of the terms in its deliberations," so that the jury is not left "free to make its own determination of the meaning of the claims." Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1367 (Fed. Cir. 2004). At trial, the parties presented the Court's claim construction in their closing statements, and there was no dispute presented to the jury regarding the terms of the Court's ruling. As a result, the Court in its instruction to the jury, after explaining that it had already determined the meaning of the claim terms, which the jury was obligated to apply, simply stated that "both sides have already presented these definitions to you, so I will not repeat

14

**A20**

them here." Tr. 1087:7-18. Since there was no dispute over the
claim terms that the jury had to resolve, and since both sides had
amply and accurately defined those terms in their closing arguments
(as well as at numerous other times throughout the trial),
reiterating those definitions in the Court's instructions would only
have created confusion. As the Federal Circuit has made clear, there
is no error in such a situation in failing to repeat the claim
construction to the jury, let alone prejudicial error. Cf. Sulzer,
358 F.3d at 1357 (finding no prejudicial error where the court did
not instruct the jury as to its claim construction and "[t]he
evidence presented at trial reflected the court's claim
construction"). Accordingly, Nintendo's motion for a new trial as to
liability is denied.

    Finally, the Court turns to Nintendo's motion for remittitur or
for a new trial on damages. District courts have discretion "to
enter a conditional order of remittitur, compelling a plaintiff to
choose between reduction of an excessive verdict and a new trial [on
damages], 'in at least two distinct kinds of cases: (1) where the
court can identify an error that caused the jury to include in the
verdict a quantifiable amount that should be stricken, . . . and (2)
more generally, where the award is "intrinsically excessive" in the
sense of being greater than the amount a reasonable jury could have
awarded, although the surplus cannot be ascribed to a particular,
quantifiable error.'" Kirsch v. Fleet St., Ltd., 148 F.3d 149, 165

(2d Cir. 1998) (ellipsis in original) (quoting Trademark Research
Corp. v. Maxwell Online, Inc., 995 F.2d 326, 337 (2d Cir. 1993)).
For cases in the latter category, a jury's damage award may be set
aside as excessive where "the award is so high as to shock the
judicial conscience and constitute a denial of justice." Id. In that
circumstance, a court may reduce the jury's award to "the maximum
that would be upheld by the trial court as not excessive."
Trademark Research Corp., 995 F.2d at 337.

Nintendo moves for remittitur on the ground that Tomita's
damages expert, Mr. Wayne Hoeberlein, used the "entire market value"
of the 3DS as the royalty base for calculating the reasonable
royalty owed to Tomita, which, according to Nintendo, erroneously
allowed the jury to include all revenue from the 3DS in its
determination of damages.  Nintendo derives this criticism from the
rule that, in calculating damages for multi-component products
accused of infringement, royalties must "be based not on the entire
product, but instead on the 'smallest salable patent-practicing
unit.'" LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51,
67 (Fed. Cir. 2012) (quoting Cornell Univ. v. Hewlett-Packard Co.,
609 F. Supp. 2d 279, 283, 287-88 (N.D.N.Y. 2009)).  "The entire
market value rule is a narrow exception to this general rule. If it
can be shown that the patented feature drives the demand for an
entire multi-component product, a patentee may be awarded damages as

16

**A22**

a percentage of revenues or profits attributable to the entire
product." Id. at 67.

Whether the entire market value rule is implicated thus turns
on the question of whether the 3DS constitutes the "smallest salable
patent-practicing unit" in which the '664 patent's technology is
utilized. As the Court found in denying Nintendo's motion in limine
on this issue, Mr. Hoeberlein properly looked to the 3DS itself as
the "smallest salable patent-practicing unit," and therefore did not
rely on the entire market value rule. Nintendo neither purchases nor
sells components of the 3DS that infringe the '664 patent; the
individual components cannot practice the patent before they are
assembled and programmed with Nintendo's software; and the 3DS is
imported to the United States fully assembled. Cf. LaserDynamics,
694 F.3d at 68 (finding the entire market value rule violated
because optical disk drives, which separately infringed the relevant
patent, were sold separately). In these circumstances, the entire
market rule was not violated, so it can provide no basis to reject
the jury's damages award.

The Court concludes, nonetheless, that the jury's $30.2 million
damages award is "intrinsically excessive" and unsupported by the
evidence presented at trial. See Kirsch, 148 F.3d at 165. An
analysis of factors set forth in Georgia-Pacific Corp. v. U.S.
Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), which the
jury was instructed to employ in determining its damages award,

17

**A23**

cannot support the very large award the jury reached. Although the
jury's award amounted to a royalty rate of just under three percent
of the sale price of the 3DS, which is less than that paid to Tomita
under the licensing agreement presented to the jury as a
"comparable" agreement, there are special circumstances relating to
the 3DS that strongly suggest that such a royalty rate is excessive
in this context.

To begin with, the evidence at trial showed that the 3DS
console is not itself profitable. See Tr. 903:16. Although Tomita's
expert testified that Nintendo derives substantial profits from the
sale of games designed solely for the 3DS and therefore those
profits should be considered in determining the profitability of the
3DS gaming system as a whole, the evidence at trial also established
that the vast majority of games designed for the 3DS do not require
or even utilize the technology covered by the '664 patent.   Tr.
484:17-485:15; 555:23-559:4. Thus, it seems that the jury, in coming
to such a substantial damages award, likely weighed too heavily the
somewhat unrelated profit that Nintendo earns on games for the 3DS.

Additionally, although the entire market value rule does not
apply on the facts of this case, the concerns that motivate the
doctrine nonetheless speak to whether the jury's damages award was
appropriate. Thus, while there is no smaller patent-practicing unit
than the 3DS as a whole, the '664 patent's technology was used only
in two features – the 3D camera and the AR games application – and

**A24**

thus was in some sense ancillary to the core functionality of the
3DS as a gaming system. Tr. 905:19-906:12. In addition, the evidence
presented at trial showed that consumer reception for the patent-
related features was mixed. Tr. 550-552. Based on these factors and
the fact that the 3DS is not itself profitable, the Court finds that
it surpasses reasonable belief that Nintendo would, in a
hypothetical negotiation, agree to a "reasonable royalty" payment
anywhere near as large as that awarded by the jury.

For these reasons, the Court finds that the jury's damages
award was at least twice as large as the amount a reasonable jury
could have awarded based on the evidence presented at trial and
thereby must have involved the degree of excessive speculation that
"shocks the judicial conscience." See Lucent Technologies, Inc. v.
Gateway, Inc., 580 F.3d 1301, 1335 (Fed. Cir. 2009) (vacating
damages award where it appeared the jury's award was "not supported
by substantial evidence" and was "based mainly on speculation or
guesswork"). Accordingly, the Court hereby gives Tomita the choice
between accepting either a remittitur of the damages award from
$30.2 million to $15.1 million or undertaking a new trial on
damages.

Turning to Tomita's motion to amend the judgment, Tomita seeks
the following additions to its now-vacated damages award: (a)
damages for sales of infringing 3DS devices occurring before
judgment was entered but not included in the jury's verdict; (b)

19

**A25**

prejudgment interest; (c) post-judgment interest; and (d) ongoing
royalties at an enhanced rate. The Court addresses each of these
motions to the extent practicable given its determination on
Nintendo's motion for remittitur.

The Court grants Tomita's uncontested motion for damages based
on sales of infringing 3DS devices not included in the jury's
verdict from December 31, 2012 (the latest date for which Nintendo
had produced sales data as of trial) through the entry of judgment
on March 14, 2013. See ActiveVideo Networks, Inc. v. Verizon
Commc'ns, Inc., No. 2:10CV248, 2011 WL 4899922, at *2 (E.D. Va. Oct.
14, 2011), aff'd, 694 F.3d 1312 (Fed. Cir. 2012) ("Where a patent
infringer is found to have infringed one or more patents, the
patentee is entitled to damages for the entire period of
infringement and should therefore be awarded supplemental damages
for any periods of infringement not covered by the jury verdict.").
However, because the implied royalty rate will change based on
whether Tomita accepts remittitur or whether a new damages award is
determined at trial, the Court leaves to later briefing the
determination of the amount of damages to be awarded.

Tomita next seeks an award of prejudgment interest. Under 35
U.S.C. § 284, "prejudgment interest should ordinarily be awarded" in
patent infringement cases, since "[a]n award of interest from the
time that the royalty payments would have been received merely
serves to make the patent owner whole," given that "his damages

**A26**

consist not only of the value of the royalty payments but also of the forgone use of the money between the time of infringement and the date of the judgment." General Motors Corp. v. Devex Corp., 461 U.S. 648, 655-56 (1983). "The normal procedure under Devex is to award prejudgment interest from the date of infringement to the date of payment." Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp., 807 F.2d 964, 967 (Fed. Cir. 1986). In determining what amount of interest to award, courts "must be guided by the purpose of prejudgment interest, which is 'to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement.'" Id. (quoting Devex, 461 U.S. at 655).

Nintendo does not contest that Tomita is entitled to an award of prejudgment interest from the date of infringement. However, the parties disagree as to the appropriate interest rate to be used in calculating such interest. Tomita argues that the proper interest rate to be applied is the prime rate, which represents the interest rate that a corporate borrower with good credit would pay for a loan, while Nintendo argues that the Court should apply the Treasury Bill rate, which represents the return that an investor would receive on a risk-free investment. Because Tomita fails to suggest that it borrowed money during the infringement period and therefore should be compensated at the higher prime rate, the Court hereby awards prejudgment interest at the Treasury Bill rate. See Laitram

**A27**

Corp. v. NEC Corp., 115 F.3d 947, 955 (Fed. Cir. 1997) (finding no
abuse of discretion where the district court awarded interest at the
Treasury Bill rate and "found that there was no evidence that [the
plaintiff had] borrowed money at a higher rate, what that rate was,
or that there was a causal connection between any borrowing and the
loss of the use of the money awarded"). However, because, again, the
damages award amount is indeterminate at this time pending Tomita's
decision on remittitur, the amount of prejudgment interest owed to
Tomita cannot be calculated at this time.

Third, Tomita requests that the Court enter an award of post-
judgment interest under 28 U.S.C. § 1961. However, the amount of
such an award is yet to be determined, not only because the amount
of the judgment is uncertain, but also because an appeal by Nintendo
is likely. Thus, while an award of post-judgment interest would be
appropriate if the Court's judgment were to be upheld on appeal,
such an award would be premature at this time.

Fourth and finally, Tomita seeks ongoing royalties for
Nintendo's continued infringement of the '664 patent. Specifically,
Tomita seeks an order that: (1) for the period the '664 patent is in
force, Nintendo shall pay ongoing royalties on the 3DS; (2) such
payments shall be made on a quarterly basis, within thirty days
following the end of each quarter, along with a certified report
stating the number of sales during such quarter; (3) the order shall
be non-assignable, non-transferable, and non-sublicensable; and (4)

22

**A28**

Nintendo shall mark all covered products covered by the order with "U.S. Patent No. 7,417,664."

While the Court accepts as a general matter that it would be appropriate for Nintendo to pay an ongoing royalty for future sales of the 3DS, it would be nonetheless premature to set an ongoing royalty rate in light of the uncertainty regarding Tomita's damages award and the royalty rate that the award implies. Thus, the Court defers ruling on Tomita's motion until after the issue of remittitur is resolved. However, given that the Court intends to award an ongoing royalty that will fully protect Tomita's interest in the '664 patent, the Court denies Tomita's request that Nintendo mark the 3DS with "U.S. Patent No. 7,417,664."

In sum, the Court denies all of Nintendo's motions except its motion for remittitur. By August 23, 2013, Tomita must inform the Court in writing of its choice whether to accept a $15.1 million damages award or whether to proceed to a new trial on damages. Furthermore, the Court grants Tomita's motion as it relates to damages based on sales of infringing 3DS devices not included in the jury's verdict, prejudgment interest, and ongoing royalty payments, with all amounts to be determined upon resolution of the remittitur issue, and denies the motion for post-judgment interest without prejudice to renewal after any appeal has been decided.

The Clerk of the Court is hereby directed to close items number 149 and 155 on the docket of this case.

23

**A29**

SO ORDERED.

Dated: New York, New York
     August 13, 2013

                        JED S. RAKOFF, U.S.D.J.

**A30**

**TAB 6**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
TOMITA TECHNOLOGIES USA, LLC; TOMITA    :
TECHNOLOGIES INTERNATIONAL, INC.        :
                                        :
                                        :       11 Civ. 4256 (JSR)
              Plaintiffs,               :
                                        :       MEMORANDUM ORDER
        -v-                             :
                                        :
NINTENDO CO., LTD.; NINTENDO OF         :
AMERICA INC.,                           :
                                        :
              Defendants.               :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 12-11-13

        Beginning on February 25, 2013, the Court conducted a jury

trial on claims by Tomita Technologies USA, LLC and Tomita

Technologies International (collectively, "Tomita") that the

Nintendo 3DS, a handheld gaming console created and sold by Nintendo

Co., Ltd., and Nintendo of America, Inc. (collectively, "Nintendo"),

infringed U.S. Patent No. 7,417,664 (the " '664 patent"), owned by

Tomita. On March 13, 2013, the jury returned a verdict for Tomita in

the amount of $30,200,000.00, finding that the 3DS infringed the

'664 patent and that the '664 patent was not invalid. The same day,

the Court ruled that, as a matter of law, Tomita had failed to prove

that Nintendo had willfully infringed the '664 patent by clear and

convincing evidence, which it confirmed in a written Memorandum and

Order. See Memorandum and Order, No. 11 Civ. 4256, ECF No. 128

(S.D.N.Y. Mar. 13, 2013).

        On March 14, 2013, the Court entered judgment in favor of

Tomita. Judgment, No. 11 Civ. 4256, ECF No. 127 (S.D.N.Y. Mar. 14,

1

**A3**

2013). Nintendo moved to set aside the judgment, or, in the alternative, for remittitur, and the motion was fully briefed by the parties. See No. 11 Civ. 4256, ECF Nos. 151, 158, 163. Finally, on August 14, 2013, the Court awarded remittitur to Nintendo for half the damages awarded by the jury, which Tomita accepted on August 21, 2013. See Opinion and Order ("Remittitur Opinion"), No. 11 Civ. 4256, ECF No. 166 (S.D.N.Y. Aug. 14, 2013); Notice of Plaintiff's Acceptance of Damage Awards, No. 11 Civ. 4256, ECF No. 167.

After the acceptance of remittitur by Tomita, the only remaining issues to be resolved are the ongoing royalty rate to be paid for future sales, and the amount of supplemental damages and prejudgment interest due Tomita. As to the latter, the parties agree that Tomita is owed $211,747.50 in supplemental damages and $29,483.50 in prejudgment interest. See 11 Civ. 4256, ECF No. 170. The Court agrees and hereby orders payment of those amounts.

With respect to the ongoing royalty rate, the parties disagree about two basic issues. The first is whether the ongoing royalty rate should be paid as a dollar figure per unit sold or as a percentage of sale price. The second is what the rate should be. Nintendo favors the rate of the implied jury royalty rate halved, per the remittitur, and expressed as a percentage of sales, which would be 1.36% of the wholesale price. Tomita seeks to double the implied royalty rate of the jury award after remittitur, expressed as a dollar figure per unit sold, which would be $4.45 per unit. For

2

**A4**

the reasons that follow, the Court hereby adopts an ongoing royalty rate of 1.82% of wholesale, to be paid by Nintendo to Tomita quarterly, within thirty days of the end of the quarter.

Whether the ongoing royalty is expressed as a percentage of sales or on a per-unit basis would have no impact on Nintendo's payment to Tomita so long as the price of the 3DS never changes. The rapid pace of technological advancement — and its effect on prices — counsels the Court that it is highly likely that the price will drop with time. If, as Tomita suggests, the ongoing royalty rate were expressed as a flat dollar amount per unit sold, Tomita would capture an increasingly large proportion of each sale as the price falls, even as the technology's reliance on the infringed patent remains constant. This would result in an unearned windfall for Tomita, and, accordingly, the Court prefers an ongoing royalty rate expressed as a percentage of wholesale price.

Determining what percentage that royalty rate should be is no exact science. The implied royalty rate of the jury award was approximately 2.73%, so the implied royalty rate after the acceptance of remittitur is about 1.36%, the rate Nintendo urges the Court to adopt. Tomita, meanwhile, argues with some force that courts routinely increase the implied royalty rate of a verdict after a finding of infringement because the status of the parties has changed, as would the result of the hypothetical negotiation between them. See Georgia-Pacific Corp. v. United States Plywood

3

**A5**

Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970), mod. and aff'd, 446 F.2d

295 (2d Cir. 1971), cert. denied, 404 U.S. 870 (1971). For many of

the reasons stated in the Court's Remittitur Opinion, the Court

adopts an increase over the remittitur's implied royalty rate of

one-third. Accordingly, the ongoing royalty rate is two-thirds of

the jury's implied royalty rate of 2.73%, or 1.82%.

In sum, Nintendo is ordered to pay Tomita prejudgment interest

of $29,483.50, supplemental damages of $211,747.50, and an ongoing

royalty rate of 1.82% of wholesale, to be paid quarterly, within

thirty days of the close of the quarter. Clerk to enter final

judgment and close the case.

SO ORDERED.

Dated: New York, New York
     December 7, 2013         JED S. RAKOFF, U.S.D.J.

4

**A6**

**TAB 7**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
TOMITA TECHNOLOGIES USA, LLC; TOMITA
TECHNOLOGIES INTERNATIONAL, INC.,

                                        Plaintiffs,

                    -against-

NINTENDO CO., LTD.; NINTENDO OF
AMERICA INC.,

                                        Defendants.
-------------------------------------------------------X

DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/16/13

11 **CIVIL** 4256 (JSR)

**JUDGMENT**

        Whereas after the acceptance of remittitur by Tomita, the only remaining issues to be

resolved are the ongoing royalty rate to be paid for future sales, and the amount of supplemental

damages and prejudgment interest due Tomita, and the matter having come before the Honorable

Jed S. Rakoff, United States District Judge, and the Court, on December 9, 2013, having rendered

its Memorandum Order ordering Nintendo to pay Tomita prejudgment interest of $29,483.50,

supplemental damages of $211,747.50, and an ongoing royalty rate of 1.82% of wholesale, to be

paid quarterly, within thirty days of the close of the quarter, and directing the Clerk to enter final

judgment and close the case, it is,

        **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Memorandum Order dated December 11, 2013, Nintendo is ordered to pay Tomita

prejudgment interest of $29,483.50, supplemental damages of $211,747.50, and an ongoing royalty

rate of 1.82% of wholesale, to be paid quarterly, within thirty days of the close of the quarter;

accordingly, the case is closed.

**Dated:** New York, New York
        December 16, 2013

                                        **RUBY J. KRAJICK**

                                        **Clerk of Court**

                    BY: _____
                                        Deputy Clerk

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____

**A2**

**TAB 8**



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

TOMITA TECHNOLOGIES USA, LLC, AND TOMITA    :
TECHNOLOGIES INTERNATIONAL, INC.,

                     *Plaintiffs,*    :    Case No. 1:11-cv-04256-JSR

        v.    :

NINTENDO CO., LTD., AND    **AMENDED JUDGMENT**
NINTENDO OF AMERICA INC.    :

                 *Defendants.*    :

-----------------------------------------------------------------x

     Whereas after the acceptance of remittitur by Tomita of the damages award to $15.1 million, the only remaining issues to be resolved are the ongoing royalty rate to be paid for future sales, and the amount of supplemental damages and prejudgment interest due Tomita, and the matter having come before the Honorable Jed S. Rakoff, United States District Judge, and the Court, on December 9, 2013, having rendered its Memorandum Order ordering Nintendo to pay Tomita prejudgment interest of $29,483.50, supplemental damages of $211,747.50, and an ongoing royalty rate of 1.82% of wholesale, to be paid quarterly, within thirty days of the close of the quarter, and directing the Clerk to enter final judgment and close the case, it is,

     **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum Order dated December 11, 2013, Nintendo is ordered to pay Tomita damages of $15,100,000, prejudgment interest of $29,483.50, supplemental damages of $211,747.50, and an ongoing royalty rate of 1.82% of wholesale, to be paid quarterly, within thirty days of the close of the quarter; accordingly, the case is closed.

**Dated:** 12/27/13

                                                _____
             BY:                    U.S.D.J

                                                _____
                                              Deputy Clerk

NY 74895306

**A1**

**TAB 9**

U 1855597

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

September 15, 2011

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *7,417,664*
ISSUE DATE: *August 26, 2008*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. SWAIN
Certifying Officer

**Tomita Ex. 001**



US007417664B2

(12) **United States Patent**

Tomita

(10) Patent No.: **US 7,417,664 B2**

(45) **Date of Patent:** **Aug. 26, 2008**

(54) **STEREOSCOPIC IMAGE PICKING UP AND DISPLAY SYSTEM BASED UPON OPTICAL AXES CROSS-POINT INFORMATION**

(76) Inventor: **Seijiro Tomita**, 13-5, Inogata 3-chome, Komae-shi, Tokyo 201-0015 (JP)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 829 days.

(21) Appl. No.: **10/475,849**

(22) PCT Filed: **Mar. 20, 2003**

(86) PCT No.: **PCT/JP03/03405**

§ 371 (c)(1),
(2), (4) Date: **Oct. 31, 2003**

(87) PCT Pub. No.: **WO2004/084560**

PCT Pub. Date: **Sep. 30, 2004**

(65) **Prior Publication Data**

US 2004/0233275 A1    Nov. 25, 2004

(51) **Int. Cl.**
*H04N 13/00*    (2006.01)

(52) **U.S. Cl.** ............................. **348/43**; 348/47; 348/51

(58) **Field of Classification Search** .................. 348/43, 348/47, 51; *H04N 13/00*
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,937,212 A * 8/1999 Kurahashi et al. ............. 348/47

* cited by examiner

*Primary Examiner*—Young Lee
(74) *Attorney, Agent, or Firm*—Edwards Angell Palmer & Dodge LLP

(57) **ABSTRACT**

A stereoscopic video image pick-up and display system having a stereoscopic video image pick-up device including two video image pick-ups for outputting video information from the pick-ups; a stereoscopic video image display device for displaying different video images; and a medium for transmitting the video image information from the stereoscopic video image pick-up device to the stereoscopic video image display device. The stereoscopic video image pick-up device includes a cross-point measuring device for measuring CP information on the cross-point (CP) of optical axes of pick-ups and outputs information including the CP information and video image information to the medium. The stereoscopic video image display device includes an offset presetting device for offsetting and displaying different video images based upon the video image information, the cross-point information and information on the size of the image which is displayed by the stereoscopic video image display device.

**22 Claims, 15 Drawing Sheets**



Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4934



FIG.1

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4935

FIG.2



Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4936

FIG.3



Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4937

# FIG.4



300
ORIGINAL STEREOSCOPIC
VIDEO IMAGE

301 LEFT-EYE
VIDEO
IMAGE

302 RIGHT-EYE
VIDEO
IMAGE

303

ORIGINAL
CROSS-POINT

LEFT-EYE

RIGHT-EYE

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4938

# FIG.5



310
STEREOSCOPIC VIDEO IMAGE
HAVING LESS STEREOSCOPIC
DEGREE AND STRESSED DEPTH

311 LEFT-EYE
VIDEO
IMAGE

312 RIGHT-EYE
VIDEO
IMAGE

CROSS-POINT

313

LEFT-EYE          RIGHT-EYE

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4939

# FIG.6



320
STEREOSCOPIC VIDEO IMAGE
HAVING HIGHER STEREOSCOPIC
DEGREE, WHICH IS VIEWED CLOSER

321 LEFT-EYE
VIDEO
IMAGE

322 RIGHT-EYE
VIDEO
IMAGE

323

CROSS-POINT

LEFT-EYE          RIGHT-EYE

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4940

# FIG.7



$$Ld : Ld - Ls = \frac{de}{2} : X1 \quad (1)$$

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4941

# FIG.8



$$Ld : Ld - Ls = \frac{de}{2} : X1 + Xo \qquad (2)$$

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4942

# FIG.9



Copy provided by USPTO from the PIRS Image Database on 09/13/2011



FIG.10



Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4944

# FIG.11



Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4945

## FIG.12



Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4946

FIG.13



Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4947

# FIG. 14

## PRIOR ART



Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4948

# FIG. 15
### PRIOR ART



Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4949

US 7,417,664 B2

1

## STEREOSCOPIC IMAGE PICKING UP AND DISPLAY SYSTEM BASED UPON OPTICAL AXES CROSS-POINT INFORMATION

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a stereoscopic image pick-up and display system and in particular to a stereoscopic image pick-up and display system which is capable of displaying an appropriate stereoscopic images by changing the stereoscopic degree depending upon the size of a display screen and different stereoscopic image pick-up conditions.

2. Description of the Prior Art

There have heretofore been stereoscopic image pick-up and display systems each comprising a stereoscopic image pick-up device, a stereoscopic image display device which displays the stereoscopic image which has been picked up by the stereoscopic image pick-up device and a medium which are disposed between both devices for transmitting image data and the like.

For example, a stereoscopic image pick-up device which is disclosed in Japanese Published Patent Application JP-A-2001-231055 comprises a image pick-up unit 601 including two CCD cameras 602 and 603 as shown in FIG. 14. Right-eye and left-eye images are picked up by first and second cameras 602 and 603, respectively. At this time, a cross-point (convergence point) CP on the surface of an object (subject) to be picked up at which optical axes CL1 and CL2 of the first and second cameras 602, and 603, respectively are intersected is formed, so that the stereoscopic images are picked up. A technology has been proposed for determining the distance between the surface of the object and the image pick-up device L (that is, the distance between the pick-up device and CP) based upon the angle of the optical axis and the spacing between two cameras 602 and 603.

Japanese Published Patent Application JP-A-Hei 8-262370 discloses a stereoscopic image display device as shown in FIG. 15, which displays the image which is picked up by the stereoscopic image pick-up device disclosed in the JP-A-2001-231055.

In addition to the stereoscopic display device requiring special glasses, a stereoscopic display device which requires no special glasses and the like has been proposed. In this case, right-eye and left-eye images having a parallax therebetween as stereoscopic information are alternately switched for every image signal (one field) by a liquid crystal device circuit (not shown) and alternate blinking operation of two backlights 705a and 705b is conducted in synchronization with the switched image display on a liquid crystal display unit 704.

When a signal of image for the right-eye is displayed on the liquid crystal display unit 704, one of the backlights 705a is lit in synchronization with an input signal so that light of the backlight is incident upon the right-eye 709a of a viewer (observer). Subsequently, when a signal of the image for the left-eye is displayed on the liquid crystal display unit 704, the other backlight 705b is lit in synchronization with the signal so that light of the backlight is incident upon the left-eye 709b of the viewer. Since one image for right-eye on the liquid crystal display unit can be viewed by only the right-eye of the viewer while one image for left-eye on the liquid crystal display unit can be viewed by only the left-eye of the viewer, both images are merged in the brain of the viewer by the afterimage effect on the retina of the viewer, so that the merged image can be viewed as a stereoscopic image by the three-dimensional perception based upon so-called binocular parallax.

2

Even when the distance between the pick-up device and CP is measured by the technology of the invention as defined in JP-A-2001-231055 on picking-up the stereoscopic image, the distance between the pick-up device and CP (CP information) is not recorded simultaneously with the stereoscopic image recording. Even if the CP information of the picked-up image is recorded, the CP information is not utilized as a signal for the reference of binocular vision by the technology disclosed in JP-A-Hei 8-262370 when the stereoscopic image is played back.

In particular, when the same content are played back on display devices having different screen sizes, the stereopsis from the screen may vary due to difference in screen size since the amount of the parallax between the right-eye and the left-eye varies, resulting in a problem in that a natural stereoscopic image can not be obtained. Since the stereoscopic image contents for large amusement parks are produced assuming that the display devices have a large size screen on which the contents are displayed, appropriate stereoscopic feeling can not obtained unless the displays have the same screen size. Large size screen provides two strong stereoscopic feeling, making viewers uncomfortable, while small size screen provides less stereoscopic feeling, giving no satisfaction to the viewers.

Since these contents are combinations of various scenes, pick-up conditions, focal-length of the lens of the pick-up unit and the spacing between two pick-up units may not be uniform throughout various contents. If these scenes are simply jointed, different stereoscopic feelings are provided by one content, which provides the viewers with different feeling and physical discomfortability.

Furthermore, the positional relationship between the stereoscopic image pick-up and display device is not necessarily constant and the viewer may not be positioned in the position that is intended by the contents producer. If the viewer is offset from the predetermined viewing position of the stereoscopic display device, he or she is not able to view correct stereoscopic image.

Accordingly, when the stereoscopic video image is produced, the cross-point of the pick-up stereoscopic cameras and the parallax of the computer graphics is adjusted while assuming the size of the display screen on which ultimately the image is displayed. Since the contents which have been produced provide different stereoscopic feeling on the different screens of the stereoscopic image pick-up and display systems, it is necessary to reproduce the stereoscopic video image depending upon the screen size. If the stereoscopic video image is produced by the CG (Computer Graphics), it is necessary to conduct rerendering.

Since there is no way to adjust the parallax which has been determined by the once produced contents when they are played back, the viewer has to adjust the stereoscopic feeling depending upon the distance between the viewing position and the screen.

If the stereoscopic video image is broadcast, there is no way to automatically adjust the stereoscopic feeling of the stereoscopic video image in responsive to an indefinite number of viewers and stereoscopic video image pick-up and display systems having various screen sizes. Therefore, broadcasting of the stereoscopic video images for the indefinite number of viewers is difficult. A technology to adjust the stereoscopic feeling depending upon the screen size is essential for the widespread of the stereoscopic video images.

Therefore, it is an object of the present invention to provide a stereoscopic video image pick-up and display system which is capable of providing the stereoscopic video image having a

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

US 7,417,664 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

natural stereopsis even if the video image producing and playback conditions are different.

## SUMMARY OF THE INVENTION

In order to solve the above-mentioned object, the present invention adopts means as follows:

An invention as set forth in Claim 1 resides in a stereoscopic video image pick-up and display system comprising a stereoscopic video image pick-up device including two video image pick-up means for outputting video information from said pick-up means; a stereoscopic video image display device for displaying different video images for the eyes of a viewer; and

a medium for transmitting said video image information from said stereoscopic video image pick-up device to said stereoscopic video image display device, in which said stereoscopic video image pick-up device includes cross-point measuring means for measuring CP information on the cross-point (CP) of optical axes of said pick-up means and outputs information including the CP information and video image information to said medium; and

in which said stereoscopic video image display device includes offset presetting means for offsetting and displaying said different video images based upon said video image information, information on the size of the image which is displayed by said stereoscopic video image display device.

In accordance with the present invention, a stereoscopic video image can be obtained which is adjusted to provide an optimal stereoscopic degree (depth) depending upon the stereoscopic video image pick-up and display system.

An invention as set forth in Claim 2 resides in a stereoscopic video image display system as defined in Claim 1 wherein said stereoscopic video image display device includes viewer's position information measuring means for measuring information on the position of a viewer relative to a display screen, and further includes offset presetting means for offsetting and displaying said different video images based upon said video image information, said cross-point information, information on the size of the image which is displayed by said stereoscopic video image display device and the information on the position of the viewer.

In accordance with the present invention, a stereoscopic video image having an optimal stereoscopic degree (depth) corresponding to the positions of the stereoscopic video image pick-up and display system and the viewer can be obtained.

An invention as set forth in Claim 3 resides in a stereoscopic video image pick-up and display system as defined in Claim 1 or 2 in which said cross-point measuring means calculates the cross-point position based upon the angle of the intersection of the optical axes in said two pick-up means.

In accordance with the present invention, the distance between two image pick-up means can be measured based upon triangulation techniques and the distance between the pick-up means and the cross-point and object (scene) can be measured based upon the value of the angle at the intersection between the optical axes of said image pick-up means. The distance between two objects can be also measured.

An invention as set forth in Claim 4 resides in a stereoscopic video image pick-up and display system as defined in Claim 1 or 2 in which said cross-point measuring means calculates the cross-point based upon the position of picking-up of an object in said two pick-up means which are disposed in a parallel relationship.

In accordance with the present invention, the distance between two image pick-up means can be measured based upon triangulation techniques and the distance between the pick-up means and the cross-point and object (scene) can be measured based upon the value of the angle at the intersection between the optical axes of said image pick-up means. The distance between two objects can be also measured.

An invention as set forth in Claim 5 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 4 in which said stereoscopic video image pick-up device is adapted to feed out information on the depth of the areas, the image of which is picked-up in a depth direction and said stereoscopic video image display device includes offset presetting means for offsetting and displaying said different video images based upon said video image information, said cross-point information, information on the size of the image which is displayed by said stereoscopic video image display device and the information on the position of the viewer.

In accordance with the present invention, more appropriate stereoscopic video image display can be carried out since the display means can obtain more exact information on image pick-up conditions.

An invention as set forth in Claim 6 resides in a stereoscopic video image pick-up and display system as defined in Claim 2 in which said viewer's position detecting means is disposed integrally with the main body of said stereoscopic video image pick-up and display system.

In accordance with the present invention, it is not necessary to separately provide the viewers position detecting means in addition to the main body of the stereoscopic video image pick-up and display system.

An invention as set forth in Claim 7 resides in a stereoscopic video image pick-up and display system as defined in Claim 2 in which said viewer's position detecting means is disposed in a position remote from the main body of said stereoscopic video image pick-up and display system.

In accordance with the present invention, the viewer's position detecting means can be disposed in an appropriate position to detect the position of the viewer, so that the position of the viewer can be accurately detected.

An invention as set forth in Claim 8 resides in a stereoscopic video image pick-up and display system as defined in Claim 6 or 7 in which said viewer's position detecting means includes an ultrasonic wave transmitter and ultrasonic wave receiver.

In accordance with the present invention, the detection of a viewer is not liable to be influenced by the peripheral noise in comparison with that using ultra-red means, so that accurate detection can be achieved.

An invention as set forth in Claim 9 resides in a stereoscopic video image pick-up and display system as defined in Claim 6 or 7 in which said viewer's position detecting means detects the position based upon the picked-up image of the viewer.

In accordance with the present invention, the detection of a viewer is not liable to be influenced by the peripheral noise in comparison with that using ultra-red means, so that accurate detection can be achieved.

An invention as set forth in Claim 10 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 9 in which said offset presetting means presets the offset of the right-eye and left-eye video images based upon the information input to said input means for adjusting the stereoscopic feeling of the image which is displayed by said display means.

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4951

US 7,417,664 B2

5                                                                                          6

In accordance with the present invention, the stereoscopic video image having a stereoscopic degree (depth) which is adjusted to meet the viewer's preferences can be obtained.

An invention as set forth in Claim 11 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 10 in which said system includes a memory for the left-eye video image for storing a left-eye video image and a memory for the right-eye video image for storing a right-eye video image, said offset presetting means includes timing control means for controlling the timing of the read-out of video image data from said frame memory for left-eye video image and/or right-eye video image; and

said timing control means presets the offset of said left-eye video image and right-eye video image by advancing or delaying the timing of the read-out of the video image data from one of said frame memories for left-eye and right-eye video images relative to the timing of the read-out of the video image data from the other of said from memories for the left-eye and right-eye video images.

In accordance with the present invention, an offset of the right-eye and left-eye video images can be preset by a simple circuit.

An invention as set forth in Claim 12 resides in a stereoscopic video image pick-up and display system as defined in any one of Claims 1 through 11 in which said system comprises a stereoscopic video image frame memory for storing the stereoscopic video image therein, and signal switching means for switching between the left-eye video image data read-out from said frame memory for the left-eye video image and right-eye video image read-out from said from memory for said right-eye video image to input the data to said frame memory for the stereoscopic video image.

In accordance with the present invention, video image in which the offset of the right-eye and left-eye video images is preset can be synthesized and be stored in the frame memory.

An invention as set forth in Claim 13 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 12 in which the offset of said left-eye and right-eye video images is preset by advancing or delaying the horizontal phase of said left-eye and right-eye video images.

In accordance with the present invention, presetting of the offset of the right-eye and left-eye video images can be easily controlled.

An invention as set forth in Claim 14 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 13 in which an area of one or both of said left-eye and right-eye video image in the vicinity of its lateral edge is enlarged in a horizontal and vertical directions so that it fills a blank area which is caused by the presetting of the offset of said left-eye and right-eye video images.

In accordance with the present invention, display causing no blank area even if the right-eye and left-eye video images are shifted and displayed, and which gives quite normal feeling can be achieved.

An invention as set forth in Claim 15 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 14 in which said display means includes video image display means for displaying a video image with transmitted light and a light source device, said light source device comprising an LED array in which white LEDs or RGB LEDs are integrally arrayed, said offset presetting means including LED control means for controlling the lighting of said white LEDs or RGB LEDs of said LED array based upon said offset.

In accordance with the present invention, lighting of the light source can be freely achieved by the control of the LED control means and power consumption can be reduced since white LEDs or RBG LEDs having less power consumption and high switching speed are used as the light source.

An invention as set forth in Claim 16 resides in a stereoscopic video image pick-up and display system as defined in Claim 15 in which said LED control means of said offset presetting means controls the lighting of said white LEDs or RGB LEDs based upon said viewer's position information so that the video image which is viewed by a viewer is maintained.

In accordance with the present invention, an appropriate video image can be displayed even if the viewer moves or viewers are in a plurality of different positions.

An invention as set forth in Claim 17 resides in a stereoscopic video image pick-up and display system as defined in Claim 15 in which each LED array which is provided at upper and lower areas of said light source device forms a right-eye video image display unit and left-eye video image display unit.

In accordance with the present invention, contort of display of stereoscopic video image can be achieved at a high freedom degree by controlling the lighting of the right-eye video image display unit and left-eye video image display unit of the LED array by the LED control means.

An invention as set forth in Claim 18 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 17 which is adapted to a display system of portable digital assistant (PDA).

In accordance with the present invention, the display of the portable digital assistant can be made stereoscopic.

An invention as set forth in Claim 19 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 17 which is adapted to a display system of mobile communication terminal.

In accordance with the present invention, the display of mobile communication terminal can be made stereoscopic.

An invention as set forth in Claim 20 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 17 which is adapted to a terminal of car navigation system.

In accordance with the present invention, the display of car navigation system can be made stereoscopic.

An invention as set forth in Claim 21 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 17 through 20 in which said video image information and CP information is communicated between said terminal devices.

In accordance with the present invention, stereoscopic video image information can be communicated between terminal devices, so that the same video image information can be shared.

An invention as set forth in Claim 22 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 21 in which said medium is a communication medium.

In accordance with the present invention, a stereoscopic video image can be displayed even if both the stereoscopic video image pick-up device and stereoscopic video image display device are in the same position, and even if both devices are remote. The communication medium may include wireless communication, wired communication and optical communication.

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

US 7,417,664 B2

7

An invention as set forth in Claim 23 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 21 in which said medium is a communication medium.

In accordance with the present invention, stereoscopic video image information which is picked-up by the stereoscopic video image pick-up device can be stored and reproduced by the stereoscopic video image display device. The communication medium may include wireless communication, wired communication and optical communication.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram for showing the basic configuration of the stereoscopic video image pick-up and display device of the present embodiment.

FIG. 2 is a block diagram showing the configuration of the stereoscopic video image pick-up and display system shown in FIG. 1.

FIG. 3 is a block diagram showing the display control circuit for the stereoscopic video image pick-up and display device shown in FIG. 1.

FIG. 4 is a view showing how the stereoscopic image is viewed by a viewer.

FIG. 5 is a view showing how the stereoscopic image is viewed by a viewer.

FIG. 6 is a view showing how the stereoscopic image is viewed by a viewer.

FIG. 7 is a view showing how the stereoscopic image is viewed by a viewer.

FIG. 8 is a view showing how the stereoscopic image is viewed by a viewer.

FIG. 9 is a view showing the configuration of the display means.

FIG. 10 is an exploded perspective view showing the configuration of the display device in detail.

FIG. 11 is a view showing the displaying state of the liquid crystal of the display device.

FIG. 12 is a view showing the polarization direction of a checkered plate of the display device.

FIG. 13 is a view showing the configuration of the stereoscopic video image pick-up and display system of the other embodiment.

FIG. 14 is a view showing the configuration of the pick-up means of prior art stereoscopic video image pick-up and display system.

FIG. 15 is a view showing the configuration of the display means of prior art stereoscopic video image pick-up and display system.

BEST MODES FOR EMBODYING THE INVENTION

Now, modes of embodying the present invention will be described with reference to the drawings.

FIG. 1 is a block diagram for showing the basic configuration of the stereoscopic video image pick-up and display device of the present embodiment. FIG. 2 is a block diagram showing the configuration of the stereoscopic video image pick-up and display system shown in FIG. 1. FIG. 3 is a block diagram showing the display control circuit for the stereoscopic video image pick-up and display device shown in FIG. 1. FIGS. 4 through 6 are views showing how the stereoscopic image is viewed by a viewer. FIGS. 7 and 8 are views explaining the position at which the stereoscopic image appears. FIG. 9 is a view showing the configuration of the display means. FIG. 10 is an exploded perspective view showing the

8

configuration of the display device in detail. FIG. 11 is a view showing the displaying state of the liquid crystal of the display device. FIG. 12 is a view showing the polarization direction of a checkered plate of the display device. FIG. 13 is a view showing the configuration of the stereoscopic video image pick-up and display system of the other embodiment.

As shown in FIGS. 1 and 2, the stereoscopic video image pick-up and display system one embodiment of the present invention comprises left and right image pick-up means (cameras) 402L, 402R for picking-up an object (subject) 401, CP measuring means 403 for measuring the distance between the cameras and the object and cross-point information (CP information) based upon the angles between the optical axes of the cameras and video signal feeding means 404 for feeding video image information and CP information to a medium 500. The CP information is able to calculate the position of the cross point based upon the picked-up position of the object in two pick-up means which are disposed. The stereoscopic video image pick-up and display system further comprises a display control circuit 100 for controlling the display means 121 to display a stereoscopic video image 600 for a viewer 90 based upon the video image information and CP information which is received via the medium 500 and further comprises display means 121 having a liquid crystal screen. In the present embodiment, information on the depth of the image picked-up area is fed. Appropriate stereoscopic video image display can be accomplished in the stereoscopic video image display device by using the depth in addition to the video image information and the cross-point information.

Preferably the stereoscopic video image pick-up and display system of the present embodiment is adapted to the display system of portable digital assistant (PDA). The stereoscopic video image pick-up and display system of the present embodiment is preferable for the display of mobile communication terminals such as cellular phones.

Preferably the stereoscopic video image pick-up and display system of the present embodiment is adapted to the display system of the car navigation system and may include communication means so that it is possible to communicate the video image information and CP information between the portable digital assistants, mobile communication terminals and car navigation system terminals.

In the present embodiment, the media of the stereoscopic video image display system may be any one of wireless, wired and optical communications. The media may be magnetic recording media such as magnetic disc, optical recording media such as CD, CD-R, CD-RW, DVD, DVD-R, DVD-RW, MD and the like, and semiconductor storage media using memory chips. The stereoscopic video image display system may be applicable to various stereoscopic displays such as stereoscopic television sets and stereoscopic projectors and is also applicable to stereoscopic movie theater motion picture playback device for the playback of stereoscopic video images which are distributed via the Internet, stereoscopic game machines, simulators for aircraft and vehicles.

In the present embodiment, the display control circuit 100 comprises a stereoscopic video image signal generating circuit 101 for generating a stereoscopic video image signal comprising a left-eye and right-eye video images as shown in FIG. 2. The stereoscopic video image signal generating circuit 101 comprises a video image information acquisition means 103 for acquiring video image information on the stereoscopically viewable video images, such as the size of the displayed image which is assumed on production, the position of a viewer and the cross-point information, information acquisition means 104 for acquiring the display device information on the display area of the display means,

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4953

US 7,417,664 B2

9            10

that is the size of the screen on which the images are actually displayed, the position of the viewer relative to the display device, and offset presetting means for presetting a offset value to display the left-eye and right-eye video images so that they are shifted each other based upon said video image information and said display device information and for causing the display means 121 to display the stereoscopic video image signal providing the viewers with the same stereoscopic feeling irrespective of video and display information representative of different conditions.

The left-eye image 10, right-eye image 11 and the distance 13 (CP information) between the cameras and the cross-point on picking-up of the image are input to the stereoscopic video image signal generating circuit 101 of the present embodiment 101 as data which is recorded on picking-up of the image as shown in FIG. 3. The left-eye image 10 is picked-up by the left-eye camera and the right-eye image 11 is picked-up by the right-eye camera which is juxtaposed with the left-eye camera. The left-eye and right-eye cameras are disposed in such a manner that their optical axes intersect with each other. The intersection of these axes is the cross-point (CP) which is present on a plane of the object.

The image pick-up device includes a cross-point data input device 12 which measures the distance between the cameras and CP by means of laser distance measuring technique or based upon the inclination angle between the optical axes of the left-eye and right-eye cameras or to which an operator inputs the distance. The information on the distance between the cameras and CP is recorded as CP information together with the stereoscopic video image when the stereoscopic video image is picked-up. The distance between the left-eye camera and the right-eye camera (intereye distance) is also recorded as CP information. This distance information corresponds to the distance between the eyes of human.

The left-eye video image 10 which is input to the stereoscopic video signal generating circuit is digitalized by an A/D converter 20 and is stored in a left-eye video image frame memory 30. Similarly, input right-eye video image 11 is digitalized by an A/D converter 21 and is stored in a right-eye video image frame memory 31. A clock signal 22 for A/D conversion is input to the A/D converters 20 and 21 from a switch control unit 1.

The left-eye and right-eye video images which have been digitalized and stored in the frame memories 30 and 31 are input to a signal switch 40. The signal switch 40 records synthesized stereoscopic video image in a synthesis frame memory 50 to generate the synthesized stereoscopic video image signal by switching the read-outs of the left-eye and right-eye video images.

The signal switch 40 is a switch (semiconductor switching element) which is operative in response to a timing signal issued from the switch control unit 41. In the stereoscopic video signal generating circuit, synthesized stereoscopic video signal image in which alternate horizontal lines of the left-eye and right-eye video images 10 and 11 are synthesized is generated from the left-eye and right-eye video images 10 and 11. Since the video image is displayed in every one scanning line in the interlace format, the video signal which is written into the synthesis frame memory 50 is switched for every field (for example, every 16.6833 msec which is a vertical synchronization period of NTSC format) by means of the signal switch 40. On the other hand, since the scanning lines are sequentially displayed in case of non-interlace format, the video signal which is to be written into the synthesis frame memory 50 is switched for every scanning line (for example, every 63.5555 μsec which is a horizontal synchronization period) so that scanning lines of the left-eye and right-eye video signals are alternately displayed.

The timing when the right-video data to be written into the synthesis frame memory 50 is read out from the right-eye video frame memory 31 is controlled by the reading out timing control unit 32, to which the CP information 12, a timing signal for the signal switch 40 from the switch control unit 41, the screen size information and a stereoscopic degree adjusting signal are input. The read-out timing control unit 32 calculates the timing when the read-out from the right-eye video from memory 31 is conducted based upon these items of information and generates a clock signal for reading out of the right-eye video data from the right-eye video frame memory 31 ahead of (or behind of) normal timing, so that the timing which provides the parallax giving appropriate stereoscopic feeling is adjusted. That is, the timing of read-out of the right-eye signal from the right-eye video frame memory 31 is controlled relative to the timing of reading-out of the left-eye signal, so that both signals are read out in such timing to provide optimal stereoscopic feeling.

The switch control unit 41 is operative to control the signal switch 40. It controls the operation of the signal switch 40 in response to a horizontal synchronization signal 71, vertical synchronization signal 72, dot synchronization signal 73 and right and left reference signal 74 input from a synchronization signal generator 70. As mentioned above, the switch control unit 41 presets the timing of switching of the signal switch 40 for writing of video data into synthesis frame memory 50 to generate the synthesized stereoscopic video signal.

The synchronization signal generator 70 generates the horizontal synchronization signal 71 and vertical synchronization signal 92 in response to a video synchronization signal 82 input internally from the stereoscopic video signal generating circuit (for example, display controller) and further generates a dot synchronization signal 73 in response to an externally input dot sampling signal 83 and generates a right and left reference signal 74. The right and left signal 74 identifies whether the video signal is left-eye or right-eye signal when the stereoscopic video signal is transmitted and displayed by using general video signal and is input to the switch control unit and is output externally of the stereoscopic video signal generating circuit.

The D/A converter 60 converts the digitalized video signal into analog signal for outputting it as a synthesized stereoscopic video signal.

Although appropriate stereoscopic feeling is provided by controlling the timing of read-out of the right-eye video data depending upon the CP information 12 and the screen size information in the above-mentioned embodiment, the parallax can be adjusted by controlling the timing of read-out of the right-eye video data depending upon the screen size even if the distance to CP is infinite (there is no CP information 12).

The stereoscopic video signal which is supplied to the above-mentioned stereoscopic video signal generating circuit is recorded by a stereoscopic video image pick-up device having a pair of right and left cameras (lenses and image pick-up elements) and a capability of recording the spacing between the right and left image pick-up elements (intereye distance) and the distance between the cameras and the intersection of the optical axes of the right-eye and left-eye video cameras (cross-point) as cross-point information simultaneously with the right and left video recording. In other words, the stereoscopic video image pick-up device records data on the stereoscopic feeling as well as the stereoscopic video images.

The stereoscopic video signal which is supplied to the above-mentioned stereoscopic video signal generating circuit

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

US 7,417,664 B2

**11**

is produced by a stereoscopic video image producing device having a capability of producing a pair of right and left video images by computer graphics (CG) technology and a capability of recording the intereye distance and the distance to a optical cross point of the right and left video images (a point at which the right and left lines of sight intersects with each other) as cross-point information simultaneously with recording of the right and left video images. In other words, the stereoscopic video image producing device produces and records the data related with stereoscopic feeling together with stereoscopic CG video image.

FIGS. 4 through 6 are views explaining the adjustment of the stereoscopic degree by a change in relative positions of the right and left video images.

FIG. 4 shows a case in which the right-eye and left-eye video images are positioned at the same place as when they are picked-up.

An original video image 300 comprises a left-eye video image 301 and a right-eye video image 302. Under this condition, the positions of the left-eye video image 301 and the right-eye video image 302 are equal to those when they are picked-up, so that relative positions of the left-eye and right-eye video images are correctly reproduced. Therefore, the cross-point 303 is positioned in position (original cross-point) when image picking up is carried out.

FIG. 5 shows that the right-eye video image is shifted rightwards and is displayed.

The stereoscopic video image 310 comprises the left-eye video image 311 and the right-eye video image 312. If an offset in which the right-eye video image is shifted rightwards relative to the left-eye video image by delaying the timing of the read-out of the right-eye video image to that of the left-eye video image (delaying the phase of the right-eye signal) is preset and the video images are displayed, the line of sight from the left-eye to the left-eye video image intersect with the line of sight from the right-eye to the right-eye video image behind the display screen, so that the cross-point 313 moves behind the position on picking-up. Therefore, the stereoscopic video image has less stereoscopic degree and stressed depth than those of the original stereoscopic video image, so that the stereoscopic video image is viewed as far image as a whole.

FIG. 6 shows that the right-eye video image is shifted leftwards and is displayed.

The stereoscopic video image 320 comprises the left-eye video image 321 and the right-eye video image 322. If an offset in which the right-eye video image is shifted leftwards relative to the left-eye video image by delaying the timing of the read-out of the right-eye video image to that of the left-eye video image (advancing the phase of the right-eye signal) is preset and the video images are displayed, the line of sight from the left-eye to the left-eye video image intersect with the line of sight from the right-eye to the right-eye video image in front of the display screen, so that the cross-point 323 moves in front of the position on picking-up. Therefore, the stereoscopic video image has a higher stereoscopic degree and a lower depth than those of the original stereoscopic video image, so that the stereoscopic video image is viewed as closer image as a whole.

When the offset is preset and left-eye and right-eye video images are displayed, any one of the opposite ends of the right eye and the left-eye video images is not displayed. It suffices to enlarge the video images in the vicinity of the blank areas and display them. At this time, the video images are also enlarged in a vertical direction according to the aspect ratio of the display screen. Specifically, although an area in the vicinity of the left end of the right-eye video image is blanked

**12**

under the offset condition as shown in FIG. 5, the video image of the right-eye video image in the vicinity of the left end thereof is extended until the end reaches the left end of the screen, so that the right-eye video image is displayed. Although an area in the vicinity of the right end of the right-eye video image is blanked under the offset condition as shown in FIG. 6, the video image of the right-eye video image in the vicinity of the right end thereof is extended until the end reaches the right end of the screen, so that right-eye video image is displayed. Natural stereoscopic video image can be displayed without causing any blank area which is offset from the screen by extending the side areas of the offset video image and also extending the side video images in a vertical direction according to the aspect ratio of the screen.

Now, the amount of the offset of the right-eye and left-eye video images will be described.

FIG. 7 shows the relationship between the parallax of the original stereoscopic video image and the stereoscopic image appearing position. In the original stereoscopic video image, the right-eye and left-eye video images are in the positional at the same place as when image picking-up is carried out as shown in FIG. 4. If the stereoscopic image appearing position (the distance between the position at which the stereoscopic view can be viewed and the viewer), the visual range (the distance between the viewer and the display screen), the parallax between the left-eye and right-eye video images which are displayed on the screen and the intereye distance are represented as Cd, Ls, X2 and de (about 65 mm), respectively, the parameters have a relationship which is defined in expression (1) in FIG. 7. The stereoscopic image appearing position Ld can be determined as a function of the parallax X1 by solving the expression (1). The X1 varies depending upon the size of the screen (in proportion to the screen size).

FIG. 8 shows the relationship between the parallax of the right-eye and left-eye video images and the stereoscopic image appearing position when both the right-eye and left-eye images are offset. If the stereoscopic image appearing position (the distance between the position at which the stereoscopic view can be viewed and the viewer), the visual range (the distance between the viewer and the display screen), the offset of the right-eye and left-eye video images, the parallax between the left-eye and right-eye video images which are displayed on the screen and the intereye distance are represented as Cd, Ls, Xo, X1 and de, respectively, the parameters have a relationship which is defined in expression (2) in FIG. 8. In order to obtain the stereoscopic image appearing position Ld which is same as that of the original video image, Ld which is determined by the expression (1) in FIG. 7 is input to expression (2). The offset Xo of the right-eye and left-eye video images is determined.

FIGS. 9 through 13 are views showing the configuration of the stereoscopic video image display device of the present embodiment.

Display means 121 comprises a display device using liquid crystal. As shown in FIGS. 9 through 10, polarization filter units 6a and 6b for the right-eye left-eye 6a and 6b having polarization directions which are at normal angles are disposed on the right and left sides of the light emitting plane of a light source 5. Even if no light emitting element and no polarization filter is used, it suffices to configure the display means so that lights having different polarizations are emitted from different positions. For example, two light emitting elements for emitting lights having different polarization may be provided so that the lights having different polarizations are incident upon a Fresnel lens 3 from different positions.

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

US 7,417,664 B2

13

In the present embodiment, reference numeral 3 denotes a Fresnel lens. The lights which have passed through the filter units 6a, 6b are changed into parallel lights by the Fresnel lens 3 and are incident upon the liquid crystal display element 2. In the present embodiment, the display panel 2a of the liquid crystal display element 2 comprises pixels (L, R) which form first and second video images which are stereoscopically viewed. The pixels L and R are alternately disposed in both lateral and vertical directions to form a checkered pattern. Polarization panels 2b and 2c are applied to the display panel on the sides facing the light source and the viewer, respectively.

In the present embodiment, the liquid crystal display panel comprises two transparent plates (for example, glass plates) between which a liquid crystal is sandwiched. The liquid crystal has an orientation which is twisted at a given angle (for example 90°. Thus, TFT type liquid crystal display panel is formed. Light which is incident upon the liquid crystal display panel is emitted therefrom after the polarization of the incident light is twisted at 90° when no voltage is applied to the liquid crystal. On the other hand, when a voltage is applied to the liquid crystal, the incident light having original polarization is emitted since the twisting of the orientation of the liquid crystal is released.

A checker patterned filter 7 is applied to the side of the display panel facing the light source in the present embodiment.

Therefore, light which has passed through the polarization filter 6 is incident upon the Fresnel lens 3. The Fresnel lens 3 changes the light emitted from the light source in a diffusing manner into substantially parallel light rays, which then pass through the checker patterned filter and are incident upon the liquid crystal display panel.

The light from the checker patterned filter 7 is emitted so that it will not be enlarged in a vertical direction, and is then incident upon the liquid crystal panel 2. In other words, the light which has passed through a predetermined area of the checker patterned filter 7 will pass through a portion of predetermined display unit of the liquid crystal display panel 2.

The lights which were incident upon the liquid crystal display panel and have passed through the right and left polarization filter portions a and b of the polarization filter 6 will be incident upon the Fresnel lens 3 at different angles and are refracted by the Fresnel lens 3 and are emitted from the liquid crystal display panel 2 via right and left different paths.

The checker patterned filter 7 has areas for changing the phases of the light transmitted therethrough, which are spacedly and repeatedly disposed to form a checkered pattern as shown in FIG. 11(1). Specifically, as shown in FIG. 11(2), the light transmitting substrate 171 is provided with areas 7a each on which a half wave length plate 172 having a very small width is placed and areas 7b each on which no half wave length plate 172 is placed. The areas 7a are disposed alternately with areas 7b in a lateral vertical directions. The half wave length plates may be provided on the light source side or display panel side.

In such a manner, the areas 7a which change the phase of the transmitting light by means of half wave length plate 172 and areas 7b which do not change the phase of the transmitting light since no half wave length plate 172 is provided are regularly disposed to form a checkered pattern. The half wave length plates 172 function as plates for shifting the phase of the light transmitting therethrough. The half wave length plates 172 are disposed in such a manner that their optical axes are inclined at 45° relative to the polarization axes of the light transmitted through the right side polarization filter unit a for rotating the polarization axes of the light which has

14

transmitted therethrough by 90°. In other words, the polarization axis of the light which has been transmitted through the left side polarization filter unit b is rotated by 90° so that it is equal to the polarization of the light which has transmitted through the left side polarization filter unit b. The areas 7b having no half wave length plates 172 provided thereon transmit the light which has passed through the left side polarization filter unit b and has the same polarization as that of the polarization plate 2b. The areas 7a having half wave length plates 172 provided thereon rotate the light which has transmitted through the right polarization filter unit a and has a polarization optical axis intersecting with the polarization plate 21 so that its polarization axis is equal to that of the polarization plate 2b.

Repetition of the polarization characteristics of the checkered filter 7 provides polarization of the light transmitting therethrough which is different for each display unit (that is, horizontal line in a lateral direction and vertical line in a vertical direction of the display unit) at the same pitch as the display unit of the liquid crystal display panel 2. The polarization characteristics of the very fine phase shift plate corresponding to each display unit of the liquid crystal display panel 2 in the scanning and subsidiary scanning lines are different, so that the directions of the light emitting from adjacent pixels are different.

In the present invention, repetition of the polarization characteristics of the checker patterned filter 7 may be in such a manner that the polarization characteristics of the checkered filter 7 change for each of a plurality of display units at a pitch of a multiple of that of the display unit of the liquid crystal display panel.

Since it is necessary to impinge light which is different for each of repeated polarization characteristics of the very fine phase shift plate upon the display unit of the liquid crystal display panel 2, the diffusion of light which has transmitted through the checkered filter 7 and impinges upon the liquid crystal panel 2 should be suppressed in a vertical direction.

In other words, the areas 7a which changes the phase of the light passing through the checker patterned filter 7 make the polarization of the light which has transmitted through the right side polarization filter unit a of the polarization filter 6 equal to that which has transmitted through the left side polarization filter unit b. The areas 7b which do not change the phase of the light of the checker patterned filter 7 transmit the light which has transmitted through the left side polarization filter unit b of the polarization filter 6 as it. The light emitted from the checkered filter 7 has the same polarization as that of the light which has transmitted through the left side polarization filter unit b and is incident upon the polarization plate 2b which is provided on the side of the liquid crystal display panel 2 facing the light source.

The polarization plate 2b functions as a second polarization plate and has polarization characteristics which transmits the light having the same polarization as that of the light which has transmitted through the checker patterned filter 7. In other words, the light which has transmitted through the left side polarization filter b of the polarization filter 6 will transmit through the second polarization filter 2c whereas the light which has transmitted through the right side polarization filter unit a of the polarization filter 6 will be subjected to the rotation of the polarization axis by 90° and transmits through second polarization plate 2b. The polarization plate 2c functions as first polarization plate and has polarization characteristics which transmit the light having polarization characteristics which is different from that of the polarization plate 21 by 90°.

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

US 7,417,664 B2

15                                                                16

Such a combination of the checker patterned filters 7 and 8, polarization plate 2b, liquid crystal panel 2a and polarization plate 2c constitute an image display device.

Therefore, in the stereoscopic video image display device of the present invention right and left images are displayed so that they form a checkered pattern on a plane. Since the filter is also disposed on a plane in a checkered pattern, the stereoscopic video image can be displayed without lowering its horizontal and vertical resolution.

As mentioned above, the stereoscopic video image signal generating circuit 101 generates a synthesized stereoscopic video image signal from the input stereoscopic video image signals and supplies the generated stereoscopic video image signal to a drive circuit 102. Screen size information on the size of the display element provided on the display means 121 is output from the display means 121. The screen size information is preset for each display means and is information on the number of dots on the screen in a lateral and vertical directions and the size of the display area which are stored in a storage (memory) provided in the display means. Sight range information on the distance between the video image displayed on the display means 121 and a viewer who views the image is output from the display means 121. The sight range information may be defined depending upon the size of the display area. Position and distance information may be obtained by providing the display means 121 with means for detecting a viewer so that the positional relation between the viewer 90 and the display means 121 is measured by the display means 121.

The screen size information and sight range and positional information output from the display means 121 is input to the display information acquisition means 104 and is converted into data of the type which is required by the stereoscopic video image signal generating circuit 101 and supplied to the circuit 101.

The video image information acquisition means 103 extracts from the stereoscopic video image signal input to the display control circuit 100, adaptable screen size information on the screen size which is suitable for the playback of the stereoscopic video image, adaptable sight range distance information on the distance between the viewer and the display screen which is suitable for the viewer to view it, camera distance information on the distance between the optical axes of the left-eye and right-eye video image cameras and cross-point information on the distance to the intersection of the optical axes of the left-eye and right-eye video image cameras and converts it into data of the type which is required by the stereoscopic video image signal generating circuit 101 and supplies the data to the circuit 101.

A stereoscopic degree adjusting signal is input to the stereoscopic video image signal generating circuit 101 from an entry unit 105. The stereoscopic video image signal generating circuit 101 offsets and displays the right-eye and left-eye video images depending upon the stereoscopic degree which is instructed to the entry unit 105 by a viewer, so that the stereoscopic degree of the stereoscopic video image displayed on the display means 121 can be changed.

The manual entry unit 105 may be switch and/or variable resistor which is actuated by the viewer depending upon user's preferences for changing the operation conditions of the display control circuit. The manual entry unit 105 outputs the above-mentioned screen size changing signal to the display information acquisition means 104 and further outputs the above-mentioned stereoscopic degree adjusting signal to the stereoscopic video image signal generating circuit 101 for adjusting the parallax so that it provides the stereoscopic feeling depending upon the viewer's preference.

The right-eye and left-eye video image signals which reaches the right-eye and left-eye respectively are alternately displayed in a checkered pattern. The offset between the right-eye and left-eye video images is preset by delaying or advancing the timing of the read-out of the right-eye video image from the right-eye from memory 31 by the stereoscopic video image generating circuit 101 to delay or advance the horizontal phase of the right-eye and left-eye video images. Thus, the stereoscopic degree is adjusted by adjusting the parallax between the eyes.

Now, a case when the position of a viewer is changed will be described.

The position information is detected by the viewer position detecting means 122. Then this information is acquired by the display information acquisition means 104. The offset is calculated by the offset presetting means 105. The display means 102 is driven by the drive circuit 102 so that the video images can be normally viewed depending upon the distance of the viewer and his or her position in a lateral direction.

Another embodiment of the present invention will be described. FIG. 13 show another embodiment in which the light source 5 of the liquid crystal display device is changed. In the embodiment shown in FIG. 13, a plurality of white LEDs 301 are juxtaposed in a horizontal direction. The liquid crystal display device comprises two column of left and right LED arrays 351U, 351D, an image display means (liquid crystal display plate) 354, and two polarizing elements 354 corresponding to the LED arrays 351U, 351D having a polarization direction which is normal to the Fresnel lens 63 which functions as a convex lens.

Lighting of the LED array 351 is controlled by LED control means 353 provided on the display control circuit 100. The LEDs which are lit and are not lit are represented as ● and ○, respectively in FIG. 13.

In the present embodiment, there is provided with viewer's position determining means 122 which measures the displacement d1 of the viewer 70 from the optical axis of the image display means 52 and the distance d2 between the viewer and the image display device 252 for generating a measurement signal. In the present embodiment, the viewer's position determining means 122 may be ultrasonic type sensor, ultra-red ray type sensor or any other means if it is suitable.

An LED control means 353 controls the lighting portions 374, 373 of the white LED1 of the LED array 351 to light them. The LED control means 353 is capable of moving the lighting position of the LED array 351 at a high speed as represented by an arrow D in response to the movement of the viewer as represented by an arrow d so that natural stereoscopic images can be always displayed.

Since no mechanical operation is accompanied by the control of the light source of the image display device, high speed and high precision operation is enabled and the image display device has a high durability and the configuration of control mechanism of the servo-control can be simplified.

If the number and positions of viewers relative to the image display device is measured and output by the position determining means 122 and lighting of the LED array 351 is controlled by the LED control means 353, appropriate stereoscopic image can be displayed for the viewers who are positioned in different positions.

In the embodiment shown in FIG. 13, the LED array 351 of the light source 5 comprises upper and lower arrays 351U and 351D. Right and left polarization filters 354 corresponding to the upper and lower arrays 351U and 351D are disposed in positions corresponding to each white LED 301 of the upper and lower arrays 351U and 351D, respectively. The polariza-

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

US 7,417,664 B2

17 18

tion filter 354 comprise polarization filters 354U and 354D through which the light from the upper and lower arrays 351U and 351D of the LED array passes. The polarization filters 354U, 354D comprises polarization filters having polarization directions which intersect at right angles.

Now, a case in which there is one viewer will be described.

The position of the viewer 70 is determined by the above-mentioned viewer position detecting means 122 and the lighting position 374 of the upper and lower LED arrays 354U and 354D are lit for displaying the stereoscopic image for the viewer. The lighting position is moved using the viewer's position detecting means which has been described in the foregoing embodiment, so that the stereoscopic image can be displayed depending upon the position of the viewer 70.

Now, a case in which there are a plurality of viewers, for example, two viewers 70, 71 will be described. At this time, LED control means 353 receives a signal from the viewer's position detection means 122 to preset two lighting positions 373, 374 on two LED arrays 351, so that these lighting areas are alternately lit at a high speed. Accordingly, LED1 other than those at lighting areas 373, 374 is not lit at one time and any one of the lighting areas 373 and 374 is lit at other times.

Accordingly, unwanted afterimage and interference of images can be eliminated and power consumption can be reduced by carrying out the blinking control so that the white LED 1 is turned off for the period of the synchronization signal and blanking period of the image display means 52. Furthermore, an image having a wide visual field angle can be obtained using a small number of LEDs in planar image display device together with a Fresnel lens and limited light source.

Since the right and left LEDs are disposed so that they are divided into upper and lower arrays in the present embodiment, the spacing between LEDs for display of the right and left areas is made larger so that interference of light from each LED is reduced, cross-talk between right and left images which gives an adverse influence upon the stereoscopic image is reduced.

INDUSTRIAL UTILIZATION

An invention as set forth in Claim 1 resides in a stereoscopic video image pick-up and display system comprising a stereoscopic video image pick-up device including two video image pick-up means for outputting video information from said pick-up means; a stereoscopic video image display device for displaying different video images for the eyes of a viewer; and

a medium for transmitting said video image information from said stereoscopic video image pick-up device to said stereoscopic video image display device, in which said stereoscopic video image pick-up device includes cross-point measuring means for measuring CP information on the cross-point (CP) of optical axes of said pick-up means and outputs information including the CP information and video image information to said medium; and

in which said stereoscopic video image display device includes offset presetting means for offsetting and displaying said different video images based upon said video image information, said cross-point information and information on the size of the image which is displayed by said stereoscopic video image display device.

In accordance with the present invention, a stereoscopic video image can be obtained which is adjusted to provide an optimal stereoscopic degree (depth) depending upon the stereoscopic video image pick-up and display system.

An invention as set forth in Claim 2 resides in a stereoscopic video image display system as defined in Claim 1 wherein said stereoscopic video image display device includes viewer's position information measuring means for measuring information on the position of a viewer relative to a display screen, and further includes offset presetting means for offsetting and displaying said different video images based upon said video image information, said cross-point information, information on the size of the image which is displayed by said stereoscopic video image display device and the information on the position of the viewer.

In accordance with the present invention, a stereoscopic video image having an optimal stereoscopic degree (depth) corresponding to the positions of the stereoscopic video image pick-up and display system and the viewer can be obtained.

An invention as set forth in Claim 3 resides in a stereoscopic video image pick-up and display system as defined in Claim 1 or 2 in which said cross-point measuring means calculates the cross-point position based upon the angle of the intersection of the optical axes in said two pick-up means.

In accordance with the present invention, the distance between two image pick-up means can be measured based upon triangulation techniques and the distance between the pick-up means and the cross-point and object (scene) can be measured based upon the value of the angle at the intersection between the optical axes of said image pick-up means. The distance between two objects can be also measured.

An invention as set forth in Claim 4 resides in a stereoscopic video image pick-up and display system as defined in Claim 1 or 2 in which said cross-point measuring means calculates the cross-point based upon the position of picking-up of an object in said two pick-up means which are disposed in a parallel relationship.

In accordance with the present invention, the distance between two image pick-up means can be measured based upon triangulation techniques and the distance between the pick-up means and the cross-point and object (scene) can be measured based upon the value of the angle at the intersection between the optical axes of said image pick-up means. The distance between two objects can be also measured.

An invention as set forth in Claim 5 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 4 in which said stereoscopic video image pick-up device is adapted to feed out information on the depth of the areas, the image of which is picked-up in a depth direction and said stereoscopic video image display device includes offset presetting means for offsetting and displaying said different video images based upon said video image information, said cross-point information, information on the size of the image which is displayed by said stereoscopic video image display device and the information on the position of the viewer.

In accordance with the present invention, more appropriate stereoscopic video image display can be carried out since the display means can obtain more exact information on image pick-up conditions.

An invention as set forth in Claim 6 resides in a stereoscopic video image pick-up and display system as defined in Claim 2 in which said viewer's position detecting means is disposed integrally with the main body of said stereoscopic video image pick-up and display system.

In accordance with the present invention, it is not necessary to separately provide the viewer's position detecting means in addition to the main body of the stereoscopic video image pick-up and display system.

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4958

US 7,417,664 B2

19

An invention as set forth in Claim 7 resides in a stereoscopic video image pick-up and display system as defined in Claim 2 in which said viewer's position detecting means is disposed in a position remote from the main body of said stereoscopic video image pick-up and display system.

In accordance with the present invention, the viewer's position detecting means can be disposed in an appropriate position to detect the position of the viewer, so that the position of the viewer can be accurately detected.

An invention as set forth in Claim 8 resides in a stereoscopic video image pick-up and display system as defined in Claim 6 or 7 in which said viewer's position detecting means includes an ultrasonic wave transmitter and ultrasonic wave receiver.

In accordance with the present invention, the detection of a viewer is not liable to be influenced by the peripheral noise in comparison with that using ultra-red means, so that accurate detection can be achieved.

An invention as set forth in Claim 9 resides in a stereoscopic video image pick-up and display system as defined in Claim 6 or 7 in which said viewer's position detecting means detects the position based upon the picked-up image of the viewer.

In accordance with the present invention, the detection of a viewer is not liable to be influenced by the peripheral noise in comparison with that using ultra-red means, so that accurate detection can be achieved.

An invention as set forth in Claim 10 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 9 in which said offset presetting means presets the offset of the right-eye and left-eye video images based upon the information input to said input means for adjusting the stereoscopic feeling of the image which is displayed by said display means.

In accordance with the present invention, the stereoscopic video image having a stereoscopic degree (depth) which is adjusted to meet the viewer's preferences can be obtained.

An invention as set forth in Claim 11 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 10 in which said system includes a memory for the left-eye video image for storing a left-eye video image and a memory for the right-eye video image for storing a right-eye video image, said offset presetting means includes timing control means for controlling the timing of the read-out of video image data from said frame memory for left-eye video image and/or said frame memory for right-eye video image; and

said timing control means presets the offset of said left-eye video image and right-eye video image by advancing or delaying the timing of the read-out of the video image data from one of said frame memories for left-eye and right-eye video images relative to the timing of the read-out of the video image data from the other of said from memories for the left-eye and right-eye video images.

In accordance with the present invention, an offset of the right-eye and left-eye video images can be preset by a simple circuit.

An invention as set forth in Claim 12 resides in a stereoscopic video image pick-up and display system as defined in any one of Claims 1 through 11 in which said system comprises a stereoscopic video image frame memory for storing the stereoscopic video image therein, and signal switching means for switching between the left-eye video image data read-out from said frame memory for the left-eye video image and right-eye video image read-out from said from memory

20

for said right-eye video image to input the data to said frame memory for the stereoscopic video image.

In accordance with the present invention, video image in which the offset of the right-eye and left-eye video images is preset can be synthesized and be stored in the frame memory.

An invention as set forth in Claim 13 resides in a stereoscopic video image pick-up and display system as defined in any of Claim 1 through 12 in which the offset of said left-eye and right-eye video images is preset by advancing or delaying the horizontal phase of said left-eye and right-eye video images.

In accordance with the present invention, presetting of the offset of the right-eye and left-eye video images can be easily controlled.

An invention as set forth in Claim 14 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 13 in which an area of one or both of said left-eye and right-eye video image in the vicinity of its lateral edge is enlarged in a horizontal and vertical directions so that it fills a blank area which is caused by the presetting of the offset of said left-eye and right-eye video images.

In accordance with the present invention, display causing no blank area even if the right-eye and left-eye video images are shifted and displayed, and which gives quite normal feeling can be achieved.

An invention as set forth in Claim 15 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 14 in which said display means includes video image display means for displaying a video image with transmitted light and a light source device, said light source device comprising an LED array in which white LEDs or RGB LEDs are integrally arrayed, said offset presetting means including LED control means for controlling the lighting of said white LEDs or RGB LEDs of said LED array based upon said offset.

In accordance with the present invention, lighting of the light source can be freely achieved by the control of the LED control means and power consumption can be reduced since white LEDs or RBG LEDs having less power consumption and high switching speed are used as the light source.

An invention as set forth in Claim 16 resides in a stereoscopic video image pick-up and display system as defined in Claim 15 in which said LED control means of said offset presetting means controls the lighting of said white LEDs or RGB LEDs based upon said viewer's position information so that the video image which is viewed by a viewer is maintained.

In accordance with the present invention, an appropriate video image can be displayed even if the viewer moves or viewers are in a plurality of different positions.

An invention as set forth in Claim 17 resides in a stereoscopic video image pick-up and display system as defined in Claim 15 in which each LED array which is provided at upper and lower areas of said light source device forms a right-eye video image display unit and left-eye video image display unit.

In accordance with the present invention, contort of display of stereoscopic video image can be achieved at a high freedom degree by controlling the lighting of the right-eye video image display unit and left-eye video image display unit of the LED array by the LED control means.

An invention as set forth in Claim 18 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 17 which is adapted to a display system of portable digital assistant (PDA).

In accordance with the present invention, the display of the portable digital assistant can be made stereoscopic.

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4959

US 7,417,664 B2

21

An invention as set forth in Claim 19 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 17 which is adapted to a display system of mobile communication terminal.

In accordance with the present invention, the display of mobile communication terminal can be made stereoscopic.

An invention as set forth in Claim 20 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 17 which is adapted to a terminal of car navigation system.

In accordance with the present invention, the display of car navigation system can be made stereoscopic.

An invention as set forth in Claim 21 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 17 through 20 in which said video image information and CP information is communicated between said terminal devices.

In accordance with the present invention, stereoscopic video image information can be communicated between terminal devices, so that the same video image information can be shared.

An invention as set forth in Claim 22 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 21 in which said medium is a communication medium.

In accordance with the present invention, a stereoscopic video image can be displayed even if both the stereoscopic video image pick-up device and stereoscopic video image display device are in the same position, and even if both devices are remote. The communication medium may include wireless communication, wired communication and optical communication.

An invention as set forth in Claim 23 resides in a stereoscopic video image pick-up and display system as defined in any of Claims 1 through 21 in which said medium is a communication medium.

In accordance with the present invention, stereoscopic video image information which is picked-up by the stereoscopic video image pick-up device can be stored and reproduced by the stereoscopic video image display device. The communication medium may include wireless communication, wired communication and optical communication.

What is claimed is:

1. A stereoscopic video image pick-up and display system comprising:

a stereoscopic video image pick-up device including two video image pick-up means for outputting video information from said pick-up means;

a stereoscopic video image display device for displaying different video images for the eyes of a viewer; and

a medium for transmitting video image information from said stereoscopic video image pick-up device to said stereoscopic video image display device,

in which said stereoscopic video image pick-up device includes cross-point measuring means for measuring CP information on the cross-point (CP) of optical axes of said pick-up means and outputs information including the CP information and video image information to said medium; and

in which said stereoscopic video image display device includes offset presetting means for offsetting and displaying said different video images based upon said video image information, said cross-point information and information on the size of the image which is displayed by said stereoscopic video image display device.

2. A stereoscopic video image display system as defined in claim 1 wherein said stereoscopic video image display device

22

includes viewer's position information measuring means for measuring information on the position of a viewer relative to a display screen, and further includes offset presetting means for offsetting and displaying said different video images based upon said video image information, said cross-point information, information on the size of the image which is displayed by said stereoscopic video image display device and the information on the position of the viewer.

3. A stereoscopic video image pick-up and display system as defined in claim 2 in which a viewer's position detecting means is disposed integrally with the main body of said stereoscopic video image pick-up and display system.

4. A stereoscopic video image pick-up and display system as defined in claim 3 in which a viewer's position detecting means includes an ultrasonic wave transmitter and ultrasonic wave receiver.

5. A stereoscopic video image pick-up and display system as defined in claim 3 in which a viewer's position detecting means detects the position based upon the picked-up image of the viewer.

6. A stereoscopic video image pick-up and display system as defined in claim 2 in which a viewer's position detecting means is disposed in a position remote from the main body of said stereoscopic video image pick-up and display system.

7. A stereoscopic video image pick-up and display system as defined in claim 1 in which said cross-point measuring means calculates the cross-point position based upon the angle of the intersection of the optical axes in said two pick-up means.

8. A stereoscopic video image pick-up and display system as defined in claim 1 in which said cross-point measuring means calculates the cross-point based upon the position of picking-up of an object in said two pick-up means which are disposed in a parallel relationship.

9. A stereoscopic video image pick-up and display system as defined in claim 1 in which said stereoscopic video image pick-up device is adapted to feed out information on the depth of an area, the image of which is picked-up in a depth direction and

said stereoscopic video image display device includes offset presetting means for offsetting and displaying said different video images based upon said video image information, said cross-point information, information on the size of the image which is displayed by said stereoscopic video image display device and the information on the position of the viewer.

10. A stereoscopic video image pick-up and display system as defined in claim 1 in which said offset presetting means presets the offset of the right-eye and left-eye video images based upon the information input to a input means for adjusting the stereoscopic feeling of the image which is displayed by a display means.

11. A stereoscopic video image pick-up and display system as defined in claim 1 in which said system includes a memory for the left-eye video image for storing a left-eye video image and a memory for the right-eye video image for storing a right-eye video image,

said offset presetting means includes timing control means for controlling the timing of the read-out of video image data from a frame memory for left-eye video image and/or a frame memory for right-eye video image; and

said timing control means presets the offset of said left-eye video image and right-eye video image by advancing or delaying the timing of the read-out of the video image data from one of said frame memories for left-eye and right-eye video images relative to the timing of the read-

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4960

US 7,417,664 B2

23

out of the video image data from the other of said from memories for the left-eye and right-eye video images.

**12.** A stereoscopic video image pick-up and display system as defined in claim **1** in which said system comprises a stereoscopic video image frame memory for storing the stereoscopic video image therein, and

signal switching means for switching between left-eye video image data read-out from said frame memory for the left-eye video image and right-eye video image read-out from said frame memory for said right-eye video image to input the data to said frame memory for the stereoscopic video image.

**13.** A stereoscopic video image pick-up and display system as defined in claim **1** in which the offset of said left-eye and right-eye video images is preset by advancing or delaying the horizontal phase of said left-eye and right-eye images.

**14.** A stereoscopic video image pick-up and display system as defined in claim **1** in which an area of one or both of left-eye and right-eye video image in the vicinity of its lateral edge is enlarged in a horizontal and vertical directions so that it fills a blank area which is caused by the presetting of the offset of said left-eye and right-eye video images.

**15.** A stereoscopic video image pick-up and display system as defined in claim **1** in which a display means includes video image display means for displaying a video image with transmitted light and a light source device, said light source device comprising an LED array in which white LEDs or RGB LEDs are integrally arrayed, said offset presetting means including LED control means for controlling the lighting of said white LEDs or RGB LEDs of said LED array based upon said offset.

24

**16.** A stereoscopic video image pick-up and display system as defined in claim **15** in which said LED control means of said offset presetting means controls the lighting of said white LEDs or RGB LEDs based upon a viewer's position information so that the video image which is viewed by a viewer is maintained.

**17.** A stereoscopic video image pick-up and display system as defined in claim **15** in which each LED array which is provided at upper and lower areas of said light source device forms a right-eye video image display unit and left-eye video image display unit.

**18.** A stereoscopic video image pick-up and display system as defined in claim **17** in which said video image information and CP information is communicated between terminal devices.

**19.** A stereoscopic video image pick-up and display system as defined in claim **1** which is adapted to a display system of portable digital assistant (PDA).

**20.** A stereoscopic video image pick-up and display system as defined in claim **1** which is adapted to a display system of mobile communication terminal.

**21.** A stereoscopic video image pick-up and display system as defined in claim **1** which is adapted to a terminal of car navigation system.

**22.** A stereoscopic video image pick-up and display system as defined in claim **1** in which said medium is a communication medium.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 09/13/2011

A4961

# CERTIFICATE OF SERVICE

I, James S. Blank, counsel for Appellants and a member of the Bar of this

Court, certify that, on March 17, 2014, I caused a copy of the Brief for Defendants-

Appellants to be served on the following counsel by the Court's ECF system:

> Kenneth L. Stein
> Ian G. DiBernardo
> Joseph Diamante
> STROOCK & STROOCK & LAVAN LLP
> 180 Maiden Lane
> New York, NY 10038

I further certify that all parties required to be served have been served.

Dated: March 17, 2014            _____*/s/ James S. Blank*_____
                                 James S. Blank
                                 *Attorney for Appellants*
                                 *Nintendo Co., Ltd. and*
                                 *Nintendo of America Inc.*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 13,803 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.


Dated:  March 17, 2014                            _____*/s/ James S. Blank*_____
                                                 James S. Blank
                                                 *Attorney for Appellants*
                                                 *Nintendo Co., Ltd. and*
                                                 *Nintendo of America Inc.*